# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## 2014-1196, -1197, -1198, -1199, -1200

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

THE NEW YORK TIMES COMPANY,

*Defendant-Appellee*,

and

J.C. PENNEY CORPORATION, INC.,

*Defendant*,

and

G4 MEDIA, LLC, THE BON-TON STORES, INC.,
BRAVO MEDIA LLC, and CBS CORPORATION,

*Third Party Defendants*.

─────────────

2014-1196

─────────────

Appeal from the United States District Court for the
Northern District of Illinois in No. 1:10-cv-04387, Judge John W. Darrah

(caption continued on next page)

## BRIEF FOR PLAINTIFF-APPELLANT
## HELFERICH PATENT LICENSING, LLC

Victoria Curtin
VICTORIA GRUVER CURTIN, P.L.C.
14555 N. Scottsdale Road, Suite 160
Scottsdale, Arizona 85254
(480) 998-3547

Aaron M. Panner
Brendan J. Crimmins
Michael E. Joffe
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

April 7, 2014

(202) 326-7900

*Counsel for Plaintiff-Appellant Helferich Patent Licensing, LLC*

(additional counsel listed on inside cover)

Steven G. Lisa
Jon E. Kappes
Law Offices of Steven G. Lisa, Ltd.
55 West Monroe Street, Suite 3210
Chicago, Illinois 60603
(312) 752-4357

Gerald D. Hosier
Law Offices of Gerald D. Hosier,
  Ltd.
PO Box 12354
Aspen, Colorado 81612
(970) 920-3475

*Counsel for Plaintiff-Appellant Helferich Patent Licensing, LLC*

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

G4 MEDIA, LLC,

*Defendant-Appellee*.

_____

2014-1197

_____

Appeal from the United States District Court for the
Northern District of Illinois in No. 1:11-cv-07395, Judge John W. Darrah

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

CBS CORPORATION,

*Defendant-Appellee*.

_____

2014-1198

_____

Appeal from the United States District Court for the
Northern District of Illinois in No. 1:11-cv-07607, Judge John W. Darrah

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

BRAVO MEDIA LLC,

*Defendant-Appellee*.

_____

2014-1199

_____

Appeal from the United States District Court for the
Northern District of Illinois in No. 1:11-cv-07647, Judge John W. Darrah

(caption continued on next page)

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

J.C. PENNEY CORPORATION, INC.,

*Defendant-Appellee*.

———————————

2014-1200

———————————

Appeal from the United States District Court for the
Northern District of Illinois in No. 1:11-cv-09143, Judge John W. Darrah

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Helferich Patent Licensing, LLC certifies the following:

1.     The full name of every party represented by the undersigned counsel in this matter is:

Helferich Patent Licensing, LLC.

2.     The real party in interest (if the party named in the caption is not the real party in interest) represented by the undersigned counsel in this matter is:

Not applicable.

3.     All parent corporations and any publicly held companies that own 10% or more of the stock of the party represented by the undersigned counsel in this matter are:

None.

4.     The names of all law firms and the partners or associates that appeared for the party now represented by the undersigned counsel in the trial court or agency or are expected to appear in this court are:

Law Offices of Steven G. Lisa, Ltd.:  Steven G. Lisa, Donald J. Lisa, James D. Busch, Jon E. Kappes, Justin J. Lesko, Mildred Park (terminated), Timothy D. Sperling (terminated);

Victoria Gruver Curtin, P.L.C.:  Victoria G. Curtin;

Law Offices of Gerald D. Hosier, Ltd.:  Gerald D. Hosier;

Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.:  Aaron M. Panner,
Michael E. Joffre, Brendan J. Crimmins.


April 7, 2014

/s/ *Aaron M. Panner*
Aaron M. Panner
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ..................................................................v

STATEMENT OF RELATED CASES ............................................... viii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUE.............................................................2

STATEMENT OF THE CASE...............................................................3

    A.    The Helferich Inventions and Patents ...................................3

    B.    HPL's Licenses.....................................................................14

    C.    Proceedings in the District Court .......................................17

        1.    The district court's summary judgment ruling .........18

        2.    The district court's order amending the judgment...................20

SUMMARY OF ARGUMENT ............................................................21

ARGUMENT .....................................................................................24

THE DISTRICT COURT ERRED IN HOLDING HPL'S CLAIMS BARRED BY THE DOCTRINE OF PATENT EXHAUSTION ...........................24

    A.    Patent Exhaustion Does Not Apply Because Enforcement of HPL's Content Claims Against Content Providers Does Not Restrict Purchasers' Rights To Use Their Handsets ...........................24

    B.    Exhaustion Does Not Apply Because Handsets Do Not "Substantially Embody" the Content Claims......................................36

    C.    The Policy Underlying the Exhaustion Doctrine Does Not Support Applying that Doctrine Here .................................44

D.    The District Court's Statements That Exhaustion Should Apply "Patent-by-Patent" Are Beside the Point and Incorrect ...................... 46

E.    Restrictions in HPL's Handset Licenses Confirm That Exhaustion Does Not Apply ............................................................ 50

CONCLUSION ...................................................................................................... 55

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

## CASES

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307
(Fed. Cir. 2007) ........................................................... 37

*Adams v. Burke*, 84 U.S. (17 Wall.) 453 (1873) ..................................... 25

*Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368
(Fed. Cir. 2011) ....................................................... 9, 28

*Aiken v. Manchester Print Works*, 1 F. Cas. 245 (C.C.D.N.H. 1865) .............. 30, 44

*Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301
(Fed. Cir. 2012), *cert. granted*, 134 S. Ct. 895 (2014) .................... 6

*AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320
(Fed. Cir. 2007) ........................................................... 34

*Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336
(1961) .................................................................. 26, 54

*Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340 (1863) ............................... 45

*Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*, 592 F.3d 1340
(Fed. Cir. 2010) ........................................................... 29

*Bowman v. Monsanto Co.*, 133 S. Ct. 1761 (2013) ....................... 22, 24, 25, 45

*C. & R. Research Corp. v. Write, Inc.*, 19 F.2d 380 (D. Del. 1927) ............... 31

*CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524
(7th Cir. 2014) ........................................................... 25

*Endo Pharm. Inc. v. Actavis, Inc.*, --- F.3d ---, 2014 WL 1272846,
(Fed. Cir. Mar. 31, 2014) ................................................. 51

*Ethyl Gasoline Corp. v. United States*, 309 U.S. 436 (1940) .................... 52

*ExcelStor Tech., Inc. v. Papst Licensing GMBH & Co. KG*,
   541 F.3d 1373 (Fed. Cir. 2008) ....................................................46

*General Talking Pictures Corp. v. Western Elec. Co.*:

   304 U.S. 175 (1938)..........................................................51, 52, 53

   305 U.S. 124 (1938)..........................................................51, 52, 53

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131
   (Fed. Cir. 2004)...........................................................................29, 36

*Hunt v. Armour & Co.*, 185 F.2d 722 (7th Cir. 1950) ...........................31

*Jones v. Hardy*, 727 F.2d 1524 (Fed. Cir. 1984) ...............................26, 48

*Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370
   (Fed. Cir. 2013)...........................................................25, 31, 32, 33,
                                                                               37, 38, 49, 50

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
   734 F.3d 1361 (Fed. Cir. 2013) ..................................... 22, 26, 29, 32, 33, 37,
                                                                               38, 39, 40, 44, 48, 50

*Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.*,
   152 U.S. 425 (1894).....................................................29, 30, 31, 44

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
   243 U.S. 502 (1917).....................................................................26

*Princo Corp. v. International Trade Comm'n*, 616 F.3d 1318
   (Fed. Cir. 2010)............................................................................53

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
   553 U.S. 617 (2008)....................................... 2, 18, 22, 25, 37, 38,
                                                                               46, 47, 48, 49, 51, 52

*SiRF Tech., Inc. v. International Trade Comm'n*, 601 F.3d 1319
   (Fed. Cir. 2010)..............................................................................9

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292
   (Fed. Cir. 2002).............................................................................38

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) ....................9

*United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21
    (1st Cir. 2009)..................................................................................45

*United States v. Univis Lens Co.*, 316 U.S. 241 (1942)....................................25, 48

## STATUTES, REGULATIONS, AND RULES

28 U.S.C. § 1295(a)(1) ..........................................................................................2

28 U.S.C. § 1331 ...................................................................................................1

28 U.S.C. § 1338(a) ..............................................................................................1

35 U.S.C. § 112 (2006) ........................................................................................26

35 U.S.C. § 121 ...................................................................................................14

37 C.F.R. § 1.72(b) ..............................................................................................42

Fed. R. Civ. P. 54(b) .......................................................................................1, 20

Fed. R. Civ. P. 59(e)........................................................................................1, 20

## OTHER MATERIALS

Julie E. Cohen & Mark A. Lemley, *Patent Scope and Innovation in
    the Software Industry*, 89 Cal. L. Rev. 1 (2001) ............................... 25, 44-45

Mark A. Lemley et al., *Divided Infringement Claims*, 6 Sedona
    Conf. J. 117 (2005) ........................................................................................6

U.S. Patent No. 7,376,432 (issued May 20, 2008) ...........................................11, 12

U.S. Patent No. 8,355,702 (issued Jan. 15, 2013) .................................................43

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Plaintiff-Appellant states that no other appeal in these civil actions was previously before this Court or any other appellate court.  Counsel is aware of no case pending in this Court or any other court that will directly affect or be directly affected by this Court's decision in these consolidated appeals.

## JURISDICTIONAL STATEMENT

Helferich Patent Licensing, LLC ("HPL") filed separate civil actions against each of the Defendants in the district court, alleging that Defendants infringed multiple HPL patents. Each Defendant filed counterclaims seeking declaratory judgments of non-infringement and invalidity. The district court's jurisdiction was based on 28 U.S.C. §§ 1331 and 1338(a).

On August 14, 2013, the district court granted Defendants' joint motion for summary judgment of non-infringement based on patent exhaustion and denied HPL's cross-motion for summary judgment on Defendants' patent exhaustion defense. A1-15; A16-20. Although the district court entered judgments that same day, A21-25, it had not yet resolved all claims against all parties. On September 11 and 17, 2013, the district court entered orders granting Defendants' motions to dismiss their counterclaims without prejudice. A26-27; A28-29.

On September 9, 2013, HPL timely filed a motion for reconsideration or to alter or amend the judgment under Rule 54(b) and Rule 59(e). A329 (DN 314); *see also* Fed. R. Civ. P. 59(e) ("A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."). On December 4, 2013, the district court entered an order granting in part and denying in part HPL's motion for reconsideration or to alter or amend the judgment. A30-33. In that order, the district court clarified that its August 14 summary judgment order

applied to every patent in the cases.  A30, A33.  The court explained that "[t]his clarification, together with the Order entered on September 11, 2013, conditionally dismissing Defendants' counterclaims without prejudice, results in a final, appealable judgment."  A30-31.  The court further stated that, "[a]ccordingly, [HPL's] Motion is properly considered under Fed. R. Civ. P. 59(e)."  A31.

On December 31, 2013, HPL timely filed notices of appeal.  A3000-01; A3003-04; A3006-07; A3009-10; A3012-13.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUE

Whether, under the doctrine of patent exhaustion, the sale of an article bars a claim of direct infringement against a defendant when (1) the defendant is not the purchaser or lawful possessor of the article, the defendant does not use the article in practicing the asserted patent claims, and the patent owner does not seek to restrict the use of the article by a purchaser or lawful possessor; (2) the article does not "embody" the asserted patent claims within the meaning of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008); and (3) the license under which the article was manufactured and sold did not authorize the manufacturer to practice the asserted patent claims.

**STATEMENT OF THE CASE**

**A.    The Helferich Inventions and Patents**

1.      In the mid-1990s, Richard Helferich was working on technology for electronic pagers, devices that alerted users upon receipt of a telephone call or message.  He recognized that contemporary pagers and paging systems had several limitations and sought to develop a new system for mobile communication that overcame them.  A95 (1:43-2:67).  Mr. Helferich observed that, while mobile devices have a limited amount of memory, and paging systems and wireless networks have limited capacity, users wanted to be able to receive ever greater amounts of content on their devices.  A95 (1:43-2:14); *see also* A95 (1:62-65) ("In addition to the demand on paging receiver memory, paging systems will be challenged as greater numbers of pages are being transmitted and as the size of the transmitted messages increases.").  For example, a content provider may want to be able to send large content files (such as songs or voice mail messages) to a user's mobile device.  A103 (18:20-24).  But transmitting a large file may unnecessarily burden the network and use up the mobile device's memory, particularly when some recipients may not want to access or download the content.  A104 (19:7-8).  Mr. Helferich recognized that "[t]he future of paging systems is therefore tied to the ability of the paging systems to control the number and size of the data

3

transmissions and to provide additional features without sacrificing the quality of service to the user." A95 (2:11-14).

One of Mr. Helferich's solutions to the capacity problem was to give content providers the capability of transmitting to mobile devices an identifier of remotely stored content rather than the full content itself. A96 (3:4-7), A103 (17:62-18:1) ("A paging system notifies a paging transceiver that a message has been received but does not initially transmit the associated message. . . . The message information includes information identifying the message . . . .").[1] In addition to an identifier of the content, a content provider might send additional information to help the user decide whether he or she is interested in and wishes to request the remotely stored content, such as "message type, length, priority, and additional descriptive material [that] may be displayed or otherwise indicated to the user." A103 (18:44-49). Mr. Helferich also recognized that the content provider could update the content – for example, a weather report – without sending another page or notification to the user so that, if the user requests the content some time after receiving the original notification, she nevertheless receives the most current information. A102 (16:9-19). Mr. Helferich incorporated the ideas for his new

---

[1] The specification sometimes refers to the stored content as the "message" (such as a voice mail message), A98 (7:28-30), A102 (15:48-53), as distinguished from the page or other short notification message that lets the user know that content is available for retrieval.

communication system in a patent specification that has resulted in numerous patents and claims (issued in jurisdictions around the world) defining multiple inventions.  *E.g.*, A95-104.[2]

**2.a.**    As most relevant here, Mr. Helferich's patent claims cover two different categories of inventions.  One set of claims – referred to as the content inventions or the content claims – covers activities of providers of content, as well as content storage systems (e.g., servers) used by content providers.  The inventions covered by the content claims enable providers of content to store, identify, manage, and update content efficiently, and to make that content available by request for delivery to mobile wireless handsets.  HPL asserted in the district court that Defendants infringe various types of content inventions.  A2235-53 (¶¶ 17-22) (discussing language of exemplary claims).

An example of the content inventions is claim 1 of the '450 patent.  That claim relates to a method for notifying users of the availability of content without

---

[2] Seven of Mr. Helferich's patents are at issue in these cases:  U.S. Patent Nos. 7,155,241; 7,280,838; 7,499,716; 7,835,757; 8,107,601; 8,166,741; and 8,134,450.  *See* A527-28 (¶¶ 6-11) (NYT 3d Am. Compl.:  '838, '716, '757, '601, '741, and '450 patents); A792-93 (¶¶ 5-11) (Bravo Am. Compl.:  '838, '716, '757, '601, '741, '450, and '241 patents); A695-96 (¶¶ 5-11) (CBS Am. Compl.:  '838, '716, '757, '601, '741, and '241 patents); A612-13 (¶¶ 6-11) (G4 Am. Compl.:  '838, '716, '757, '601, '741, and '450 patents); A501-02 (¶¶ 5-10) (J.C. Penney 2d Am. Compl.:  '838, '716, '757, '601, '741, and '450 patents).

initially transmitting the content itself, as well as for limiting the time that the

content is available by making it inaccessible after a period of time:

> 1.  A method of providing content to a cell phone comprising:

> **a content provider** causing the content to be stored in an internet
> accessible storage unit;

> **the content provider** initiating a page to a content subscriber, the
> page including a notification that: (i) identifies the content, and
> (ii) includes an address of a system to be contacted to trigger retrieval
> of the content, but does not include the content; wherein the page
> indicates that the content is available for a specified time; and

> **the content provider** causing the content identified by the
> notification to become inaccessible at the internet accessible storage
> unit after the specified time identified by the initiated page.

A294-95 (emphases added).

As shown in the emphases, each step of the claimed method is performed

solely by a content provider.[3]  The content provider stores the content at a location

on the internet, initiates a page or notification to a user or "content subscriber" that

identifies the content and includes an address of a system to be contacted to trigger

retrieval of the content, and causes the content to become inaccessible after the

---

[3] As this Court has held, a method claim is directly infringed only when a
single actor performs all the steps of the method either directly or vicariously.  *See
Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1307 (Fed. Cir.
2012) (en banc) (per curiam), *cert. granted*, 134 S. Ct. 895 (2014).  For that reason,
method claims are appropriately drafted from the point of view of a single actor, as
the claims at issue here are.  *See* Mark A. Lemley et al., *Divided Infringement
Claims*, 6 Sedona Conf. J. 117, 124 (2005).

time specified by the content provider in the page.  A294.  No step of the claimed method is performed by the user of a wireless handset.  *See id.*; A2236-39 (¶ 18).  The method defined by this claim does not even require the page to be received by a wireless handset:  after the specified time, the content becomes inaccessible regardless of whether the page is received by the handset.  A294; A2237-38 (¶ 18(b)).  Among other things, this invention helps content providers manage content and memory at their servers (by deleting outdated content).

An example of a different content invention is claim 1 of the '757 patent, which claims a method for dynamically updating content.  A176.  This invention teaches content providers to notify users of the availability of content (for example, a weather forecast, stock price, or "comment" blog) and then to update that content without sending a new notification to the user, so that if the user later chooses to retrieve the content, she always receives the latest version using the original identifier.  This invention saves content providers the expense of creating and sending a new page every time content is updated.  The claim language states:

> 1.  A method that communicates content from a content provider utilizing a content notification system, through a mobile radiotelephone network to a cellular phone, the content notification system: (i) including an interface to a home location registry, (ii) configured to process data into a paging call suitable for transmission to the cellular phone via short message service ("SMS") messaging, and (iii) configured to transmit the paging call to the cellular phone; the method comprising:

7

(a) **the content provider** causing content available for delivery to a cellular phone to be stored at one of a plurality of independently identifiable internet accessible storage locations;

(b) **the content provider** receiving a system identifier address code that identifies the internet-accessible storage location at which the content is stored from an identification service;

(c) **the content provider** causing a message intended for the cellular phone to be created, the message including: (i) an identifier of the content, (ii) the system identifier address code, (iii) a type identifier indicating the content's type, and (iv) the name of the content provider; wherein the content is not included in the message;

(d) **the content provider** causing communication from the content notification system of a paging call including the message and intended for the cellular phone via SMS messaging; and

(e) **the content provider** causing the content to be updated;

(f) **the content provider** receiving a request message transmitted over the mobile radiotelephone network, the request message including (i) data corresponding to the identifier of the content and the system identifier address code received by the wireless communication device, (ii) the address of the cellular phone, and (iii) a command from the cellular phone to receive to the content; and

(g) **the content provider**, subsequent to receiving the request message, causing the updated content to be delivered to the cellular phone via the mobile radiotelephone network.

A176, A178-79 (emphases added).

Here, too, each step of the claimed method is performed solely by a content provider. The patent assumes an environment in which certain other technologies have been deployed – for example, it assumes the existence of mobile wireless devices (including cellular phones) that are able to receive SMS (text) messages

sent over a "mobile radiotelephone network," such as a cell phone network.  That

is common:  many, if not most, method patents assume the availability of other

technologies as part of the environment in which the invention is used.[4]  But,

again, no step of the asserted method claim is performed by the user of a wireless

handset.  *See* A176; A2239-43 (¶ 19).

Other claims of Mr. Helferich's patents define different improvements to the

methods and systems used by content providers.  None of them requires for

infringement use of a handset.[5]

---

[4] For example, in *SiRF Technology, Inc. v. International Trade Commission*, 601 F.3d 1319, 1329 (Fed. Cir. 2010), one of the patents involved a method of receiving GPS satellite signals.  That method depended on the existence of GPS satellites transmitting certain signals, but the method was performed by the terrestrial service provider.  *See also Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1374 (Fed. Cir. 2011); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1308-09 (Fed. Cir. 2011) ("For example, a claim that reads 'An algorithm incorporating means for receiving e-mails' may require two parties to function, but could nevertheless be infringed by the single party who uses an algorithm that receives e-mails.").

[5] *E.g.*, A231 ('601 patent, claim 1) (claiming "[a] method that provides notification of content," including "causing error status information to be transmitted" and "causing the content to be transmitted" based at least in part on the error status information); A2243-46 (¶ 20) (discussing claim 1 of the '601 patent); A262 ('741 patent, claim 13) (claiming "[a] system that sends dynamic content," including a "content storage and retrieval system configured to store updates to the content" and to transmit the updated content upon request); A2246-50 (¶ 21) (discussing claim 13 of the '741 patent); *see also* A2231 (¶ 11(a)) (listing additional content claims).

HPL asserts only content claims in these cases.  A2231 (¶ 11(a)).  Five of the seven patents asserted in these cases contain exclusively content claims. A2255 (¶ 25) (listing content-only patents); *supra* note 2 (identifying patents-in-suit).  For example, the '450 patent contains two independent claims – the method claim discussed above and a system claim that defines a system used by content providers such as Defendants, not by owners of handsets.[6]

**b.**    Mr. Helferich also received patent claims covering numerous inventions used in mobile devices by the users of the devices (referred to as the handset inventions or handset claims).  None of the handset claims is asserted to be infringed in these cases.  Mr. Helferich's handset claims disclose numerous improvements in technology for mobile devices, including:  a device allowing users to enable and disable acknowledgment signals sent in response to transmissions received by the device (this is useful in settings such as airplanes, where signals can cause harmful interference); a device allowing users to access

---

[6] Specifically, that system claim (claim 15) defines "[a] content provider system" with the following elements: (i) "a first memory having one or more content subscriber databases" and "a second memory having digital content available to subscribers"; (ii) a controller "configured to initiate a page to a cellular phone that includes a notification" regarding the content, including an indication that "the digital content is available for a specified time"; and (iii) "the controller further configured to cause the digital content identified by the notification and stored on the second memory to become inaccessible at the second memory after the specified time identified by the initiated page."  A294-95.

content stored in multiple locations using a single user interface (this is useful to provide the user a consistent interface for content stored on the handset or on a remote system); a device allowing users to delete a message identifier from the device's memory while retaining the message in the memory (this is useful to conserve device memory by deleting identifiers after the corresponding messages have been downloaded); and a method of operating a wireless communication device to transmit actions to perform on stored content and to receive alerts that requested actions were completed (this allows the user to confirm that a requested action (e.g., forward, delete, or reply) was properly completed).  A2260-69 (¶¶ 37-40) (discussing claim language).

Claim 1 of U.S. Patent No. 7,376,432 is an example of a handset claim.[7]  It claims:

> 1.  A **device** that transmits data to and receives data from a radiotelephone communication system, comprising:
>
> **a radio receiver including an antenna** and that (i) receives a selective call signal that initiates a link between the device and the radiotelephone communication system and (ii) receives information over the link;
>
> **a transmitter coupled to the antenna** and configured to transmit signals to the system; and

---

[7] The '432 patent is one of several Helferich patents that contain exclusively handset claims.  A2256 (¶ 26).  None of those patents is asserted in these cases.

**a user interface** that includes an input device, the user interface configured so that a user may selectively enable and disable acknowledgment signals, wherein, if acknowledgment signals are enabled, the transmitter transmits an acknowledgment signal in response to the receiver receiving the information, and, if acknowledgment signals are disabled, the transmitter does not transmit acknowledgment signals in response to receiving the information.

U.S. Patent No. 7,376,432, claim 1 (emphases added).

Each element of that apparatus claim describes a feature of a wireless device – that is, a device with a radio receiver, an antenna, a transmitter, and a user interface. *See id.* The claim provides further detail regarding the device but does not describe or claim anything about the operations or systems of content providers. *See id.*; A2260-62 (¶ 37).

Another example of a handset claim is claim 7 of the '838 patent, which states:

7. **A method of operating a wireless communication device** in a communication system that includes a plurality of information storage systems, and a mobile radiotelephone network comprising:

**receiving a notification message** from the mobile radiotelephone network, the notification message including (a) a system identifier identifying a particular one of the plurality of information storage systems and (b) a message identifier identifying information that is stored in at least one of the plurality of information storage systems and which information is intended for a user of the wireless communication device;

**alerting the user** that the notification message has been received;

12

**receiving input from the user** specifying an action to delete, forward, or reply to be performed on the information corresponding to the notification message; and

**transmitting** via a mobile radiotelephone network, to the information storage system identified by the system identifier, an action identifier corresponding to the action specified by the user;

**alerting** the user that the action specified by the user has been completed.

U.S. Patent No. 7,280,838, claim 7 (reexam. cert.) (emphases added).

In this claim, all the operations are performed on the receiving user's wireless device. For example, the device receives a notification including a system address and an identifier identifying the information that resides on the network. *See id.* The device then performs several steps, including alerting the user of the message, receiving input from the user, transmitting instructions to the network, and then alerting the user that the instruction was performed. *See id.*; A2267-69 (¶ 40). No step in that claimed method is performed by a content provider.

In light of the advances in handset technology disclosed in Mr. Helferich's handset claims, it is no surprise that 28 major manufacturers of wireless handsets have paid for licenses to use the handset inventions. *See infra* pp. 14-15.

**3.** The Patent and Trademark Office ("PTO") recognized the distinctiveness of the separately claimed content and handset inventions by issuing numerous restriction requirements during the prosecution of the Helferich patents. The Patent Act provides that, "[i]f two or more independent and distinct inventions

are claimed in one application," the PTO has discretion to "require the application to be restricted to one of the inventions." 35 U.S.C. § 121. During the prosecution of the Helferich patents, the PTO issued at least 17 restriction requirements identifying "independent and distinct" groups of inventions, several of them addressed to the differences between the two categories of content claims and handset claims. A2257-59 (¶¶ 28-33). For example, in one office action, the examiner identified as "distinct" two groups of claims drawn, on the one hand, "to a method and a (mobile) device for transmitting and receiving data from a communication system" and, on the other hand, "to a method and a system for storing a message intended for (communication) [to a] transmitting and receiving device." A2332-33.

## B.    HPL's Licenses

HPL sought to license separately the content inventions and the handset inventions of the Helferich patents. A2106 (¶ 13). With respect to the content inventions, HPL entered into license agreements with more than 150 content providers like Defendants. A2099 (¶ 2(b)); A2109-10. With respect to the handset inventions, HPL sought and granted licenses to handset manufacturers, including

Apple, Samsung, Research in Motion, LG Electronics, Motorola, and HTC. A2099 (¶ 2(a)); A2111; A2075 (¶ 10).[8]

In the handset licenses, HPL took care to license only patent claims that cover the wireless devices and their operation and not to authorize the licensee outside of a defined licensed field. The handset licenses contain a field-of-use restriction. They provide:

> 3.a. "**License Grant**: Subject to the exceptions and limitations set forth in Section[ ] 3.e . . . HPL hereby grants to Licensee a worldwide, non-exclusive and irrevocable license to practice only in the Licensed Fields . . . ."

A2101 (¶ 5).[9] "Licensed Fields" is defined as "Mobile Wireless Communication Devices that are made, used, imported, exported, offered for sale, sold or otherwise disposed of by Licensee, anywhere in the world." A2100 (¶ 5).

As quoted above, the handset license grant is expressly made "[s]ubject to the exceptions and limitations set forth in Section[ ] 3.e." A2101 (¶ 5). In many of

---

[8] A minority of the handset manufacturers that entered into handset licenses with HPL were also content providers and therefore infringed the content claims; those companies negotiated and paid additional fees for licenses covering their use of the content claims to deliver their own content, in addition to their handset licenses. A2099 (¶ 2(c)); A2109-10.

Although most major handset manufacturers have handset licenses from HPL, not all handset manufacturers that have entered the market are licensed under the Helferich patents. *See* A2881.

[9] The terms of the handset licenses varied somewhat over time. However, the provisions quoted in the text were presented to the district court as reasonably representative. A2100-04 (¶¶ 4-5).

the handset licenses, section 3.e provides that "[n]o provision of this Agreement (including the Covenant Not to Sue in 3.b) grants to Licensee any express or implied license or any right to make, use, sell, offer for sale, import or export products or methods that Infringe a Reserved Claim." A2102 (¶ 5). A "Reserved Claim" is a claim that "recite[s] material additional operations that are carried out (or material additional structure that is added) by Third Parties, including . . . Wireless Content Provider[s] . . . and/or are not substantially embodied in the products, services or methods within the scope of the Licensed Fields." *Id.* Still further, some of the handset licenses list specific reserved or withheld content claims, which include many of the claims asserted against Defendants in these cases. A2102-04 (¶¶ 5-6).[10]

The handset licenses contain an express acknowledgment by the licensee that "it has paid a substantially reduced License Fee . . . in part because it has not compensated HPL to exhaust HPL's rights against Third Parties, or to obtain a license, release or covenant for Third Parties that actively Infringe the Reserved Claims." A2104 (¶ 5).

---

[10] *Compare*, *e.g.*, A828 (¶ 33), 830 (¶ 40), 832 (¶ 47), 834 (¶ 54), 835-36 (¶ 61), 837 (¶ 68), 839 (¶ 75), 841 (¶ 82), 843 (¶ 89), 844 (¶ 96), 846 (¶ 103) (identifying asserted claims), *with*, *e.g.*, A2149-60; A2171-86 (identifying excluded claims).

C.      **Proceedings in the District Court**

Defendants provide content to their customers and prospective customers over wireless networks via text message.  They infringe HPL's content claims by, among other things, creating and causing to be sent to their customers (often through their branded social media) text message alerts (a type of "page") that contain URL "links" to content on Defendants' websites, but that do not contain the content itself.  They also actively manage the content, for example, by updating the content between the time they send the notification and the time the content is requested.[11]  Thus, Defendant The New York Times creates and sends to its subscribers text messages with alerts regarding breaking news stories and links identifying those stories.[12]

HPL notified each Defendant of its infringement and offered to enter into a license agreement granting rights to practice the content claims of the HPL patents.[13]  After Defendants refused, HPL filed these actions.

---

[11] *See* A529-32 (¶ 13); A794-97 (¶ 13); A697-700 (¶ 13); A614-15 (¶ 13); A506-07 (¶¶ 18-19).

[12] *See* A529 (¶ 13(a)).

[13] *See* A797-801 (¶¶ 14-15); A700-04 (¶¶ 14-15); A507-09 (¶¶ 20-21); *see also* A532 (¶ 14); A615-16 (¶ 14).

### 1.    The district court's summary judgment ruling

**a.**    Defendants jointly moved for summary judgment, arguing that HPL's claims against them "are precluded under the doctrine of patent exhaustion." A1010.  They contended that "*[e]very* claim of *every* asserted patent requires the use of a handset." A1013.  Defendants submitted no expert testimony or other evidence to support that assertion.  Defendants further asserted that "HPL has licensed all of its patents (including those asserted in this case) to the entire U.S. wireless handset industry, thereby authorizing the practice of its patents in every wireless handset in use in the United States." A1010.  According to Defendants, because the "handsets are already licensed, and they embody the invention," HPL "exhausted its patent rights." *Id.*

HPL opposed Defendants' motion, arguing (among other things) that, because "handsets . . . do not remotely (let alone 'substantially') 'embody' the inventions patented by the Content Claims," exhaustion does not apply under the Supreme Court's decision in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008).  A2056.  That case, HPL noted, premised exhaustion on "a prior 'authorized sale of an article that substantially embodies a patent.'" *Id.* (quoting *Quanta*, 553 U.S. at 638).  To support its contention that handsets do not embody the content patents and claims, HPL submitted the expert declaration of Dr. John Grindon, which (among other things) rebutted in detail Defendants' assertion that

the patent claims at issue require the use of a handset. A2226-72. HPL also denied Defendants' assertion that all handset companies were licensed and showed that, with respect to the manufacturers that had signed handset licenses, HPL had "properly reserved from the 'field' of [those] licenses any rights under the distinct Content Claims." A2056. Accordingly, HPL explained, the handset licenses did not authorize manufacturers to make sales that exhausted HPL's patent rights under the content claims. A2056, A2065. In addition, HPL filed a cross-motion for summary judgment on the exhaustion issue, contending that exhaustion is inapplicable as a matter of law in these cases. A324 (DN 258).

**b.** On August 14, 2013, the district court granted Defendants' motion and denied HPL's cross-motion. A1-15 (reported at 965 F. Supp. 2d 971). The court stated that "[a]ll of the patents-at-issue require the use of a handset device" and that "the handset devices at least partially practice, and therefore, sufficiently embody, HPL's patents." A10-11. In reaching those conclusions, the court did not consider the language of the actual patent claims that Defendants are alleged to infringe or mention Dr. Grindon's testimony. It stated that "[t]he doctrine of patent exhaustion governs the exhaustion of a *patent*, not the exhaustion of individual claims." A13. The court accordingly indicated that, so long as handsets sufficiently embody "a patent," that entire patent is exhausted, including materially distinct claims that are not embodied in handsets. *See id.* The district court did not

acknowledge, let alone address, HPL's showing that five of the seven asserted patents do not include any handset claims at all.[14]

Having concluded that handsets "sufficiently embody" the asserted patents, A10, the court reasoned that exhaustion "turns on the handset manufacturers' licenses to sell the handset devices practicing HPL's patents," A11. The court acknowledged that HPL's handset licenses expressly granted rights "only within the described Licensed Fields" and "carve[d] out individual claims" from the scope of those licenses. A9, A13. The court stated, however, that "HPL cannot avoid patent exhaustion by attempting to shield some of the claims within the patents-in-suit from being covered by Licensing Agreements." A9-10. The court accordingly concluded that, "[o]nce the handset manufacturers sell the handsets which embody HPL's patents, HPL's patents are exhausted as to all third parties, including Defendants." A11.

## 2. The district court's order amending the judgment

Following the district court's summary judgment order, HPL filed a motion for reconsideration or to alter or amend the judgment under Rule 54(b) and Rule 59(e). A329 (DN 314). HPL argued, among other things, that the district court appeared to have ignored Dr. Grindon's unrebutted testimony refuting Defendants'

---

[14] *See* A2255 (¶ 25) (discussing '241, '757, '741, '601, and '450 patents).

contention that handsets are used in practicing the content claims. A2875-76, A2878-80.

The district court denied HPL's motion. A30-33. With respect to Dr. Grindon's declaration, the court stated only that it "considered and gave the appropriate weight, if any, to everything properly before the Court in ruling on the motions for summary judgment." A32. But, as in the original order, the court provided no explanation for reaching conclusions contradicted by Dr. Grindon's unrebutted testimony.

## SUMMARY OF ARGUMENT

The exhaustion doctrine is old, with roots in the common law's hostility to "servitudes on chattels" – that is, the idea that personal property, once sold, is no longer subject to restraints on further sale or use enforceable through property rules. Yet in the history of the doctrine, it has never been applied as the district court applied it here. The district court held that, by licensing certain patent rights to the manufacturers of wireless handsets, HPL exhausted other, different patent rights against third-party providers of content to those handsets – even though the content providers did not purchase or otherwise acquire licensed handsets or use them in practicing the asserted patent claims. *See* A11 ("Once the handset manufacturers sell the handsets which embody HPL's patents, HPL's patents are

exhausted as to all third parties, including Defendants.").  That holding is incorrect, and the exhaustion doctrine does not apply here.

A.    Defendants' reliance on exhaustion fails because the exhaustion doctrine protects only the ability of a purchaser (or other lawful possessor) of an article to "use" and "sell" the article.  *Bowman v. Monsanto Co.*, 133 S. Ct. 1761, 1766 (2013) (internal quotation marks omitted).  When Defendants perform activities that infringe the content claims of HPL's patents, they do not "use" (*id.*) the licensed handsets but instead operate different systems to store, manage, and deliver content.  They accordingly cannot claim the protection of the exhaustion doctrine based on sales of wireless handsets to others.

B.    Exhaustion also does not apply in these cases because the handsets do not "substantially embody" the content inventions.  *Quanta*, 553 U.S. at 621.  This Court has instructed that whether an article "embodies" an invention within the meaning of the Supreme Court's decision in *Quanta* depends on whether the use of the article, in the manner intended, entails performing every inventive step of the asserted claim.  *See LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1368-69 (Fed. Cir. 2013).  Here, the asserted claims teach methods and systems that content providers use to store, manage, and deliver content – operations that handset users do not perform.

**C.**    The exhaustion doctrine's roots in the common law's historical hostility to servitudes on personal property reinforce the conclusion that HPL's rights under the content claims have not been exhausted.  HPL seeks no restriction on the ability of handset owners to use or sell their devices.  HPL has not sued any handset user; nor has it accused Defendants of inducing or contributing to infringement by handset users.  Rather, HPL asserts that Defendants are liable for their own direct infringement of HPL's content claims – distinct claims that Defendants practice using different equipment and systems, not handsets.

**D.**    The district court's assertion that exhaustion should be analyzed "patent-by-patent" is irrelevant to five of the seven patents-in-suit.  Only two of the seven asserted patents include both handset claims and content claims.  With regard to those two patents, the district court's assertion is incorrect, first of all, because HPL has not exhausted *any* claims as to Defendants, which are not purchasers or users of authorized handsets.  In any event, to the extent relevant here, exhaustion should be analyzed on a claim-by-claim basis because each claim defines a distinct patented invention.

**E.**    HPL's handset licenses foreclose any alternative argument that the sale of a handset exhausted the asserted claims.  HPL's handset licenses contain restrictions (i) providing that the handset manufacturers can practice HPL's inventions only in the licensed field of mobile wireless communication devices,

(ii) expressly confirming the licensee's lack of authority to practice certain claims, and (iii) specifying that HPL received a reduced licensing fee because it was not exhausting its rights under the distinct content claims.  Those provisions demonstrate that both parties to the licensing transaction recognized that sales of licensed handsets do not exhaust HPL's content claims because handsets do not embody, and handset users do not infringe, those distinct claims.

## ARGUMENT

## THE DISTRICT COURT ERRED IN HOLDING HPL'S CLAIMS BARRED BY THE DOCTRINE OF PATENT EXHAUSTION

### A.    Patent Exhaustion Does Not Apply Because Enforcement of HPL's Content Claims Against Content Providers Does Not Restrict Purchasers' Rights To Use Their Handsets

The district court held that HPL lost the right to assert claims of direct patent infringement against content providers because HPL licensed manufacturers' sale of handsets to third-party end-users.  That holding finds no support in any prior case applying the doctrine of patent exhaustion.  To the contrary, the doctrine of patent exhaustion protects the purchaser's rights to "use" and "sell" a patented article.  *Bowman*, 133 S. Ct. at 1766 (internal quotation marks omitted).  When Defendants perform activities that allegedly infringe the content claims of HPL's patents, they do not "use" (*id.*) licensed handsets; rather, they operate different systems to store, manage, and cause the delivery of content to handset users.  HPL

therefore has authorized no sale that could exhaust its patent rights against Defendants.[15]

1.    Under the doctrine of patent exhaustion, "'the initial authorized sale of a patented item terminates all patent rights *to that item*.'" *Bowman*, 133 S. Ct. at 1766 (quoting *Quanta*, 553 U.S. at 625) (emphasis added). "It is not the patent right itself that is exhausted, of course." Julie E. Cohen & Mark A. Lemley, *Patent Scope and Innovation in the Software Industry*, 89 Cal. L. Rev. 1, 31 (2001). Instead, by "'exhaust[ing] the [patentee's] monopoly' in [the purchased] item, the sale confers on the purchaser, or any subsequent owner, 'the right *to use [or] sell' the thing* as he sees fit." *Bowman*, 133 S. Ct. at 1766 (quoting *United States v. Univis Lens Co.*, 316 U.S. 241, 249-50 (1942)) (emphasis added; first, second, and fourth alterations in *Bowman*). In other words, "when a patented item is 'once lawfully made and sold, there is no restriction on [its] *use* to be implied for the benefit of the patentee.'" *Quanta*, 553 U.S. at 630 (quoting *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 457 (1873)) (alteration in *Quanta*).

Exhaustion doctrine thus protects the ability of a purchaser (or other lawful possessor) to "use" (and "sell") a particular article. *Bowman*, 133 S. Ct. at 1766

---

[15] This Court reviews the district court's grant of summary judgment de novo. *See Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1372 (Fed. Cir. 2013); *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014).

(internal quotation marks omitted).  "The basic principle underlying the Supreme Court's exhaustion cases is that the authorized transfer of ownership in a product embodying a patent carries with it the right to engage in that product's contemplated *use*."  *LifeScan*, 734 F.3d at 1373 (emphasis added).

2.    Here, Defendants' infringing activities cannot come under the exhaustion doctrine because Defendants do not use handsets when they infringe the content claims of the patents-in-suit.  As described in the statement, and established by Dr. Grindon's unrebutted testimony, *see* A2235-53 (¶¶ 17-22), A2269-70 (41(b)), the content claims of the Helferich patents define inventions that are practiced by providers of content and not by users of handsets.  *See supra* pp. 5-10.[16]  And HPL does not allege that handset owners infringe the content claims; nor does it seek any restriction on how those consumers use their devices.

For example, claim 1 of the '757 patent claims "[a] method that communicates content from a content provider."  A176.  That method comprises

---

[16] The claims are the appropriate focal point for this analysis because they define the patented invention.  *See* 35 U.S.C. § 112 (¶ 2) (2006) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."); *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984) ("[T]he claims . . . measure and define the invention."); *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961) ("the claims made in the patent are the sole measure of the grant"); *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 510 (1917) ("It is to the claims of every patent . . . that we must turn when we are seeking to determine what the invention is . . . .").

seven steps, each of which is performed by a content provider, not a user of a wireless handset. *See id.* First, "the content provider caus[es] content available for delivery to a cellular phone to be stored." *Id.* Second, "the content provider receiv[es] a system identifier address code" that "identifies the internet-accessible storage location." *Id.* Third, "the content provider caus[es] a message intended for the cellular phone to be created, the message including" certain information identifying the content and the content provider. *Id.* Fourth, "the content provider caus[es] communication . . . of a paging call." *Id.* Fifth, "the content provider caus[es] the content to be updated." *Id.* Sixth, "the content provider receiv[es] a request message." *Id.* Seventh, "the content provider . . . caus[es] the updated content to be delivered." *Id.*

No step of that claimed method requires the person performing it to use a handset. Rather, the content provider causes content to be stored; receives an identifying code; causes a message to be created; causes a text message to be sent; causes the content to be updated; receives a request; and causes the content to be delivered. A content provider that carries out each of these steps thus directly infringes the patent. The claim does assume that the method will be performed in an environment that includes certain complementary technologies, including the internet, a mobile radiotelephone network capable of transmitting certain types of messages, and wireless communication devices. It is also true that a handset may

ultimately receive a message as a result of Defendants practicing the content claims. But none of the steps that an infringing content provider carries out requires the content provider to use a handset.

Nor is a handset part of any of the patented systems included in the content claims. For example, claim 13 of the '741 patent claims a "system that sends dynamic content to a cell phone," comprising four elements: "a content storage and retrieval system that is coupled to the internet"; "a notification system configured to send a notification to the cell phone"; "the content storage and retrieval system configured to store updates to the content"; and "the content storage and retrieval system configured to cause the updates to the content to be transmitted." A262. While that system contemplates the existence of the internet and cell phones, it does not include the cell phone in the patented system – any more than a patented system to pump gasoline would include the car into which the gasoline would be pumped. *See Advanced Software Design*, 641 F.3d 1368 (defendant infringed method and system for decrypting or reincrypting information to validate a check, even though defendant did not encrypt the information and print the checks).

**3.** Because HPL's claims against Defendants are for Defendants' own undivided and direct infringement of the content claims, it is irrelevant whether handset users, in responding to messages sent by Defendants and retrieving content

that Defendants make available, themselves practice other patented inventions.
The operation of the handset might involve use of a patented invention, or not; the
handset user might be authorized to use that handset invention (for example, as the
purchaser through an authorized sale of the handset), or not: that does not affect
HPL's claims in these cases, which allege that Defendants themselves practiced
HPL's content inventions without authorization. Whether anyone else involved in
the transaction happens also to practice one of HPL's other inventions does not
affect HPL's direct infringement claims. *See Honeywell Int'l Inc. v. Hamilton
Sundstrand Corp.*, 370 F.3d 1131, 1148 (Fed. Cir. 2004) (en banc) ("[e]ach claim
defines a separate invention"); *see also Boehringer Ingelheim Int'l GmbH v. Barr
Labs., Inc.*, 592 F.3d 1340, 1354 (Fed. Cir. 2010).

This conclusion is illustrated by the principle – recently reaffirmed by this
Court – that, when a component of a combination is separately patented, the
purchase of the combination does not confer any right on the purchaser to acquire
the patented component from anyone other than the patentee, even if the
component is essential to the use of the combination. *See LifeScan*, 734 F.3d at
1371-72. Thus, in *Morgan Envelope Co. v. Albany Perforated Wrapping Paper
Co.*, 152 U.S. 425 (1894), the Supreme Court held that when an unpatented
component of a patented combination "is an article of manufacture perishable in its
nature . . . and which must be renewed periodically," the patentee has no right to

restrict the sale of that component, even if it is specially adapted for use in the combination, because the purchaser of the combination acquires the right to use it. *Id.* at 433.  But that would *not* be true if the component was separately patentable: in that case, "it would be an infringement of that patent to purchase such product of another than the patentee."  *Id.*

The *Morgan* Court illustrated the "true distinction," *id.* at 435, by citing *Aiken v. Manchester Print Works*, 1 F. Cas. 245, 247 (C.C.D.N.H. 1865).  In that case, the "invention was of a knitting machine" that used needles that "were the subject of a separate patent.  It was held that the purchase of the knitting machine, and the needles accompanying the same, did not confer upon the purchaser any right, after the needles were worn out and became useless, to manufacture other needles, and use the same in the knitting machine so sold and purchased."

*Morgan*, 152 U.S. at 435.  Courts have applied that distinction repeatedly;[17] we are aware of no holding – other than the decision below – to the contrary.[18]

That principle is fully applicable here.  Because the content inventions are separately patented (some as a result of restriction requirements by the PTO), the direct infringement of those claims is actionable, irrespective of whether Defendants' conduct results in the practice of HPL's handset claims by handset users.  HPL owns the separate and exclusive right to use the inventions defined by the content claims of its patents, and its right to pursue an action based on

---

[17] *See Hunt v. Armour & Co.*, 185 F.2d 722, 729 (7th Cir. 1950) ("Apparently it is defendant's view that by purchasing the fingers, which are covered by one group of claims in the patent, it automatically also obtained a license under the separate group of machine claims.  However, each claim of a patent constitutes a separate grant of monopoly."); *C. & R. Research Corp. v. Write, Inc.*, 19 F.2d 380, 381 (D. Del. 1927) (sale of combination machine did not bar claim based on independently patented replacement component where the machine and the component were separately claimed in the same patent).

[18] Dictum in this Court's decision in *Keurig* does not support a contrary conclusion.  The Court there stated in passing that "[p]ermitting Keurig to recover multiple times on its patented brewers by holding Sturm or any other cartridge manufacturer liable for *direct*, induced, or contributory infringement based on the independent manufacture and sale of cartridges for use in those brewers would be contradictory to [exhaustion] policies and the law."  732 F.3d at 1375 (emphasis added).  No claim of direct infringement by Sturm was at issue in that appeal, *see infra* note 19, and so the quoted statement was dictum.  There is nothing in the opinion to suggest that, if Keurig had had a valid patent on cartridges, it would have been limited in enforcing such a patent against a manufacturer who made and sold patented cartridges without authorization.

Defendants' unauthorized use of those inventions cannot be curtailed because handset users have the right to use other inventions, no matter whether they are related.

**4.**     *LifeScan* and *Keurig* – two of this Court's recent cases finding claims of indirect infringement to be barred by patent exhaustion – provide Defendants no support. Those two cases hold merely that a claim of indirect infringement cannot succeed when the underlying claim of direct infringement is barred by patent exhaustion. In those cases, the defendants asserting exhaustion were third parties that supplied disposable items (coffee cartridges in *Keurig* and blood glucose test strips in *LifeScan*) used by consumers in conjunction with machines they purchased from the patent holders (coffee brewers and blood glucose meters) to perform the patented methods. The defendants were accused of *indirectly* infringing by causing the authorized *purchasers* of articles to directly infringe.[19]

---

[19] *See*, *e.g.*, *LifeScan*, 734 F.3d at 1365 ("In its amended complaint, [LifeScan] alleged that Shasta's manufacture and distribution of GenStrips would *indirectly* infringe the '105 patent. It alleged that *the users* of Shasta's GenStrips would be *direct* infringers.") (emphases added; footnote omitted); *Keurig*, 732 F.3d at 1372 ("Keurig filed suit against Sturm, alleging, *inter alia*, that *the use* of Sturm's Grove Square cartridges in certain Keurig brewer models *directly* infringed method claim 29 of the '488 patent and method claims 6-8 of the '938 patent, and that Sturm *induced and contributed to* that infringement.") (emphases added); *id.* at 1374 ("Keurig alleges that purchasers of its brewers infringe its brewer patents by using Sturm cartridges to practice the claimed methods and therefore that Sturm is liable for *induced* infringement.") (emphasis added); *see also id.* at 1371 ("Keurig also holds at least one design patent directed to its own

Because the exhaustion doctrine barred the plaintiffs from maintaining any claim that the *purchasers'* uses of the coffee brewers and blood glucose meters were directly infringing, the defendants could not be held liable for inducing or contributing to any infringement. *See LifeScan*, 734 F.3d at 1373-74; *Keurig*, 732 F.3d at 1374. Those cases are not on point here because HPL does not assert that Defendants induced *handset users* to infringe the *handset* claims, but rather that *Defendants* directly infringe the *content* claims.

**5.** Although HPL argued in the district court that exhaustion does not apply here because Defendants do not use handsets when they infringe the content claims,[20] the district court largely ignored the point, except to assert that "[a]ll of *the patents-at-issue* require the use of a handset device." A10 (citing A528 (¶ 12); A1032 (¶ 14)) (emphasis added). But the court made no attempt to reconcile that assertion with the language of *the asserted content claims*. The language of the content claims makes clear that, in engaging in the allegedly infringing conduct, an infringer does not use a handset. *See supra* pp. 5-10, 26-28.

---

brand of cartridges, but that patent was not asserted here."); *id.* at 1373-74 ("Keurig did not assert its cartridge patent against Sturm . . . .").

[20] *See, e.g.*, A2055 ("Exhaustion exists to protect 'downstream' purchasers of an authorized *item*, so that they can use *that item* as intended without fear of infringement charges. HPL seeks no restriction on a user of a licensed handset."); A2059 ("Defendants' infringement of the Content Claims is *not* 'based on' *their* use of handsets."); A2067 ("[a] handset user does not perform [the] actions" that infringe the content claims).

The district court also ignored the unrebutted expert testimony HPL submitted demonstrating that the asserted patent claims do not "require the use of a handset device." Dr. Grindon explained in detail that "[n]one of the operations of the Asserted Content Claims must be performed on or by a wireless handset." A2269 (¶ 41(b)); *see* A2235-53 (¶¶ 17-22) (discussing claim language). Defendants submitted no testimony (or other evidence) in response, instead relying on (mis)characterizations of the patents and other record materials in their briefing. But "lawyer argument" is not evidence, and it does not suffice to create a genuine issue of material fact, let alone provide a basis for granting summary judgment *against* a party that has submitted competent evidence on a material factual issue. *See AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1329 (Fed. Cir. 2007).

Neither of the sources cited by the district court supports the proposition that the content claims "require the use of a handset device." The district court first cited the complaint, but the referenced paragraph in fact makes clear that handsets are *not* necessary to perform infringing activities. *See* A528 (¶ 12). That paragraph identifies the asserted content inventions, describing them as "systems and methods *used by content providers* to create, store, and cause delivery of electronic messages and related content to mobile phones." *Id.* (emphasis added).

As the complaint explains, content providers (not handset users) perform the

infringing activities operating other systems and equipment:

> *The content provider stores its content* (such as news, coupons,
> specials, media, etc.) on an internet accessible website and creates a
> short description of the content (of the type intended for placement
> into an SMS or MMS message). *The content provider also selects
> and inserts a unique identifier of the content*, such as a URL "link" in
> the message. *The content provider uses an interface with a
> notification system* (such as various social media sites or messaging
> services) to disseminate its messages to its customers', followers', and
> fans' mobile phones via SMS or MMS. Thereafter, *the content
> provider receives a request for the content* identified by the link *and
> delivers the requested content* to the user's mobile phone.

*Id.* (emphases added).

The district court's other citation – a paragraph from Defendants' statement

of facts – likewise provides no support for the court's statement that the content

claims "require the use of a handset device."  In the cited paragraph, Defendants

stated:  "HPL admits that every patent claim asserted in this litigation requires an

operation that must be performed on or by a wireless handset."  A1032 (¶ 14).  To

support that statement, Defendants cited only the same paragraph of the complaint

on which the district court erroneously relied.  Critically, HPL "[d]enied"

Defendants' statement in its responsive statement of facts and explained as

follows, with citations to record evidence:  "No patent claim asserted in this

litigation has as an element, recites or requires an operation that must be performed

on or by a wireless handset. . . . Neither [the cited] statements in the Complaints

nor the language of the claims in suit recite an operation performed on or by a wireless handset; rather, they require operations performed by a content provider . . . ." A2077-78 (¶ 14) (citing A2235-53 (¶¶ 17(b), 18-22), A2269-70 (¶ 41(b)) (emphasis omitted). Thus, HPL not only denied Defendants' assertion but also established through competent evidence that the language of the asserted claims required the district court to reach the opposite conclusion: none of the asserted claims requires use of a handset, and exhaustion therefore does not apply.

It is, of course, true that the *specification* of each patent includes a written description not only of methods and systems for storing, managing, and delivering content, but also of mobile wireless communication devices and methods of using them. That is because all of the patents are based on the same specification – one that the PTO found sufficient to support not only content claims, but also handset claims. *See supra* pp. 4-5. But the content claims are nevertheless distinct inventions from the handset claims, and can be enforced separately. *See Honeywell*, 370 F.3d at 1148.

### B.    Exhaustion Does Not Apply Because Handsets Do Not "Substantially Embody" the Content Claims

**1.**    Exhaustion also does not apply here because handsets do not "substantially embody" the content claims. An article is said to substantially embody a patented invention if (a) the "only reasonable and intended use" of the components is "to practice the patent" and (b) the purchased components embody

36

"[t]he essential, or inventive, feature[s]" of the patented invention. *Quanta*, 553

U.S. at 632; *see id.* at 630-35. Neither of those elements is met here.

*First*, for the reasons discussed above, and unlike in *Quanta*, *LifeScan*, and

*Keurig*, practicing the content claims is not an intended use of the handsets at all –

much less the *only* reasonable and intended use of those handsets.[21]  That fact

demonstrates how far the district court strayed from established doctrine in its

exhaustion ruling.

*Second*, and relatedly, handsets do not embody the inventive aspects of the

content claims.  "[W]hether [a] product 'substantially embodies [a] patent'" turns

on "whether the additional steps needed to complete the invention from the product

are themselves 'inventive' or 'noninventive.'"  *LifeScan*, 734 F.3d at 1368

(quoting *Quanta*, 553 U.S. at 633-34).  "What is 'inventive' about patent claims in

---

[21] Under *Quanta*, when a purchased article is used by the defendant in practicing the asserted patents, courts ask whether the articles also have any "reasonable noninfringing use."  553 U.S. at 638; *see LifeScan*, 734 F.3d at 1368; *Keurig*, 732 F.3d at 1373.  That element – which raises a question of fact, *see ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007) ("infringement is a question of fact") – was essentially undisputed in *Quanta*; as the Court explained, LGE had "suggested no reasonable use for the Intel Products other than incorporating them into computer systems that practice the LGE patents."  553 U.S. at 632.  In *LifeScan* and *Keurig*, this Court indicated that a hypothetical non-infringing use is not "reasonable" when the infringing use in question "is the very use contemplated by the patented invention itself."  *LifeScan*, 734 F.3d at 1369 (citing *Keurig*).  Here, as discussed in text, HPL has shown that handsets are not used to infringe the content claims, so the Court should not even reach the question of alternative reasonable uses.

the patent exhaustion context is what distinguishes them from the prior art." *Id.* at 1369.[22]  Once the "inventive" functions of the patent claims have been identified, "the question" for exhaustion "is whether the [purchased articles] 'control' and 'carry out' [those] inventive functions." *Id.*[23]

Applying the potentially fact-intensive *LifeScan* standard here, HPL established that everything "inventive" about the content claims – and what distinguishes them from the prior art – is "control[led]" and "carr[ied] out" by the content providers, not by the users of handsets.  *See* A2235-53 (¶¶ 17-22).  The language of the claims makes that clear.  The claims describe operations performed or systems employed by content providers, not handset users – for example, storing

---

[22] This element, too, requires an inherently factual inquiry.  *See Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1294 (Fed. Cir. 2002) ("Novelty, or anticipation, is a question of fact.").

[23] Applying the substantial-embodiment standard was unnecessary in *Keurig* because the purchased article (the coffee brewer) "completely practiced the claimed invention" (a method of brewing coffee using the brewer).  732 F.3d at 1372.  Because the purchasers of Keurig's brewers "obtained the unfettered right to use [those brewers] in any way they chose, at least as against a challenge from Keurig," that case presented "an *a fortiori* fact situation" in which it was not necessary to conduct the substantial-embodiment analysis to conclude that exhaustion applied.  *Id.* at 1373-74.  For the reasons explained above in Part A, this appeal presents the opposite "*a fortiori* fact situation," where the alleged direct infringers do not use the purchased articles in practicing the claimed inventions, and so exhaustion can be rejected without applying the substantial-embodiment analysis.  At a minimum, for the reasons explained in Part B, applying the substantial-embodiment standard set forth in *Quanta* and this Court's post-*Keurig* decision in *LifeScan* leads to the same conclusion:  exhaustion is inapplicable.

content, providing notifications that identify the content, updating the content, and making the content inaccessible after a certain period.  Because the inventions defined by the content claims do not contain any step performed by handsets, the "inventive" aspects of the content claims are not controlled or carried out by – and in fact do not concern – handsets.  *See supra* pp. 5-10, 26-28.[24]

"The prosecution history" of the patents-in-suit "confirms" that the operations performed by the content providers using their own systems – and not any operation performed using handsets – "is the key to the invention[s] reflected in the [content] claims."  *LifeScan*, 734 F.3d at 1370; *see* A2238-39 (¶ 18(g)), A2242-43 (¶ 19(f)-(h)), A2245-46 (¶ 20(f)-(g)), A2249 (¶ 21(f)) (discussing prosecution history of several content claims).  For example, in confirming the patentability of claim 1 of the '757 patent on reexamination, the PTO emphasized (among other points) that the claim limitation relating to "updating the content" –

---

[24] The *LifeScan* Court analyzed the claim language at the outset of its opinion, concluding that some of the steps in the claimed method "refer[red] to the electrodes located on the strips," while others were "performed by the meter."  734 F.3d at 1364-65.  The Court's focus on the specification and prosecution history later in the opinion, *see id.* at 1370, indicates that the Court concluded that the claim language in that case did not resolve the question whether the "inventive" functions resided in the test strips or the meters.  Here, by contrast, each step of the patent claims at issue refers to the conduct and systems of content providers, leaving no doubt that nothing "inventive" about the content claims is embodied in wireless handsets.  In any event, as explained in the text, even if it is necessary to refer to the specification and prosecution history here, those sources only reinforce that conclusion.

an operation performed by the content provider, not the handset user –

distinguished the invention from the prior art.  A2451 (concluding that the cited

reference does not disclose "updating the content . . . after the message has been

sent but prior to receiving the request for the content").  To cite another example,

in the notice of allowance for the '601 patent, the PTO stated that the limitation in

claim 1 relating to "causing error status information to be transmitted" – another

operation controlled and carried out by the content provider – differentiated the

invention from the prior art.  A2502 (the cited reference "failed to teach error

status information to be transmitted to the wireless transceiver from the system to

be contacted to trigger retrieval of the content").

The "specification of the patent" – though including descriptions of both

content inventions and handset inventions – similarly supports the conclusion that

"the claimed inventive concept[s]" *of the content claims* "lie[ ] in" the systems and

conduct of content providers, "rather than the [handsets]."  *LifeScan*, 734 F.3d at

1370.  Specifically, the specification emphasizes the limitations of "paging

systems" and the ability to overcome those limitations by "control[ling] the

number and size of the data transmissions."  A95 (1:62-65, 2:11-14).  The

specification describes how content providers can "control the number and size of

the data transmissions" by, for example, transmitting to mobile devices an

identifier of the content, rather than the full content itself.  A96 (3:4-7), A103

(17:62-18:1) ("A paging system notifies a paging transceiver that a message has been received but does not initially transmit the associated message. . . . The message information includes information identifying the message . . . ."). To be sure, the specification also describes inventive concepts embodied in handset claims. *See supra* pp. 10-13 (discussing handset claims). But that does not change the fact that the specification discloses distinct inventions performed by content providers – inventions defined by the language of the content claims, the inventiveness of which is reinforced by the prosecution history. Indeed, the PTO confirmed the distinctiveness of the Helferich content and handset inventions by issuing numerous restriction requirements during the prosecution of the patents. *See supra* pp. 13-14.

**2.** The district court concluded that "the handset devices at least partially practice, and therefore, sufficiently embody, HPL's patents." A11. The court said little to explain that conclusion, and it is incorrect. The court asserted that "the patents all require devices capable of receiving content or messages," A10 – that is, handsets. Although it is true that one purpose of the inventions defined in the content claims is to enable content providers efficiently to provide their content to users of wireless handsets, that does not mean that handsets "substantially embody" the content claims. On the contrary, as shown above, everything "inventive" about the content claims is embodied by the methods and systems of

41

the content providers.  Dr. Grindon's unrebutted testimony confirmed that handsets do not even partially (let alone substantially) embody the claimed content inventions.  A2270-71 (¶ 41(c)).

The district court's only support for its assertion that "the patents all require devices capable of receiving content or messages" was a reference to the abstract of one of the seven patents-in-suit (the '241 patent).  *See* A10.  But that abstract, like the abstracts for the other patents-in-suit, refers to a "method for selectively paging" and a "paging system" that "conserves air time . . . by not automatically receiving the associated messages."  A50; *see*, *e.g.*, A264 ('450 abstract) ("[m]ethods and systems that provide content to subscribers"; "[t]he content provider conserves air time by not automatically transmitting the content"; "the content provider may provide to subscribers . . . updates on weather or stock rates"); A232 ('741 abstract) ("[s]ystems and methods for delivering information to a transmitting and receiving device").  In any event, the abstract does not define the invention; the claims do.  *See supra* note 16; 37 C.F.R. § 1.72(b) ("The purpose of the abstract is to enable the [PTO] and the public generally to determine quickly from a cursory inspection the nature and gist of the technical disclosure.").  And the content claims define materially different inventions performed by content providers on content servers, not inventions embodied by handsets.  *See supra* pp. 5-10, 26-28.

The district court also reasoned that "[t]here would be little value to the handset manufacturers (or their end users) to have purchased licenses to HPL's patents to receive content from a third-party content provider if the content provider, like Defendants, could not send the message to the licensed handset device without infringing the patents."  A11.  But the value to handset manufacturers and their customers from having acquired licenses for HPL's handset inventions is that those customers can practice those handset inventions without infringing the handset claims.  In addition, HPL showed below that handset purchasers can request, receive, send, and process "links" and content without *anyone* infringing the content claims.  A2253-55 (¶ 24).[25]

If Defendants want to use Mr. Helferich's separate content inventions to *store, manage, and provide* content to users of wireless handsets, they need licenses to do so.[26]  The district court appeared to believe that the purchase of a handset conferred an implied license on handset users to receive messages that provide access to content that is stored, managed, and processed by third parties

---

[25] Moreover, the handset claims of the Helferich patents define inventions that handset users could practice even if no provider of content were licensed to practice the content claims.  *See* U.S. Patent No. 8,355,702 (airplane mode).

[26] Indeed, handset companies that also practiced the materially different content claims specifically negotiated for, and paid the additional license fees to acquire, a license to avoid their own direct infringement of the content claims.  *See supra* note 8.

43

using the inventions of the content claims, and that Defendants can somehow

benefit from that. But that is wrong. Indeed, this was the precise holding of *Aiken*

– discussed in *Morgan* and above. The purchaser of the knitting machine argued

that "the sale of the machines implies the right to use the same, and that, when the

needles were worn out, so that the machine could not be operated, it carries with it

the right to manufacture new ones as the necessary means to enable them to enjoy

the right of use implied by the purchase." 1 F. Cas. at 246. Justice Clifford, sitting

as Circuit Justice, rejected the argument. Because "the needle is subject to a

patent, . . . in making and using it [defendants] have infringed the right of the

plaintiff." *Id.* at 247.

### C.    The Policy Underlying the Exhaustion Doctrine Does Not Support Applying that Doctrine Here

The doctrine of patent exhaustion derives from the common law's hostility

to servitudes on personal property. This Court made that clear in *LifeScan*. There,

the Court explained that both patent exhaustion and its counterpart in copyright

law, the "first sale" doctrine, derive from "common policies" – namely, "the

common law's refusal to permit restraints on the alienation of chattels." 734 F.3d

at 1376 (internal quotation marks omitted). Patent exhaustion therefore prohibits

"restraints upon the downstream use or sale of a patented product" because those

restraints "offend against the ordinary and usual freedom of traffic in chattels." *Id.*

at 1376-77 (internal quotation marks omitted); *see also* Cohen & Lemley, 89 Cal.

L. Rev. at 31 ("[O]nce the patentee has sold a particular product, its control over that particular product ends, and the general legal antipathy toward restraints on alienation takes over.").

The policy against restraints on alienation has no application here. Defendants are not "purchaser[s]" or authorized "subsequent owner[s]" of the licensed wireless handsets. *Bowman*, 133 S. Ct. at 1766. That fact undermines Defendants' claim that exhaustion protects their separate infringement of the materially different content claims simply because Defendants' activities bear some relationship to handsets purchased by others. The district court expanded the doctrine of exhaustion beyond where it had been applied by any court, relieving a defendant that is not an authorized purchaser or transferee of liability for *its own* direct infringement of distinct claims using different articles. That extension of patent exhaustion finds no support in the doctrine's core purpose of limiting restraints on alienation. *Cf. United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 31 (1st Cir. 2009) (en banc) (Boudin, J.) ("Where the rationale for a rule stops, so ordinarily does the rule.").

The district court thought that applying exhaustion was necessary to prevent HPL from receiving more than "'one royalty for a patented machine.'" A14 (quoting *Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340, 350 (1863)). But HPL is not seeking multiple royalties on a single handset. Rather, it seeks compensation from

different parties (handset manufacturers versus content providers) that infringe

different inventions (handset inventions versus content inventions) in entirely

different ways (making and selling handsets versus providing content without

using handsets).  HPL does not seek a "double recovery"; it seeks its first and only

recovery for Defendants' use of the separate content inventions.  In any event, as

this Court reaffirmed after *Quanta*, "[p]atent exhaustion prohibits patentees from

enforcing patent rights in certain circumstances, but it does not forbid multiple

licenses on a single product or even multiple royalties."  *ExcelStor Tech., Inc. v.*

*Papst Licensing GMBH & Co. KG*, 541 F.3d 1373, 1377 (Fed. Cir. 2008).

### D.    The District Court's Statements That Exhaustion Should Apply "Patent-by-Patent" Are Beside the Point and Incorrect

The district court stated that "[t]he doctrine of patent exhaustion governs the

exhaustion of a *patent*, not the exhaustion of individual claims."  A13.  It

accordingly suggested that, so long as a purchased article substantially embodies at

least one claim in a multi-claim patent, that entire patent is exhausted, including

patentably distinct claims not embodied in the article.  *See id.*  That reasoning is

inapplicable by its terms to most of the patents-in-suit and is also incorrect.

 At the outset, even if the district court were correct that, when any claim in

a patent is exhausted, the entire patent is exhausted, the judgments in these cases

still could not stand.  That is because five of the seven patents-in-suit contain

*exclusively* content claims.  A2255 (¶ 25); *supra* p. 10.  The undisputed evidence

establishes that none of the claims in those five patents recites the use of, or is

embodied in, wireless handsets.  Therefore, none of those claims, and none of

those patents, is subject to exhaustion.  Although HPL raised this point below,[27] the

district court ignored it.

Furthermore, at least as applied by the district court below, the principle that

exhaustion should be analyzed patent-by-patent rather than claim-by-claim is

incorrect because it ignores the basic point that HPL cannot have exhausted its

patent rights *as to Defendants* by authorizing the sale of a handset to end users,

when Defendants do not use the handsets in practicing *any* claim of the asserted

patents.  Whether HPL could have authorized *handset users* to practice certain

claims of certain patents without exhausting other claims is a question that does not

arise in this case, because HPL has not here asserted any infringement by handset

users.

In any event, in an appropriate case, exhaustion should be analyzed

separately with respect to each invention, which may in some cases require

applying exhaustion separately with respect to different claims in the same patent.

As the Supreme Court described the exhaustion doctrine in *Quanta*, one

requirement is that the purchased product substantially embody the " 'essential

---

[27] *See*, *e.g.*, A2059 n.3.

features of [the] patented *invention*.'" 553 U.S. at 632 (quoting *Univis*, 316 U.S. at 250-51) (emphasis added; alteration in *Quanta*); *see LifeScan*, 734 F.3d at 1367 ("[T]he Court [in *Univis*] held that the sale of an article which 'embodies essential features' of a patented *invention* exhausted the patent-holder's rights in that article.") (emphasis added). Because "each claim [in a patent] must be considered as defining a separate invention," *Jones*, 727 F.2d at 1528, each claim should be analyzed separately to determine whether the invention it defines is substantially embodied in the product whose sale is asserted to give rise to exhaustion.

The Supreme Court's agreement in *Quanta* with the proposition that "exhaustion does not apply across patents" supports that conclusion. 553 U.S. at 634. The Court expressly recognized that "[t]he sale of a device that practices patent A does not, by virtue of practicing patent A, exhaust patent B" – even though the patentee owns both patent A and B. *Id.* Instead, the question for exhaustion is whether the product at issue "embod[ies] the essential features" of "patent B." *Id.* at 634-35. Although the Court referred to "patents" rather than "claims" in that discussion, it had no occasion to consider whether exhaustion should be analyzed patent-by-patent or claim-by-claim, because it concluded that the Intel products substantially embodied all of the LGE inventions at issue in the case. When read in light of the entire opinion, which described the exhaustion inquiry as focused on the "essential features of the patented invention," *id.* at 632

(internal quotation marks and brackets omitted), the Court's discussion supports

analyzing exhaustion invention-by-invention, and thus (where appropriate) claim-

by-claim.[28]

This Court's discussion in *Keurig* of whether "patent exhaustion must be

adjudicated on a claim-by-claim basis" is not to the contrary.  732 F.3d at 1374.

The question there was whether Keurig's sales of coffee brewers, which Keurig

conceded exhausted its apparatus claims on the brewers, also exhausted Keurig's

claims covering a method of brewing coffee using those brewers.  There was no

dispute that the brewers substantially embodied the claimed methods; this Court

explained that the accused infringers (the owners of the brewers) "us[ed]" those

brewers "to practice the claimed methods," *id.*, and the district court found that the

brewers "completely practiced the claimed invention," *id.* at 1372.  In that context,

the Court concluded that the sales of the brewers exhausted both types of claims:

"If Keurig were allowed to assert its claims to methods of brewing a beverage

---

[28] The district court sought support from the *Quanta* Court's statement that exhaustion applies where a product "sufficiently embodies the patent – even if it does not completely practice the patent."  553 U.S. at 628; *see* A13.  But the Court was referring to a case (such as *Quanta* itself) in which the purchased products were "components of a patented system that must be combined with additional components in order to practice the patented methods."  553 U.S. at 621.  It did not suggest that the sale of a product that embodies some but not all claims in a patent would exhaust the entire patent, including claims to distinct inventions that are not embodied in the product.

using the subject brewers of its apparatus claims of the same patent, the effect would be to vitiate the doctrine of patent exhaustion." *Id.* at 1374.

In her opinion concurring in the result in *Keurig*, Judge O'Malley recognized that "[t]here could be instances where assessing exhaustion on a claim-by-claim basis – the same way we conduct almost every analysis related to patent law – would be necessary and appropriate." *Id.* at 1375 (O'Malley, J., concurring in the result); *see also LifeScan*, 734 F.3d at 1369 ("[T]he question here is whether the meters 'control' and 'carry out' the inventive functions described *in the method claims* of the '105 patent.") (emphasis added). That analysis is correct.

## E.    Restrictions in HPL's Handset Licenses Confirm That Exhaustion Does Not Apply

HPL's handset licenses foreclose any argument that the sale of a handset exhausts HPL's rights under claims that the handset is not used to practice and that are not embodied in the handset.

**1.**    HPL's handset licenses grant rights "to practice *only in the Licensed Fields*," and the only "Licensed Field[ ]" is the field of "Mobile Wireless Communication Devices." A2100-01 (¶ 5) (emphasis added). The releases and covenants not to sue in the handset licensing agreements are similarly limited to the licensed field of mobile wireless communication devices (and contain additional limitations and exclusions to preserve HPL's rights against the licensees and third parties). *See id.* In addition, the vast majority of the handset licenses

contain additional terms (the wording of which varies somewhat across the licenses) confirming in substance that the handset licensees are not authorized to practice claims that "expressly recite material additional operations that are carried out (or material additional structure that is added) by Third Parties . . . and/or are not substantially embodied in the products, services or methods within the scope of the Licensed Fields." A2102 (¶ 5). Finally, the handset licenses also contain a provision expressly recognizing the licensee's payment of a reduced fee in light of the restrictions in the license grant. A2104 (¶ 5).[29] In short, the handset licenses do not authorize manufacturers to practice claims that handsets are not used to infringe and that are not embodied in handsets.

      **2.**     The Supreme Court and this Court have long held that restrictions on a licensee's right to sell prevent the operation of patent exhaustion. In *Quanta*, the Court observed that, in its decisions in the *General Talking Pictures* cases, it approved of the use of license restrictions to limit patent exhaustion. In *General Talking Pictures*, "the manufacturer sold patented amplifiers for commercial use, thereby breaching a license that limited the buyer to selling the amplifiers for

---

[29] Those provisions foreclose any argument for an implied license (a doctrine on which Defendants did not rely at summary judgment in the district court). *See Endo Pharm. Inc. v. Actavis, Inc.*, --- F.3d ---, 2014 WL 1272846, at *6 (Fed. Cir. Mar. 31, 2014) (rejecting accused infringers' attempt "to capture via implied license subject matter *in addition to that* for which they bargained").

private and home use.  The Court held that exhaustion did not apply because the manufacturer had no authority to sell the amplifiers for commercial use, and the manufacturer 'could not convey to petitioner what both knew it was not authorized to sell.'" *Quanta*, 553 U.S. at 636 (quoting *General Talking Pictures Corp. v. Western Elec. Co.*, 304 U.S. 175, 181 (1938)); *see General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 127 (1938) ("As the restriction was legal and the amplifiers were made and sold outside the scope of the license, the effect is precisely the same as if no license whatsoever had been granted to [the manufacturer]."); *see also Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 456 (1940) ("[A patentee] may grant licenses to make, use or vend, restricted in point of space or time, or with any other restriction upon the exercise of the granted privilege, save only that by attaching a condition to his license he may not enlarge his monopoly and thus acquire some other which the statute and the patent together did not give.").[30]

This Court has recognized the continuing validity of license restrictions as a limit on patent exhaustion after *Quanta*:  "Th[e] 'exhaustion' doctrine does not apply . . . to a conditional sale or license, where it is more reasonable to infer that a

---

[30] In *Quanta*, the Supreme Court found the principle recognized in *General Talking Pictures* to be inapplicable because the license agreement "broadly permit[ted] Intel to 'make, use, [or] sell' products free of LGE's patent claims." 553 U.S. at 536.

negotiated price reflects only the value of the 'use' rights conferred by the patentee. Thus, express conditions accompanying the sale or license of a patented product, such as field of use limitations, are generally upheld." *Princo Corp. v. International Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc) (citing *General Talking Pictures*, 304 U.S. at 181).

    **3.**    The district court acknowledged that HPL's handset licenses granted limited rights to those manufacturers "only within the described Licensed Fields." But it stated that "HPL cannot avoid patent exhaustion by attempting to shield some of the claims within the patents-in-suit from being covered by Licensing Agreements." A9-10; *see* A12 ("HPL cannot reserve claims from its patent license"). It expressed concern that, "if HPL were able to carve out individual claims from a single patent, it could potentially claim a multitude of separately licensable rights from one invention." A13.

    The district court's reasoning cannot be reconciled with *General Talking Pictures*. There, the patentee licensed *the same invention* to multiple different licensees – one manufacturer received an exclusive license to make and sell products for commercial use, while others received non-exclusive licenses to make and sell for home use. *See* 305 U.S. at 125-26. The Supreme Court held that the license restrictions were "legal" and effective to prevent authorized sales and hence exhaustion, *id.* at 127; it expressed no concern that the patentee had received

multiple license fees for the same invention.  Here, the case against exhaustion is even stronger, because the inventions licensed in HPL's handset licenses are materially different from the content inventions that Defendants are accused of practicing without authority.[31]

Regardless, the district court's belief about the effectiveness of HPL's licensing restrictions to avoid exhaustion where it would otherwise apply misses the point.  As explained above, exhaustion does not apply because Defendants do not use handsets in practicing the content claims and because handsets do not embody those claims.  The handset licenses reinforce that conclusion because they demonstrate that sophisticated handset manufacturers analyzed HPL's patents and came to the same conclusion as HPL:  that handsets are not involved in the practice of the content claims.  That further confirms that the essential predicate for applying the exhaustion doctrine is lacking.

---

[31] The district court cited *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, for the proposition that, if "claims are separate and distinct within a single patent . . . , the patentee must file separate patents and then issue a license on each distinct patent."  A13.  *Aro* said nothing of the sort.  That case addressed "a combination patent, comprised entirely of unpatented elements," and it specifically noted that *each claim* in the patent "claims only a combination."  365 U.S. at 338-39 & n.1.  In that context, the Court observed that, "[s]ince none of the separate elements of the combination is claimed as the invention, none of them when dealt with separately is protected by the patent monopoly."  *Id.* at 345 (internal quotation marks omitted).  Here, Mr. Helferich's content inventions are "claimed as the invention[s]" and therefore are "separately . . . protected by the patent monopoly."

**4.** In all events, there can be no claim that exhaustion protects Defendants from liability for infringement when they provide content to users of handsets purchased from manufacturers that have no valid license from HPL. Because HPL denied that it licensed all handset manufacturers whose handsets are used in the United States, *see supra* note 8, the judgment below should be reversed under any circumstances.

## CONCLUSION

The district court's judgments should be reversed.

Respectfully submitted,

/s/ *Aaron M. Panner*

| | |
|---|---|
| Victoria Curtin | Aaron M. Panner |
| VICTORIA GRUVER CURTIN, P.L.C. | Brendan J. Crimmins |
| 14555 N. Scottsdale Road, Suite 160 | Michael E. Joffre |
| Scottsdale, Arizona 85254 | KELLOGG, HUBER, HANSEN, TODD, |
| (480) 998-3547 | EVANS & FIGEL, P.L.L.C. |
| | 1615 M Street, N.W., Suite 400 |
| Steven G. Lisa | Washington, D.C. 20036 |
| Jon E. Kappes | (202) 326-7900 |
| LAW OFFICES OF STEVEN G. LISA, LTD. | |
| 55 West Monroe Street, Suite 3210 | Gerald D. Hosier |
| Chicago, Illinois 60603 | LAW OFFICES OF GERALD D. HOSIER, |
| (312) 752-4357 | LTD. |
| | PO Box 12354 |
| | Aspen, Colorado 81612 |
| | (970) 920-3475 |

*Counsel for Plaintiff-Appellant Helferich Patent Licensing, LLC*

April 7, 2014

# ADDENDUM

# TABLE OF CONTENTS

Page

Memorandum Opinion and Order, Nos. 10-cv-4387, *et al.*
(Aug. 14, 2013) (DN 308)........................................................A1

Order, No. 10-cv-4387 (Aug. 14, 2013) (DN 307)..............................A16

Order, No. 11-cv-7395 (Aug. 14, 2013) (DN 123)..............................A17

Order, No. 11-cv-7607 (Aug. 14, 2013) (DN 120)..............................A18

Order, No. 11-cv-7647 (Aug. 14, 2013) (DN 124)..............................A19

Order, No. 11-cv-9143 (Aug. 14, 2013) (DN 142)..............................A20

Judgment, No. 10-cv-4387 (Aug. 14, 2013) (DN 309) ........................A21

Judgment, No. 11-cv-7395 (Aug. 14, 2013) (DN 125) ........................A22

Judgment, No. 11-cv-7607 (Aug. 14, 2013) (DN 122) ........................A23

Judgment, No. 11-cv-7647 (Aug. 14, 2013) (DN 126) ........................A24

Judgment, No. 11-cv-9143 (Aug. 14, 2013) (DN 144) ........................A25

Order Conditionally Dismissing Counterclaims Without Prejudice and
Extending Deadlines To Move for Costs and Fees, Nos. 10-cv-4387 &
11-cv-9143 (Sept. 11, 2013) (DN 317).................................................A26

Order Conditionally Dismissing Counterclaims Without Prejudice and
Extending Deadlines To Move for Costs and Fees, Nos. 11-cv-7607,
11-cv-7647 & 11-cv-7395 (Sept. 17, 2013) (DN 139) ........................A28

Order, Nos. 10-cv-4387, *et al.* (Dec. 4, 2013) (DN 324).....................A30

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HELFERICH PATENT LICENSING, LLC, | ) | |
| | ) | |
| | ) | Case No. 10-cv-4387 |
| Plaintiff, | ) | Case No. 11-cv-7395 |
| v. | ) | Case No. 11-cv-7607 |
| | ) | Case No. 11-cv-7647 |
| THE NEW YORK TIMES COMPANY; | ) | Case No. 11-cv-9143 |
| G4 MEDIA, LLC; | ) | |
| CBS CORPORATION; | ) | Judge John W. Darrah |
| BRAVO MEDIA, LLC; | ) | |
| J.C. PENNEY CORPORATION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Helferich Patent Licensing, LLC ("HPL"), filed suit against Defendants, The New York Times Company ("NYT"); G4 Media, LLC ("G4"); CBS Corporation ("CBS"); Bravo Media, LLC ("Bravo"); and J.C. Penney Corporation, Inc. ("J.C. Penney"), alleging claims of patent infringement. The parties filed cross-motions for summary judgment on the issue of patent exhaustion, which have been fully briefed. Defendants jointly move for summary judgment on the basis that the patents asserted by HPL are exhausted as to HPL's infringement claims; HPL concurrently moves for summary judgment on the basis that Defendants are not entitled to the defense of patent exhaustion.

### BACKGROUND

HPL holds a large portfolio of patents; it enforces its patent rights with licensing or through litigation. The patents at issue relate to the methods and systems that send and receive hyperlinks to websites to an electronic device, such as a cellular phone. Using Short Message Service ("SMS") or Multimedia Messaging Service ("MMS") protocols, a cell phone can receive

**A 1**

a link to a website from a content provider.  A cell phone user can then click on the link sent to the phone to retrieve the content found at a website.

HPL has licensed this technology to cell phone manufacturers, so that any handheld device sold can receive such content without being accused of infringing HPL's patents.  Many content providers have also entered into license agreements with HPL, so that they may send their content to a cell phone.  Defendants in this case did not enter into license agreements with HPL.  Instead, Defendants contend that the patents at issue are exhausted, based on HPL's licensing agreements with cell phone and handset manufacturers.

The parties have submitted statements of material facts pursuant to Local Rule 56.1.[1] The following facts are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.[2,3]  HPL is a limited liability company, organized under the

---

[1] Local Rule 56.1(a)(3) requires a party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue . . . ." Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny each factual statement proffered by the moving party and concisely designate any material facts that establish a genuine dispute for trial.  A litigant's failure to dispute the facts set forth in an opponent's statement in the manner dictated by Local Rule 56.1 results in those facts' being deemed admitted for summary judgment purposes.  Local Rule 56.1(b)(3) further permits the non-movant to submit additional statements of material facts that "require the denial of summary judgment . . . ."

To the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted.  *See Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact which relies upon inadmissible hearsay, such a fact is disregarded.  *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

[2] Plaintiff also attempts to designate certain statements and arguments in Defendants' brief in support of their motion as Defendants' Statements of Material Facts, and then provide responses to these statements and arguments.  Plaintiff's approach goes beyond the scope of Local Rule 56.1; these statements are not properly identified as statements of material facts for purposes of Local Rule 56.1 and will not be regarded as such, nor will Plaintiff's responses be considered.

**A 2**

laws of the state of Illinois, with its principal place of business in Phoenix, Arizona.  (Pl.'s SOF ¶ 2.)  HPL holds a patent portfolio which includes more than fifty patents, including the patents-at-issue, relating to mobile communication devices and the provision of media and content to such devices.  (Pl.'s SOF ¶ 2.)  HPL is the exclusive licensee of the patents-in-suit.  (Defs.' SOF ¶ 7.)

NYT is a New York corporation and Bravo is a New York limited liability company, both with their principal places of business in New York, New York.  (Defs.' SOF ¶¶ 2, 5; Pl.'s SOF ¶¶ 3, 6.)  CBS and J.C. Penney are both Delaware corporations, with principal places of business in New York, New York, and Plano, Texas, respectively.  (Defs.' SOF ¶¶ 4, 6; Pl.'s SOF ¶¶ 5,7.)  G4 is a Delaware limited liability company, with its principal place of business in Los Angeles, California.  (Defs.' SOF ¶ 3; Pl.'s SOF ¶ 4.)  Subject-matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1338(a) and 2202, and venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1400(b).  (Defs.' SOF ¶¶ 8-9; Pl.'s SOF ¶¶ 8-9.)

There are six patents-in-suit:  U.S. Patent No. 7,280,838, issued on October 9, 2007; U.S Patent No. 7,499,716, issued on March 3, 2009; U.S. Patent No. 7,835,757, issued on November 16, 2010; U.S. Patent No. 8,107,601, issued on January 31, 2012; U.S. Patent No. 8,116,741, issued on February 14, 2012; and U.S. Patent No. 8,134,450, issued on March 13, 2012.  (Third Am. Compl. ¶¶ 6-11.)

The entire cellular handset manufacturing industry has acquired licenses under the HPL portfolio.  (Defs.' SOF ¶ 11.)  All the licenses at issue here provide for certain releases (subject to some limitations); the licenses to each handset manufacturer generally provide that:

---

[3] Admitted Statements of Material Facts by Defendants are designated as "Defs.' SOF," with the corresponding paragraph referenced; Plaintiff's Additional Admitted Statements of Material Facts are designated as "Pl.'s SOF," with the corresponding paragraph referenced.

> HPL hereby releases, acquits and discharges Licensee's respective direct and indirect past, present and future customers, retailers, wholesalers, distributors, dealers, resellers, users, OEMs, vendors and manufacturers from and against any and all claims, demands, liabilities and rights of action of any kind of nature, at law, in equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, relating to any infringement or alleged infringement of any of the Licensed Patents and Applications (whether direct, contributory or by inducement, and whether or not willful), but only to the extent that such claim, demand, liability or right of action arises from the manufacture, use, sale, offer for sale, import or export by or for Licensee of a product within the Licensed Fields.

(Defs.' SOF ¶ 12; Defs.' SOF Ex. BB § 2(b).)  HPL's license agreements also have provisions relating to a "Covenant Not to Sue," which provides that, subject to exceptions:

> HPL hereby covenants and agrees with Licensee that neither HPL nor any person or entity directly or indirectly controlled by it or claiming through it will bring suit or otherwise assert **any claim or cause of action . . . against a Third Party (including, without limitation, Wireless Service Providers, Wireless Service Message Providers, Wireless Content Providers and Consumers) for an infringement claim** that is dependent upon such Third Party making, importing, exporting, selling or offering for sale to Consumers a Mobile Wireless Communication Device within the scope of the Licensed Fields . . . .

(Defs.' SOF ¶ 13; Defs.' SOF Ex. BB § 3(b) (emphasis added and to be discussed further, below.)  One Licensed Field includes "Mobile Wireless Communication Devices that are made, used, imported, offered for sale, sold or otherwise disposed of by Licensee, anywhere in the world."  (Pl.'s SOF ¶ 57.)  Another Licensed Field, incorporated in some of the license agreements, includes "Mobile Wireless Content Provision carried out by or for Licensee."  (Defs.' SOF Ex. B § 1g(1).)  Some of these license agreements indicate that the "licensed patents and applications" at issue include:

> [A]ll the patents and applications owned or controlled by, or exclusively licensed to, HPL including but not limited to those identified on Exhibit A, including any continuations, continuations-in-part, divisionals, extension, reissues, or reexaminations thereof, renewals and extensions thereof, any patent or application to which those listed in Exhibit A claim priority, in whole or in part, and any foreign counterparts claiming priority or issuing from any of the above.

4

**A 4**

(Defs.' Add'l. SOF ¶ 14; Defs.' Ex. B at §1(h).)  However, some of the license agreements also specifically withhold certain *claims* against third parties.  These license agreements attach a separate exhibit, separately identify claims from HPL's patents that are not covered by the license agreement and, therefore, in HPL's view, reserving its rights to enforce these specific claims against other parties.

In U.S. Patent No. 8,134,450, the Field of Invention states:  "the present invention relates generally to paging transceivers and methods for selectively acting on messages and, more particularly, to paging transceivers and methods for selectively retrieving messages." (Defs.' Add'l. SOF ¶ 15.)  The properties and activities of handsets (also called paging transceivers, pager transceivers, and paging receivers) are discussed in the portions of the '450 Patent that describe the field of the invention, the background of the invention, and the summary of the invention.  (Defs.' Add'l. SOF ¶ 16.)  The other patents-in-suit similarly discuss the properties of, and activities performed by, handsets.  (Defs.' Add'l. SOF ¶ 17.)  Each of the patents asserted in this suit provides for an operation to be performed by a content provider, directed to a mobile phone.  (Defs.' SOF ¶ 14; Pl.'s Resp. to Defs.' SOF ¶ 14.)  HPL has sent notice letters to at least 121 companies that have subsequently agreed to take a content license.  (Defs.' SOF ¶ 22.)  HPL has admitted to the PTO that it granted content licenses to several handset manufacturers, as well.  (Defs.' SOF ¶ 23.)

## LEGAL STANDARD

Patent exhaustion is an affirmative defense to a claim of patent infringement. *ExcelStor Technology, Inc. v. Papst Licensing GMBH & Co. KG*, 541 F.3d 1373, 1376 (Fed. Cir. 2008).  Accordingly, as a substantive patent issue, Federal Circuit law controls the issue of patent exhaustion; though, Seventh Circuit law governs procedural summary judgment issues, such as

the statement of material facts.  *See U.S. Gypsum Co. v. LaFarge North America, Inc.*, 508 F.

Supp. 2d 601, 611-12 (N.D. Ill. 2007).

Patent exhaustion is an issue that may be properly decided by summary judgment.  *See*

*Transcore v. Elec. Transaction Consultants*, 563 F.3d 1271, 1274 (Fed. Cir. 2009).  Patent

exhaustion requires that after a patented product is sold initially, all patent rights terminate in that

product, provided the product sufficiently embodies, or "partially practice[s]" the patent.  *Quanta*

*Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625, 635 (2008).  "The rationale

underlying the doctrine rests upon the theory that an unconditional sale of a patented device

exhausts the patentee's right to control the purchaser's use of that item thereafter because the

patentee has bargained for and received the full value of the goods."  *Multimedia Patent Trust v.*

*Apple Inc.*, Case No. 10-cv-2618-H, 2012 WL 6863471, at *3 (S.D. Cal. Nov. 9, 2012) (citing

*Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc)).  Much like claim

construction, the issue of whether a product sufficiently embodies a patent such that the patent is

exhausted is an issue of law and, therefore, appropriately addressed on summary judgment.  *See*

*Baychar, Inc. v. Salomon North America*, Case No. 04-136-B-C, 2006 WL 2061400, at *6 (D.

Me. 2006) ("Whether the principle of patent exhaustion . . . should be recognized is a matter of

law for the Court to decide.") (citation omitted).

Summary judgment is proper if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears

the initial responsibility of informing the court of the basis for its motion and identifying the

evidence it believes demonstrates the absence of a genuine issue of material fact.  *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323-24 (1986).

In considering a motion for summary judgment, the court views the evidence in a light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The court does not make credibility determinations or weigh conflicting evidence on summary judgment. *Anderson*, 477 U.S. at 255.

## ANALYSIS

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta*, 553 U.S. at 625. "[T]he traditional bar on patent restrictions following the sale of an item applies when the item sufficiently embodies the patent – *even if it does not completely practice the patent* – such that its only and intended use is to be finished under the terms of the patent." *Id.* (explaining the holding in *United States v. Univis Lens Co.*, 316 U.S. 241, 249-51 (1942)) (emphasis added).

Defendants rely on the Supreme Court's ruling in *Quanta* to support their motion for summary judgment, arguing that when a patented invention is sold, all of the patent's claims are exhausted, regardless of any narrowly tailored license agreements. (Defs.' Mem. in Support of Mot. at 5-6.) In *Quanta*, LG Electronics ("LGE") purchased a portfolio of patents, including three patents that contemplated a system and methods for a computer to efficiently access data and transfer data between the microprocessor (which carries out the main functions of the computer system), and the other devices, like the computer keyboard and mouse. *Quanta*, 553 U.S. at 621-22. LGE licensed its patent portfolio to Intel Corporation, permitting Intel to

7

**A 7**

manufacture and sell microprocessors which use the LGE patents.  *Id.* at 623.  The agreement in

*Quanta* between LGE and Intel contained some limitations, providing, in part, that Intel was

required to give written notice to its customers that, while it had a broad license from LGE on the

products purchased by its customers, "the license 'does not extend, expressly or by implication,

to any product that you make by combining an Intel product with any non-Intel product.'"  *Id.* at

623-24.  Thereafter, Quanta purchased microprocessors from Intel and manufactured computers

that combined Intel parts with non-Intel parts.  *Id.*  The Supreme Court held that the Intel

products "constitute a material part of the patented invention and all but completely practice the

patent," and further, that "[b]ecause Intel was authorized to sell its products to Quanta, the

doctrine of patent exhaustion prevents LGE from further asserting its patent rights with respect to

the patents substantially embodied by those products."  *Id.* at 633, 637.  The focus of *Quanta* is

that the sale of the product results in the exhaustion of the *patent* in its entirety, rather than the

exhaustion of certain *claims*.

However, HPL contends that its patents are distinguishable from those at issue in *Quanta*,

as HPL's patented inventions include distinct "handset" claims and "content" claims.  (Pl.'s

Resp. at 3-4.)  Essentially, HPL argues that the handset manufacturer companies which obtained

licenses from HPL received licenses to practice only the *handset* claims.  Defendants' activities

do not infringe these handset claims but, instead, purportedly infringe HPL's *content* claims,

which were not licensed to the handset manufacturer companies.  Defendants counter that a

patentee cannot use a license agreement to carve up a patent, claim by claim, in order to receive

multiple royalties.  A claim in a patent can only be carved out if it becomes the subject of a

separate, distinct patent, relying on the Supreme Court's holding that the elements of a patent

claim cannot be parceled out – "[f]or if anything is settled in the patent law, it is that the

combination patent covers only the totality of the elements in the claim and that no element, separately viewed, is within the grant." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 344 (1961).

*Licensing of All Handsets Requires Exhaustion*

No genuine issue of material fact exists with respect to HPL's licensing of its portfolio to all handset manufacturers, as HPL asserted to the PTO that "[i]n about four years, the **_entire_** cellular handset industry – 28 of the world's most aggressive companies – acquired licenses under the [HPL] portfolio." (Defs.' SOF ¶ 11, Ex. CC at 33-34) (emphasis in original). In these licenses between HPL and the handset manufacturers, the handset manufacturers are permitted, only within the described Licensed Fields, to practice, without limitation, any and all inventions claimed in the Licensed Patents, subject to restrictions, which vary between License Agreements.

HPL contends it "carefully licensed the materially different content and handset claims to the respective infringers in the respective fields." (Pl.'s Resp. to Mot. at 6.) It is apparent that HPL sought to carefully construct some of its Licensing Agreements in such a way that it could recover multiple royalties on the same patents from a single sale or use.[4]

By HPL's own admission, every cellular handset manufacturer has licensed its portfolio. Now, HPL seeks to recover royalties beyond the handset manufacturers and recover additional

---

[4] However, provisions regarding these reserved claims across the License Agreements is inconsistent. For example, some of the License Agreements indicate that the Licensed Patents include *all* patents and patent applications assigned to, owned by, or controlled by HPL; however, other license agreements define the Licensed Patents as *only* the patents listed on an exhibit attached to that specific license agreement. (*See* Defs.' SOF Exs. B-D.) Still others name the Licensed Patents as only the patents listed on an exhibit attached to the agreement, but further provide that HPL did not own any patents outside those listed. (Defs.' SOF Ex. E.) Additionally, the License Agreements are inconsistent in their reservation of claims; some License Agreements specifically identify each claim covered by the license, while others are much more vague.

royalties from downstream third parties.  However, HPL cannot avoid patent exhaustion by

attempting to shield some of the claims within the patents-in-suit from being covered by

Licensing Agreements.  "[O]nce lawfully made and sold, there is no restriction on [the product's]

*use* to be implied for the benefit of the patentee or his assignees or licensees."  *Adams v. Burke*,

84 U.S. 453, 457 (1873) (emphasis in original).  Once HPL licensed its patent portfolio to, for

example, Motorola, downstream consumers and third-party users of Motorola devices employing

HPL's patents cannot be found to be infringing.  *See Quanta*, 553 U.S. at 630 (rejecting LGE's

argument that method claims are never exhausted and explaining that, on LGE's rejected theory,

despite issuing licenses to some parties, "any downstream purchasers of the system could

nonetheless be liable for patent infringement.").

All of the patents-at-issue require the use of a handset device.  (Third Am. Compl. ¶ 12;

Defs.' SOF ¶ 14.)  HPL licensed its patents to every handset manufacturer.  Accordingly, no

genuine issue of material fact exists that every handset device has been licensed to practice

HPL's patents; ergo, no handset device can infringe HPL's patents.

### *Sufficient Embodiment*

Patent exhaustion bars further restrictions on a patent once an item is sold which

sufficiently embodies a patent – "even if it does not completely practice the patent – such that its

only and intended use is to be finished under the terms of the patent."  *Quanta*, 553 U.S. at 628.

Here, there is no genuine issue of material fact that the handset devices sold sufficiently embody

the patents-in-suit.

The handset devices have the capability to receive content from content providers, and

the patents all require devices capable of receiving content or messages.  *See, e.g.*, U.S. Patent

No. '241 Abstract (explaining that the handset device receives a "page and alerts the user that a

message is waiting and preferably provides a short description of the message.  The user can then

download or otherwise act on the message . . . . The messages stored by the systems and

delivered to the [handset] may be of different types, such as voice, text, audio, or even video.")

There would be little value to the handset manufacturers (or their end users) to have purchased

licenses to HPL's patents to receive content from a third-party content provider if the content

provider, like Defendants, could not send the message to the licensed handset device without

infringing the patents.  The handset devices are capable of receiving content, and they are

permitted to receive content in the manners provided for by HPL's patents.  Therefore, the

products "embody the essential features of the [HPL] Patents because they carry out all the

inventive processes when combined, according to their design, with standard components."

*Quanta*, 553 U.S. at 634.  No genuine issue of material fact exists that the handset devices at

least partially practice, and therefore, sufficiently embody, HPL's patents.  *See Quanta*, 553 U.S.

at 635 ("The relevant consideration is whether the . . . Products that partially practice a patent –

by, for example, embodying essential features – exhaust *that* patent.").

Exhaustion then turns on the handset manufacturers' licenses to sell the handset devices

practicing HPL's patents.  "The authorized sale of an article that substantially embodies a patent

exhausts the patent holder's rights and prevents the patent holder from invoking patent law to

control postsale use of the article."  *Quanta*, 553 U.S. at 638.  Once the handset manufacturers

sell the handsets which embody HPL's patents, HPL's patents are exhausted as to all third

parties, including Defendants.

*Covenants Not To Sue*

Each of HPL's License Agreements include Covenants Not to Sue, which provide that

HPL agrees not to sue the licensee and third parties, including content providers and consumers,

for selling or using a device covered by the License Agreement. The License Agreements attempt to limit these Covenants by reserving causes of actions for infringement of "reserved claims."

"[A] product sold under a covenant not to sue constitutes an authorized sale under the patent exhaustion doctrine." *Bobel v. MaxLite, Inc.*, Case No. 12 C 5346, 2013 WL 142987, at *4 (N.D. Ill. Jan. 11, 2013) (citing *Transcore*, 563 F.3d at 1276). HPL's Covenants Not to Sue exhaust the rights under the patents despite HPL's efforts to limit the rights of third parties, like Defendants, while permitting end users to employ the technology without violating the patents. "[T]he parties' intent with respect to downstream customers is of no moment in a patent exhaustion analysis." *Transcore,* 563 F.3d at 1775 (citing *Quanta*, 553 U.S. at 637). The right of Defendants and other third parties here to practice HPL's patents is based exhaustion, not on an implied license from a covenant in other agreements. "And exhaustion turns only on [licensee's] own license to sell products practicing the [licensor's] Patents." *Quanta*, 553 U.S. at 637. HPL's attempt to create post-sale restrictions against third parties, including Defendants, in its Covenants Not to Sue fails, as it violates the basic principles of patent exhaustion.

HPL's Covenants Not to Sue essentially state that HPL agrees not to sue any third parties, except for any third party that may potentially infringe some of the claims in its patents. As discussed above, HPL cannot reserve claims from its patent license. However, even if this were not the case, some of its License Agreements fail to identify which specific claims are actually reserved. HPL's so-called "Withheld Claims" provision serves to almost entirely defeat the grant of the Covenant Not To Sue in each License Agreement, as emphasized above. This is precisely the sort of end-run around of patent exhaustion *Quanta* rejects. *Quanta*, 553 U.S. at 630.

## CONCLUSION

A single patent can contain many claims, as the patents at issue here.  If HPL were permitted to license some claims but not others, the effect would be to vitiate the doctrine of patent exhaustion, which provides that the sale of a device which partially practices a patent *exhausts* that patent in its entirety.  *Quanta*, 553 U.S. at 635.  The reasoning in *Quanta*, as discussed above, is readily applicable here:  once a licensee sells a mobile device that partially embodies HPL's patent, even if the device does not *completely* practice HPL's patent, that patent is exhausted.  The doctrine of patent exhaustion governs the exhaustion of a *patent*, not the exhaustion of individual claims.

HPL's licensing model attempts to parcel out separate claims in a patent and recover royalties from each distinct claim within a patent.  HPL's proposed rule would have an adverse impact on the licensees and third parties.  A licensee would be uncertain as to what parts of a patent it has use rights and what is not licensed, as is likely the case with many of HPL's licensees, who entered into License Agreements that do not clearly name what claims are covered under the License Agreements.  If these claims are separate and distinct within a single patent that a patentee seeks royalties on licenses for each individual claim, the patentee must file separate patents and then issue a license on each distinct patent.  *See Aro*, 365 U.S. at 344-45 (addressing the issues of treating claim elements separately and providing:  "Since none of the separate elements of the combination is claimed as the invention, none of them when dealt with separately is protected by patent monopoly.").

Moreover, if HPL were able to carve out individual claims from a single patent, it could potentially claim a multitude of separately licensable rights from one invention and thereby, in effect, create hundreds of patents out of a single patent.  Here, HPL has licensed its patents to the

13

**A 13**

entire handset manufacturing industry and received a licensing fee from each handset

manufacturer.  If HPL were then permitted to prosecute every third party sending content to a

licensed handset device for infringement, HPL would, by definition, receive multiple royalties

for its previously licensed (and therefore, exhausted) patent.  "Patentees . . . are entitled to but

one royalty for a patented machine, and consequently when a patentee has . . . authorized another

to construct and sell it, or to construct and use and operate it, and the consideration has been paid

to him for the right, he has then to that extent parted with his monopoly, and ceased to have any

interest whatever in the machine so sold or so authorized to be constructed and operated."

*Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340, 350 (1863).  To permit a patentee to reserve specific

claims from patent exhaustion would frustrate the purposes of the doctrine, including an efficient

method of determining that a patent had been exhausted.  To the contrary, the confusion that

would be created by HPL's model would produce uncertainty regarding the rights of third parties

and end users and potentially deter further innovation.  "[T]he primary purpose of our patent

laws is not the creation of private fortunes for the owners of patents but is 'to promote the

progress of science and useful arts.'"  *Quanta*, 553 U.S. at 626 (quoting *Motion Picture Patents

Co. v. Universal Film Manufacturing Co.*, 243 U.S. 502, 511 (1917) and detailing the United

States Supreme Court's history of ruling on patent exhaustion issues).

The doctrine of patent exhaustion is designed to avoid double recovery by a patentee,

promote the orderly administration of patent rights, provide an efficient method for determining

the termination of the patent monopoly, and promote fair competition.  To permit HPL to recover

multiple times on the same patent by selling licenses to the patents piece by piece (or claim by

claim) is contradictory to these policies supporting the doctrine of patent exhaustion.  Therefore,

HPL's patents are exhausted.

Accordingly, Defendants' Motion for Summary Judgment on the issue of patent exhaustion is granted, and HPL's Motion for Summary Judgment is denied. Judgment is entered in favor of Defendants, and HPL's claims of patent infringement are dismissed.


Date: __August 14, 2013_____          _____

JOHN W. DARRAH
United States District Court Judge

Case: 1:10-cv-04387 Document #: 307 Filed: 08/14/13 Page 1 of 1 PageID #:7829

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| Helferich Patent Licensing | ) | Case No: 10 C 4387 |
|  | ) |  |
| v. | ) |  |
|  | ) | Judge: John W. Darrah |
|  | ) |  |
| New York Times Co. | ) |  |
|  | ) |  |

### <u>ORDER</u>

Status hearing and ruling on motion hearing held. For the reasons stated in the attached memorandum opinion and order, defendants' motion for summary judgment on the issue of patent exhaustion is granted [228], and HPL's motion for summary judgment is denied [258]. Judgment is entered in favor of defendants, and HPL's claims of patent infringement are dismissed. Enter Memorandum Opinion and Order. Civil case closed. Any pending dates or motions are moot.

Date:   8/14/13                                    /s/ Judge John W. Darrah

**A 16**

Case: 1:11-cv-07395 Document #: 123 Filed: 08/14/13 Page 1 of 1 PageID #:4555

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| | ) | |
| Helferich Patent Licensing | ) | Case No: 11 C 7395 |
| | ) | |
| v. | ) | |
| | ) | Judge: John W. Darrah |
| | ) | |
| G4 Media, LLC | ) | |
| | ) | |

## <u>ORDER</u>

Status hearing and ruling on motion hearing held. For the reasons stated in the attached memorandum opinion and order, defendants' motion for summary judgment on the issue of patent exhaustion is granted [84], and HPL's motion for summary judgment is denied [96]. Judgment is entered in favor of defendants, and HPL's claims of patent infringement are dismissed. Enter Memorandum Opinion and Order. Civil case closed. Any pending dates or motions are moot.

Date:   8/14/13                                              /s/ Judge John W. Darrah

**A 17**

Case: 1:11-cv-07607 Document #: 120 Filed: 08/14/13 Page 1 of 1 PageID #:4584

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

|  |  |  |
|---|---|---|
| Helferich Patent Licensing | ) | Case No: 11 C 7607 |
|  | ) |  |
| v. | ) |  |
|  | ) | Judge: John W. Darrah |
|  | ) |  |
| CBS Corporation | ) |  |
|  | ) |  |

**<u>ORDER</u>**

Status hearing and ruling on motion hearing held. For the reasons stated in the attached memorandum opinion and order, defendants' motion for summary judgment on the issue of patent exhaustion is granted [78], and HPL's motion for summary judgment is denied [91]. Judgment is entered in favor of defendants, and HPL's claims of patent infringement are dismissed. Enter Memorandum Opinion and Order. Civil case closed. Any pending dates or motions are moot.

Date:   8/14/13                                   /s/ Judge John W. Darrah

**A 18**

Case: 1:11-cv-07647 Document #: 124 Filed: 08/14/13 Page 1 of 1 PageID #:4601

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| | ) | |
| Helferich Patent Licensing | ) | Case No: 11 C 7647 |
| | ) | |
| v. | ) | |
| | ) | Judge: John W. Darrah |
| | ) | |
| Bravo Media, LLC | ) | |
| | ) | |

## <u>ORDER</u>

Status hearing and ruling on motion hearing held. For the reasons stated in the attached memorandum opinion and order, defendants' motion for summary judgment on the issue of patent exhaustion is granted [81], and HPL's motion for summary judgment is denied [93]. Judgment is entered in favor of defendants, and HPL's claims of patent infringement are dismissed. Enter Memorandum Opinion and Order. Civil case closed. Any pending dates or motions are moot.

Date:   8/14/13                                    /s/ Judge John W. Darrah

**A 19**

Case: 1:11-cv-09143 Document #: 142 Filed: 08/14/13 Page 1 of 1 PageID #:3786

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

|  |  |  |
|---|---|---|
| | ) | |
| Helferich Patent Licensing | ) | Case No: 11 C 9143 |
| | ) | |
| v. | ) | |
| | ) | Judge: John W. Darrah |
| | ) | |
| J.C. Penney Company | ) | |
| | ) | |

## <u>ORDER</u>

Status hearing and ruling on motion hearing held. For the reasons stated in the attached memorandum opinion and order, defendants' motion for summary judgment on the issue of patent exhaustion is granted [94], and HPL's motion for summary judgment is denied [110]. Judgment is entered in favor of defendants, and HPL's claims of patent infringement are dismissed. Enter Memorandum Opinion and Order. Civil case closed. Any pending dates or motions are moot.

Date:   8/14/13                                   /s/ Judge John W. Darrah

**A 20**

AO 450 (Rev. 11/11)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
### Northern District of Illinois, Eastern Division

| | |
|---|---|
| Helferich Patent Licensing, LLC. | ) |
| *Plaintiff* | ) |
| v. | )     Civil Action No.    10 C 4387 |
| New York Times Co. | ) |
| *Defendant* | ) |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

❏  the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate _____ % per annum, along with costs.

❏  the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____
_____ .

X   other:   For the reasons stated in the Court's 8/14/13 memorandum opinion and order, defendants' motion for summary judgment on the issue of patent exhaustion is granted [228], and HPL's motion for summary judgment is denied [258]. Judgment is entered in favor of defendants, and HPL's claims of patent infringement are dismissed ____ .

This action was *(check one)*:

❏  tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

❏  tried by Judge _____ without a jury and the above decision was reached.

X   decided by Judge ____ Darrah _____ on a motions for ___ summary ____
judgment. _____ .

| | |
|---|---|
| Date: ____ Aug 14, 2013 ____ | *Thomas G. Bruton, CLERK OF COURT* |
| | Melanie A. Foster |
| | _____ |
| | *Signature of Clerk or Deputy Clerk* |

## A 21

AO 450 (Rev. 11/11)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Illinois, Eastern Division

| | | |
|---|---|---|
| Helferich Patent Licensing, LLC. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    11 C 7395 |
| G4 Media, LLC | ) | |
| *Defendant* | ) | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

❒  the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate _____ % per annum, along with costs.

❒  the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____ _____ .

X  other:   For the reasons stated in the Court's 8/14/13 memorandum opinion and order, defendants' motion for summary judgment on the issue of patent exhaustion is granted [84], and HPL's motion for summary judgment is denied [96]. Judgment is entered in favor of defendants, and HPL's claims of patent infringement are dismissed _____ .

This action was *(check one)*:

❒  tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

❒  tried by Judge _____ without a jury and the above decision was reached.

X  decided by Judge ___Darrah___ on a motions for ___summary___ judgment. _____ .

Date:    ___Aug 14, 2013___          *Thomas G. Bruton, CLERK OF COURT*

                                          Melanie A. Foster
                                    _____
                                    *Signature of Clerk or Deputy Clerk*

**A 22**

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Northern District of Illinois, Eastern Division

| | | |
|---|---|---|
| Helferich Patent Licensing, LLC. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    11 C 7607 |
| CBS Corporation | ) | |
| *Defendant* | ) | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

❏  the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate _____ % per annum, along with costs.

❏  the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____
_____ .

X  other:   For the reasons stated in the Court's 8/14/13 memorandum opinion and order, defendants' motion for
summary judgment on the issue of patent exhaustion is granted [78], and HPL's motion for summary judgment is
denied [91]. Judgment is entered in favor of defendants, and HPL's claims of patent infringement are dismissed     .

This action was *(check one)*:

❏  tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

❏  tried by Judge _____ without a jury and the above decision
was reached.

X  decided by Judge    Darrah _____ on a motions for   summary _____
judgment.
_____ .

| | |
|---|---|
| Date:    Aug 14, 2013 | *Thomas G. Bruton, CLERK OF COURT* |
| | Melanie A. Foster |
| | *Signature of Clerk or Deputy Clerk* |

**A 23**

Case: 1:11-cv-07647 Document #: 126 Filed: 08/14/13 Page 1 of 1 PageID #:4617

AO 450 (Rev. 11/11)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois, Eastern Division

| | |
|---|---|
| Helferich Patent Licensing, LLC. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.     11 C 7647 |
| Bravo Media, LLC | ) |
| *Defendant* | ) |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____ _____ .

X   other:   For the reasons stated in the Court's 8/14/13 memorandum opinion and order, defendants' motion for summary judgment on the issue of patent exhaustion is granted [81], and HPL's motion for summary judgment is denied [93]. Judgment is entered in favor of defendants, and HPL's claims of patent infringement are dismissed _____ .

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

X   decided by Judge     Darrah _____ on a motions for   summary _____ judgment.
_____ .

| | |
|---|---|
| Date:     Aug 14, 2013 | *Thomas G. Bruton, CLERK OF COURT* |
| | Melanie A. Foster |
| | _____ |
| | *Signature of Clerk or Deputy Clerk* |

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Illinois, Eastern Division

| | |
|---|---|
| Helferich Patent Licensing, LLC. | ) |
| *Plaintiff* | ) |
| v. | )     Civil Action No.    11 C 9143 |
| J.C. Penney Company | ) |
| *Defendant* | ) |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

❏ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate _____ % per annum, along with costs.

❏ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ _____ recover costs from the plaintiff *(name)* _____ _____ .

X  other:   For the reasons stated in the Court's 8/14/13 memorandum opinion and order, defendants' motion for summary judgment on the issue of patent exhaustion is granted [94], and HPL's motion for summary judgment is denied [110]. Judgment is entered in favor of defendants, and HPL's claims of patent infringement are dismissed _____ .

This action was *(check one)*:

❏ tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

❏ tried by Judge _____ without a jury and the above decision was reached.

X  decided by Judge _____ Darrah _____ on a motions for _ summary _____ judgment.

Date: _____ Aug 14, 2013 _____          *Thomas G. Bruton, CLERK OF COURT*

                                             Melanie A. Foster
                                         _____
                                          *Signature of Clerk or Deputy Clerk*



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| HELFERICH PATENT LICENSING, L.L.C. an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> THE NEW YORK TIMES COMPANY, a New York Corporation, *Defendant.* | No. 1:10-cv-04387 <br><br> Hon. John W. Darrah <br> Magistrate Hon. Jeffrey T. Gilbert |
| HELFERICH PATENT LICENSING, L.L.C. an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> J.C. PENNEY CORPORATION, INC., a Delaware Corporation, *Defendant.* | No. 1:11-cv-09143 <br><br> Hon. John W. Darrah <br> Magistrate Hon. Jeffrey Gilbert |

### ORDER CONDITIONALLY DISMISSING COUNTERCLAIMS WITHOUT PREJUDICE AND EXTENDING DEADLINES TO MOVE FOR COSTS AND FEES

In order to finalize the judgment for purposes of appeal and to facilitate case management following appeal, the Court orders as follows:

1.      Dismissal of Counterclaims

Defendant/Counterclaim-Plaintiff The New York Times Company's Counterclaims for Declaratory Judgment, pled in its Answer, Affirmative Defenses, and Counterclaims to the Plaintiff's Third Amended Complaint for Patent Infringement (Apr. 17, 2012) (Dkt. 140) are hereby dismissed without prejudice. Furthermore, Defendant/Counterclaim-Plaintiff J.C.

1

**A 26**

Penney Corporation, Inc.'s Counterclaims for Declaratory Judgment, pled in its Answer, Affirmative Defenses, and Counterclaims to the Plaintiff's Second Amended Complaint for Patent Infringement (March 28, 2012) (Dkt. 34) are hereby dismissed without prejudice. In the event the case is remanded to this Court, all counterclaims will be automatically reinstated on the date the mandate issues to this Court. No further action from any party will be required to reinstate these claims, which shall not be deemed waived in the event of a remand.

2.    Deferral of Deadline to Move for Costs and/or Fees

Pursuant to Local Rule 54.1(a) and Local Rule 54.3(b), the Court hereby extends the deadlines for moving for costs and/or fees to 90 days after the latter of:

(1)    the deadline for filing a notice of appeal expires;

(2)    the Federal Circuit dismisses the appeal;

(3)    in the event this Court's judgment ultimately is affirmed without intervening remand to this Court, the date the mandate issues to this Court, or

(4)    in the event this Court's judgment is remanded to this Court, the date this Court enters final judgment.

Dated: 9-11, 2013

By: _____
U.S. District Court
Judge John W. Darrah

2

**A 27**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| HELFERICH PATENT LICENSING, L.L.C.<br>*Plaintiff/Counterclaim-*<br>*Defendant,*<br><br>v.<br><br>CBS CORPORATION,<br>*Defendant/Counterclaim-*<br>*Plaintiff.* | No. 1:11-cv-07607<br><br>Hon. John W. Darrah |
| HELFERICH PATENT LICENSING, L.L.C.<br>*Plaintiff/Counterclaim-*<br>*Defendant,*<br><br>v.<br><br>BRAVO MEDIA, LLC,<br>*Defendant/Counterclaim-*<br>*Plaintiff.* | No. 1:11-cv-07647<br><br>Hon. John W. Darrah |
| HELFERICH PATENT LICENSING, L.L.C.<br>*Plaintiff/Counterclaim-*<br>*Defendant,*<br><br>v.<br><br>G4 MEDIA, LLC,<br>*Defendant/Counterclaim-*<br>*Plaintiff.* | No. 1:11-cv-07395<br><br>Hon. John W. Darrah |

## ORDER CONDITIONALLY DISMISSING
## COUNTERCLAIMS WITHOUT PREJUDICE AND
## EXTENDING DEADLINES TO MOVE FOR
## COSTS AND FEES

The Court orders as follows:

1.    <u>Dismissal of Counterclaims</u>

Defendant/Counterclaim-Plaintiff CBS Corporation's counterclaims for declaratory judgment pled in its Answer to Amended Complaint, Defenses, Counterclaims, and Jury Demand (Apr. 17, 2012) (Dkt. 45) are hereby dismissed without prejudice. In addition, Defendant/Counterclaim-Plaintiff Bravo Media's counterclaims for declaratory judgment pled in its Answer to Amended Complaint, Defenses, Counterclaims, and Jury Demand (Apr. 17, 2012) (Dkt. 46) are hereby dismissed without prejudice. Furthermore, Defendant/Counterclaim-Plaintiff G4 Media's counterclaims for declaratory judgment pled in its Answer to Amended Complaint, Defenses, Counterclaims, and Jury Demand (Apr. 17, 2012) (Dkt. 51) are hereby dismissed without prejudice. In the event the case is remanded to this Court, all counterclaims will be automatically reinstated on the date the mandate issues to this Court. No further action from any party will be required to reinstate these claims, which shall not be deemed waived in the event of a remand.

     2.     <u>Deferral of Deadline to Move for Costs and/or Fees</u>

Pursuant to Local Rule 54.1(a) and Local Rule 54.3(b), the Court hereby extends the deadlines for moving for costs and/or fees to 90 days after the latter of:

     (1)     the deadline for filing a notice of appeal expires;

     (2)     the Federal Circuit dismisses the appeal;

     (3)     in the event this Court's judgment ultimately is affirmed without intervening remand to this Court, the date the mandate issues to this Court, or

     (4)     in the event this Court's judgment is remanded to this Court, the date this Court enters final judgment.

Dated: __9-17__, 2013

By: _____

U.S. District court
Judge John W. Darrah

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HELFERICH PATENT LICENSING, LLC, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 10-cv-4387 Case No. 11-cv-7395 |
| v. | ) ) | Case No. 11-cv-7607 Case No. 11-cv-7647 |
| THE NEW YORK TIMES COMPANY; G4 MEDIA, LLC; | ) ) | Case No. 11-cv-9143 |
| CBS CORPORATION; BRAVO MEDIA, LLC; | ) ) | Judge John W. Darrah |
| J.C. PENNEY CORPORATION, INC., | ) ) | |
| Defendants. | ) | |

## ORDER

Plaintiff, Helferich Patent Licensing, LLC ("HPL"), filed suit against Defendants, The New York Times Company ("NYT"); G4 Media, LLC ("G4"); CBS Corporation ("CBS"); Bravo Media, LLC ("Bravo"); and J.C. Penney Corporation, Inc. ("J.C. Penney"), alleging claims of patent infringement.   The parties filed cross-motions for summary judgment on the issue of patent exhaustion, and on August 14, 2013, this Court issued a Memorandum Opinion and Order ("the Opinion") granting Defendants' motion for summary judgment and denying HPL's cross motion.   HPL filed a motion for reconsideration under Fed. R. Civ. P. 54(b) or, alternatively, under Fed. R. Civ. P. 59(e).   For the reasons stated below, this Motion [314] is granted in part and denied in part.

## STATEMENT

Any omission of U.S. Patent No. 7,155,241 from the Opinion was inadvertent, and that Patent was specifically contemplated in the Opinion; the ruling is applicable to that Patent.   This

clarification, together with the Order entered on September 11, 2013, conditionally dismissing

Defendants' counterclaims without prejudice, results in a final, appealable judgment.

Accordingly, this Motion is properly considered under Fed. R. Civ. P. 59(e), which

governs motions to alter or amend a judgment. "Rule 59(e) allows a court to alter or amend a

judgment only if the petitioner can demonstrate a manifest error of law or present newly

discovered evidence." *Obriecht v. Raemisch*, 517 F.3d 489, 494 (7th Cir. 2008) (citing

*Sigsworth v. City of Aurora*, 487 F.3d 506, 511–12 (7th Cir. 2007)). "A 'manifest error' is not

demonstrated by the disappointment of the losing party. It is the 'wholesale disregard,

misapplication, or failure to recognize controlling precedent.'" *Oto v. Metropolitan Life Ins. Co.*,

224 F.3d 601, 606 (7th Cir. 2000) (quoting *Sedrak v. Callahan*, 987 F.Supp. 1063, 1069 (N.D.

Ill. 1997) and noting the movant in reconsideration simply "took umbrage with the court's ruling

and rehashed old arguments.").

HPL's reconsideration motion might better be characterized as a motion for clarification,

because, instead of identifying manifest errors of fact or law, HPL requests, "if only for sake of

clarity of the appellate record," to amend the Opinion and provide additional information and

analysis regarding evidence HPL submitted, which HPL did not believe was adequately

addressed by the Court. HPL also seeks clarification of a footnote under the premise that it

would further assist the appellate court. HPL finally seeks clarification with respect to the

impact of the Opinion on potential future licensing agreements.

*Footnote 2*

In the second footnote of the Opinion, the Court states: "Plaintiff also attempts to

designate certain statements and arguments in Defendants' brief in support of their motion as

Defendants' Statements of Material Facts, and then provide responses to these statements and

arguments. Plaintiff's approach goes beyond the scope of Local Rule 56.1; these statements are not properly identified as statements of material facts for purposes of Local Rule 56.1 and will not be regarded as such, nor will Plaintiff's responses be considered."

"Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, [the Seventh Circuit has] repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011). The determination of how strictly to enforce these rules "is one left to the district court's discretion." *Id.* at 887 (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995)). This footnote was within the discretion of the Court, and reconsideration is denied on this basis.

### *The Grindon Declaration*

The next issue HPL raises in its reconsideration motion is that the Court, in ruling on the summary judgment motions, did not properly consider, or did not at all consider, evidence put forth by HPL in the form of Dr. John R. Grindon's declaration. While a reconsideration motion allows a court to correct its errors, "it is not an opportunity for a disappointed party to rehash the same arguments that it raised earlier." *Zepter v. Dragisic*, 237 F.R.D. 185, 187 (N.D. Ill. 2006) (citing *Oto*, 224 F.3d at 606). The Court considered and gave the appropriate weight, if any, to everything properly before the Court in ruling on the motions for summary judgment. HPL's Motion to Reconsider on this basis is also denied.

### *Further Clarification*

Finally, HPL "asks that the Court clarify that its ruling of exhaustion does not apply with regard to unlicensed phones that have or will enter the market and that were not at issue in these

3

**A 32**

proceedings." (Mot. at 11.)  The Court ruled on the issues presented to it.  Accordingly, the

Motion to Reconsider is denied on this basis.

    For the reasons stated above, HPL's Motion for Reconsideration is granted with respect

to clarifying that the Opinion specifically contemplates the inclusion of U.S. Patent No.

7,155,241.  HPL's other bases for reconsideration are denied.


Date:  December 4, 2013          _____
                                     JOHN W. DARRAH
                                     United States District Court Judge

**Form 30**

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

4/7/14

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
  (by email or CM/ECF)

Aaron M. Panner

/s/ Aaron M. Panner

Name of Counsel

Signature of Counsel

Law Firm    Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.

Address    1615 M Street, N.W., Suite 400

City, State, ZIP    Washington, D.C. 20036

Telephone Number    202-326-7900

FAX Number    202-326-7999

E-mail Address    apanner@khhte.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

## CERIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this brief contains 13,515 words. This certificate was prepared in reliance on the word count of the word-processing system (Word 2007) used to prepare this brief.

The undersigned further certifies that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Word 2007 in 14-point Times New Roman font.

April 7, 2014

/s/ *Aaron M. Panner*
Aaron M. Panner
*Counsel for Plaintiff-Appellant*
*Helferich Patent Licensing, LLC*