# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————————————

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

THE NEW YORK TIMES COMPANY,

*Defendant-Appellee*,

and

J.C. PENNEY CORPORATION, INC.,

*Defendant*,

and

G4 MEDIA, LLC, THE BON-TON STORES, INC., BRAVO MEDIA LLC, and CBS CORPORATION,

*Third Party Defendants*.

———————————————

2014-1196

———————————————

Appeal from the United States District Court for the Northern District of Illinois in No. 1:10-cv-04387, Judge John W. Darrah.

———————————————

## BRIEF FOR DEFENDANTS-APPELLEES

———————————————

Alexander N. Harris
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8264

Brian M. Buroker
    *Principal Attorney*
Blair A. Silver
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Defendant-Appellee The New York Times Company*

*[Caption and additional counsel continued]*

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

G4 MEDIA, LLC,

*Defendant-Appellee*.

————————————

2014-1197

————————————

Appeal from the United States District Court for the Northern District of Illinois in No. 1:10-cv-07395, Judge John W. Darrah.

————————————

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

CBS CORPORATION,

*Defendant-Appellee*.

————————————

2014-1198

————————————

Appeal from the United States District Court for the Northern District of Illinois in No. 1:10-cv-07607, Judge John W. Darrah.

————————————

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

BRAVO MEDIA LLC,

*Defendant-Appellee*.

————————————

*[Caption and additional counsel continued]*

_____

2014-1199

_____

Appeal from the United States District Court for the Northern District of Illinois in No. 1:10-cv-07647, Judge John W. Darrah.

_____

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

J.C. PENNEY CORPORATION, INC.,

*Defendant-Appellee*.

_____

2014-1200

_____

Appeal from the United States District Court for the Northern District of Illinois in No. 1:10-cv-09143, Judge John W. Darrah.

_____

Edward R. Reines
   *Principal Attorney*
Byron C. Beebe
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

*Counsel for Defendants-Appellees G4 Media, LLC, CBS Corporation, and Bravo Media LLC*

*[Additional counsel continued]*

Adam Conrad
KING & SPALDING LLP
100 N. Tryon Street
Charlotte, NC 28202
(704) 503-2600

Daryl Joseffer
   *Principal Attorney*
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 737-0500

Benjamin M. Stern
HOLLAND & KNIGHT, LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

R. David Donoghue
Anthony J. Fuga
HOLLAND & KNIGHT, LLP
131 South Dearborn Street
Chicago, IL 60603
(312) 263-3600

*Counsel for Defendant-Appellee J.C. Penney Corporation, Inc.*

# CERTIFICATES OF INTEREST

**Counsel for Defendant-Appellee The New York Times Company certifies the following:**

1.      The full name of every party or amicus represented by me is:

The New York Times Company

2.      The name of the real party in interest (if the party in the caption is not the real party in interest) represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by me are:

N/A

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

| **Gibson, Dunn & Crutcher LLP** | **Hunton & Williams LLP** |
|---|---|
| Brian M. Buroker | Daniel George Vivarelli, Jr. |
| Alexander N. Harris | David A. Kelly |
| Blair A. Silver | |
| Matthew F. Chandler | **Marshall, Gerstein & Borun LLP** |
| David R. Chiang | Michael R. Weiner |
| | Julianne M. Hartzell |

**Counsel for Defendant-Appellee G4 Media, LLC certifies the following:**

1.      The full name of every party or amicus represented by me is:

G4 Media, LLC

2.      The name of the real party in interest (if the party in the caption is not the real party in interest) represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by me are:

G4 Media, LLC is a subsidiary of NBCUniversal Media, LLC, which is wholly and indirectly owned by Comcast Corporation.  No other publicly held company owns more than 10% of the stock of G4 Media, LLC.

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

**Leydig, Voit & Mayer, Ltd.**
David M. Airan
John Knox Winn

**Weil, Gotshal & Manges LLP**
Edward R. Reines

**Covington & Burling LLP**
Matthew Brandon Phelps
Michael M. Markman
Robert J. Williams

**Counsel for Defendant-Appellee CBS Corporation certifies the following:**

1.     The full name of every party or amicus represented by me is:

CBS Corporation

2.     The name of the real party in interest (if the party in the caption is not the real party in interest) represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by me are:

CBS Corporation is a publicly traded company.  National Amusements, Inc., a privately held company, beneficially owns the majority of the Class A voting stock of CBS Corporation.  Otherwise, with respect to ownership of the Class A voting stock of CBS Corporation in the amount of 10% or more, CBS Corporation is only aware of the following information based upon filings made pursuant to Section 13(d) or Section 13(g) of the Securities and Exchange Act of 1934: according to a Schedule D dated February 25, 2011 and filed with the SEC on March 15, 2011, GAMCO Investors, Inc., along with certain entities and persons affiliated therewith, hold approximately 10.1% of CBS Corporation's Class A voting stock.

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

**Leydig, Voit & Mayer, Ltd.**
David M. Airan
John Knox Winn

**Weil, Gotshal & Manges LLP**
Edward R. Reines

**Covington & Burling LLP**
Matthew Brandon Phelps
Michael M. Markman
Robert J. Williams

**Counsel for Defendant-Appellee Bravo Media LLC certifies the following:**

1.      The full name of every party or amicus represented by me is:

Bravo Media LLC

2.      The name of the real party in interest (if the party in the caption is not the real party in interest) represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by me are:

Bravo Media LLC is a subsidiary of NBCUniversal Media, LLC, which is wholly and indirectly owned by Comcast Corporation.  No other publicly held company owns more than 10% of the stock of Bravo Media LLC.

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

**Leydig, Voit & Mayer, Ltd.**          **Covington & Burling LLP**
David M. Airan                                        Matthew Brandon Phelps
John Knox Winn                                      Michael M. Markman
                                                                  Robert J. Williams
**Weil, Gotshal & Manges LLP**
Edward R. Reines

**Counsel for Defendant-Appellee J.C. Penney Corporation, Inc. certifies the following:**

1.     The full name of every party or amicus represented by me is:

J.C. Penney Corporation, Inc.

2.     The name of the real party in interest (if the party in the caption is not the real party in interest) represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by me are:

J.C. Penney Corporation, Inc. is wholly owned by J.C. Penney Company, Inc., which is a Delaware Corporation whose stock is publicly traded on the New York Stock Exchange.

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

| **King & Spalding** | **Holland & Knight LLP** |
|---|---|
| Daryl Joseffer | R. David Donoghue |
| Adam Conrad | Anthony James Fuga |
| | Benjamin M. Stern |
| **J.C. Penney** | |
| Diane K. Lettelleir | |

*/s/ Brian M. Buroker*
Brian M. Buroker*
    *Principal Attorney*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
T:  (202) 955-8500
F:  (202) 530-4200
bburoker@gibsondunn.com

*Counsel has consent of all
Appellees to file the foregoing
document

# TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES ................................................................ vii

INTRODUCTION ..................................................................................................1

STATEMENT OF THE ISSUE..............................................................................3

STATEMENT OF THE CASE................................................................................3

    A.    The HPL Patents Describe Two-Party Communications
        Focused On Functionality Performed By Wireless Handsets..............4

    B.    HPL Licenses Every Manufacturer That Sells Handsets In The
        United States........................................................................................8

    C.    HPL Asserts Its Licensed Patents Against Appellees........................11

    D.    The District Court Grants Summary Judgment Of Patent
        Exhaustion ..........................................................................................13

SUMMARY OF ARGUMENT ..............................................................................16

ARGUMENT ..........................................................................................................18

I.    HPL EXHAUSTED ITS PATENT RIGHTS BY LICENSING ITS
    PATENT PORTFOLIO TO THE ENTIRE HANDSET
    INDUSTRY ..................................................................................................18

    A.    Exhaustion Prevents Attempts To Extract Multiple Royalties
        For Use Of An Already-Licensed Product...........................................18

    B.    HPL Granted Every Handset Manufacturer Licenses And
        Covenants Not To Sue Covering Its Entire Portfolio .........................21

    C.    HPL Exhausted All The Asserted Patents As To The Licensed
        Two-Way Communication...................................................................23

        1.    Exhaustion Covers All Claims To The Patented
            Communication System, No Matter How They Are
            Drafted ......................................................................................23

# TABLE OF CONTENTS
(continued)

                                                                    Page

      2.     Every Asserted Claim Requires Use Of A Handset .................29

II.    HPL'S ARGUMENTS AGAINST EXHAUSTION FIND NO
SUPPORT UNDER THE LAW ....................................................34

    A.   Exhaustion Protects More Than Purchasers.......................................35

    B.   Exhaustion Cannot Be Avoided By HPL's Purported Contract
Limitations...................................................................................39

        1.     Exhaustion Cannot Be Evaded By Contractual
Restrictions On Use Of A Licensed Article..............................39

        2.     Exhaustion Is Not Limited To Individual Claims....................44

    C.   Substantial Embodiment Is Not A Requirement For Patented
Products .............................................................................................52

        1.     *Keurig* Rejected HPL's Argument That Exhaustion
Requires A Substantial Embodiment Test................................52

        2.     Even If A Substantial Embodiment Test Applied, The
Handsets Embody The Patents .................................................56

        3.     Substantial Embodiment Is Appropriately Decided By
The Court On Summary Judgment Where It Does Apply........59

CONCLUSION ........................................................................................61

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Adams v. Burke*,
  84 U.S. (17 Wall.) 453 (1873) .......................................................... 16, 20, 28, 35

*Advanced Software Design Corp. v. Fiserv, Inc.*,
  641 F.3d 1368 (Fed. Cir. 2011) ..........................................................33

*Aiken v. Manchester Print Works*,
  1 F. Cas. 245 (C.C.D.N.H. 1865) ................................................ 37, 38

*Alice Corp. v. CLS Bank Int'l*,
  573 U.S. --- (2014) ................................................................ 31, 32, 39

*Aro Manufacturing Co. v. Convertible Top Replacement Co.*,
  365 U.S. 336 (1961) ..................................................................... 32, 33

*Bloch v. Frischholz*,
  587 F.3d 771 (7th Cir. 2009) ..............................................................22

*Bloomer v. McQuewan*,
  55 U.S. (14 How.) 539 (1852) ..................................................... 17, 35

*Bobel v. Maxlite, Inc.*,
  No. 12-C-5346, 2013 WL 142987 (N.D. Ill. Jan. 11, 2013) .............................43

*Bowman v. Monsanto Co.*,
  133 S. Ct. 1761 (2013) ............................................................ 36, 37, 41

*Cotton-Tie Co. v. Simmons*,
  106 U.S. 89 (1882) ..............................................................................38

*DaimlerChrysler Corp. v. United States*,
  361 F.3d 1378 (Fed. Cir. 2004) ..........................................................44

*Endo Pharmaceuticals Inc. v. Actavis, Inc.*,
  746 F.3d 1371 (Fed. Cir. 2014) ..........................................................50

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Ethyl Gasoline Corp. v. United States*,
  309 U.S. 436 (1940).................................................................. 42, 50

*ExcelStor Technology Inc. v. Pabst Licensing GMBH & Co. KG*,
  541 F.3d 1373 (Fed. Cir. 2008) ...........................................38

*Fujitsu Ltd. v. Netgear Inc.*,
  620 F.3d 1321 (Fed. Cir. 2010) ...........................................56

*General Talking Pictures Corp. v. Western Electric Co.*,
  304 U.S. 175 (1938)..............................................................42

*Graphic Controls Corp. v. Utah Med. Prods., Inc.*,
  149 F.3d 1382 (Fed. Cir. 1998) ...........................................56

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008) ...........................................46

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
  123 F.3d 1445 (Fed. Cir. 1997) ...........................................20

*In re Longi*,
  759 F.2d 887 (Fed. Cir. 1985) .............................................51

*Keeler v. Standard Folding-Bed Co.*,
  157 U.S. 659 (1895)..............................................................28

*Keurig, Inc. v. Sturm Foods, Inc.*,
  732 F.3d 1370 (Fed. Cir. 2013) ................................. *passim*

*LifeScan Scotland, Ltd. v. Shasta Techs., Ltd.*,
  734 F.3d 1361 (Fed. Cir. 2013) ................................. *passim*

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
  744 F.3d 1272 (Fed. Cir. 2014) ...........................................60

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
  134 S. Ct. 2111 (2014).........................................................32

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)...........................................................34, 48, 49

*Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*,
  336 F.3d 1373 (Fed. Cir. 2003) ...........................................................22

*Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.*,
  152 U.S. 425 (1894)........................................................... 19, 37, 38, 54

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
  243 U.S. 502 (1917)........................................................... 2, 16, 20, 35

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
  678 F.3d 1280 (Fed. Cir. 2012) ...........................................................22

*Princo Corp. v. Int'l Trade Comm'n*,
  616 F.3d 1318 (Fed. Cir. 2010) ...........................................................42

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
  553 U.S. 617 (2008)........................................................... *passim*

*Rubber Co. v. Goodyear*,
  76 U.S. (9 Wall.) 788 (1870) ........................................................... 40, 42

*Stephanatos v. United States*,
  306 F. App'x 560 (Fed. Cir. 2009) ...........................................................46

*Strauss v. Victor Talking Mach. Co.*,
  243 U.S. 490 (1917)...........................................................49

*Tessera, Inc. v. Int'l Trade Comm'n*,
  646 F.3d 1357 (Fed. Cir. 2011) ........................................................... *passim*

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
  563 F.3d 1271 (Fed. Cir. 2009) ........................................................... *passim*

*United States v. Dunkel*,
  927 F.2d 955 (7th Cir. 1991) ...........................................................46

# TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Masonite Corp.,*
    316 U.S. 265 (1942)......................................................................... 25, 39

*United States v. Univis Lens Co.,*
    316 U.S. 241 (1942)....................................................... 53, 54, 56, 60

*Vas-Cath Inc. v. Mahurkar,*
    935 F.2d 1555 (Fed. Cir. 1991) .........................................................55

*Woods v. Interstate Realty Co.,*
    337 U.S. 535 (1949)...........................................................................45

## STATEMENT OF RELATED CASES

Helferich Patent Licensing, LLC ("HPL") filed an action in the District of Arizona against different parties that may be affected by this case because that action involves common patents. *See Helferich Patent Licensing LLC v. Suns Legacy Partners LLC*, No. 2:11-cv-02304 (D. Ariz. filed Nov. 22, 2011) (lead case). On August 29, 2013, two weeks after the grant of summary judgment in the cases here, the District of Arizona dismissed HPL's pending claims against the defendants who had not already been dismissed—Nissan Motor Co., Ltd., Nissan North America, Inc., and Midway Holdings, Inc., d/b/a Midway Nissan—without prejudice. *See* Order, *Helferich Patent Licensing LLC v. Suns Legacy Partners LLC*, No. 2:11-cv-02304 (D. Ariz. Aug. 29, 2013) (D.E. 231).

In addition, Wal-Mart Stores, Inc. sued HPL for rescission of a licensing agreement based upon the district court's summary judgment grant in this case. *See Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC*, 1:13-cv-06485 (N.D. Ill. filed Sept. 10, 2013).

Appellees are not aware of other related appeals from district courts. Wireless Science, LLC, the purported owner of the patents-in-suit here, has filed a Notice of Appeal to this Court with the United States Patent and Trademark Office in an *Inter Partes* Review proceeding involving U.S. Patent No. 7,155,241. That

*Inter Partes* Review was initiated by, among others, The New York Times Company, Bravo Media LLC, G4 Media, LLC, and CBS Interactive Inc.

**INTRODUCTION**

After collecting tens of millions of dollars in royalties from licensing its entire patent portfolio to every manufacturer that sells handsets in the United States, HPL unsuccessfully attempted to double-dip by asserting infringement against Appellees based on uses of the already-licensed handsets. As the district court correctly held, all of HPL's claims are precluded by the doctrine of patent exhaustion.

HPL's patents describe a two-party communication system in which both parties send and receive messages. In short, one party transmits a message to a mobile handset; the handset responds by requesting more information; and the first party then transmits the additional information to the handset. HPL holds method and system claims covering this two-party communication. Some claims are drafted from the perspective of transmitting parties (allegedly including the Appellees) and others are drafted from the perspective of receiving parties (handset owners). Regardless of any given claim's perspective, all the claims describe the same two-party communication system, and the handset is at the center of it.

That is important because HPL has licensed "the *entire* cellular handset industry" to sell handsets that practice the patented communication system. JA2004-05. Whenever anyone practices any of the asserted patent claims, two parties are communicating in HPL's patented system, a handset is used, and the use

1

of the handset is licensed. Having licensed the central party to a two-party communication, HPL cannot now obtain a second royalty from the other party to that very same communication. Where, as here, the acts alleged to infringe necessarily require the use of a licensed article for its intended purpose, exhaustion bars further recovery. *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 516 (1917).

HPL argues that it is exempted from this law because it drafted its claims to cover the two-party communications from different perspectives (those of the receiving and transmitting parties). This Court and the Supreme Court have rejected such form-over-substance arguments. *E.g.*, *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). Exhaustion does not permit "a patent drafter" to "shield practically any patented item from exhaustion." *Id.* at 630; *see also id.* at 629 n.5. HPL would impermissibly restrict the use of the licensed handsets, and render the licenses to the handset industry essentially worthless, by precluding handset owners from receiving the very communications HPL already licensed them to receive unless those communications were licensed a second time.

In the past four years, this Court has four times enforced exhaustion over the protests of patentees like HPL. *See LifeScan Scotland, Ltd. v. Shasta Techs., Ltd.*, 734 F.3d 1361, 1366-77 (Fed. Cir. 2013); *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1372-75 (Fed. Cir. 2013); *Tessera, Inc. v. Int'l Trade Comm'n*, 646

2

F.3d 1357, 1369 (Fed. Cir. 2011); *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1274-78 (Fed. Cir. 2009).  This Court's precedent, as well as the Supreme Court's repeated explanation of the exhaustion doctrine's import, amply support the district court's judgment.

## STATEMENT OF THE ISSUE

Whether the district court correctly held that HPL's infringement claims are barred due to patent exhaustion because they necessarily involve the use of already-licensed handsets.

## STATEMENT OF THE CASE

HPL is a patent licensing company that purports to hold the exclusive rights to license patents obtained by Richard J. Helferich ("Helferich").   JA2106. Helferich is the named inventor on two primary families of patents that all claim priority to applications filed on September 19, 1997.  HPL's portfolio includes over 30 U.S. patents generated through a series of continuation, divisional, and continuation-in-part applications—all claiming priority, at least in part, to those original filings in 1997.  JA2106-07.

HPL admits that it licensed the manufacture, sale, and use of all handsets sold in the United States (*e.g.*, smartphones, mobile phones, pagers, and wireless

devices) under all the patents-in-suit.[1]  JA1031-48, 2004-05.  Nonetheless, HPL sued the New York Times Company, J.C. Penney, Bravo, CBS, and G4 ("Appellees") for their alleged actions related to transmitting text messages and related web content to those licensed handsets.

### A.    The HPL Patents Describe Two-Party Communications Focused On Functionality Performed By Wireless Handsets

The Helferich patents describe a two-party communication method where both parties must interact to complete the communication.  *E.g.*, '241 Patent, 3:10-15 (JA66).  The first party (or transmitter) sends a message to a handset associated with the second party (or receiver), but the message does not contain all information relevant to the communication, so only a reference as to where to find additional information is included.  *Id.*  The second party must then receive the message and, using the handset, initiate a request to obtain the additional content.  *Id.*  Then, the first party transmits the additional information to the pager or mobile telephone.  *Id.*  The key to that two-party transmission is the handset and its ability to receive the message and enable a request for the additional information.  JA528, 2034-39.

Helferich claims to have invented the capability for a handset to read a string of text in a short message service ("SMS") message (a "text message"), create a

---

[1]  U.S. Patent Nos. 7,155,241 ("the '241 Patent"); 7,280,838 ("the '838 Patent"); 7,499,716 ("the '716 Patent"); 7,835,757 ("the '757 Patent"); 8,107,601 ("the '601 Patent"); 8,116,741 ("the '741 Patent"); and 8,134,450 ("the '450 Patent").

selectable link based on that string of text, and determine the address of the additional content based on the string of text when the user activates the link. *Id.* HPL explained to the U.S. Patent and Trademark Office ("PTO") during reexamination proceedings that, in the prior art, if someone received a message on his handset with information about content, "he must separately pull" that content. JA1982. "This is precisely the mechanism that Helferich intended to improve upon" with an *improved handset* that recognizes text strings (such as a Uniform Resource Locator, or "URL") in messages as potential links, creates those links, and then enables the handset user to click a link and thereby cause the handset to request the content. *Id.*

The patents-in-suit share a common disclosure that focuses on the properties of these handsets that make them smartphones. HPL Br. 36. For example, the '450 Patent states: "The present invention relates generally to paging transceivers and methods for selectively acting on messages and, more particularly, to paging transceivers and methods for selectively retrieving messages." JA2816 (citing '450 Patent, 1:26-29 (JA285)). The first three columns of the specification in the '450 Patent emphasize the handset's importance. *Id.* (citing '450 Patent, cols. 1-3 (JA285-86)). The common disclosure of the patents-in-suit focuses on properties of, or activities performed by, handsets. JA2817.

The Helferich patents thus disclose a single, two-party invention, illustrated in the following flowchart:



JA1032-48.[2]   Helferich drafted claims covering that two-party communication from each party's perspective.  The claims include receiving content claims (which HPL labels "handset claims") that describe text-to-link rendering on a handset (steps 3, 4, and 5 in red above).  Other claims are written as transmitting content claims (which HPL labels "content claims") that rely on the text-to-link concept of sending text and, upon selection of a link in the text, providing a response (steps 1, 2, and 6 in black above).  Regardless of the perspective, all claims refer to and depend on the handset to play a central role in the two-party communication.  JA74-76, 104-09, 137-46, 176-86, 231, 262-63, 294-95, 1032-48.

Claim 7 of the '838 Patent is an exemplary "receiving content" claim.  HPL Br. 12-13; JA104.  It recites a "method of operating a wireless communication

_____

[2]  JA1032-48 compiles quotations from the asserted claims of the patents-in-suit, which were attached as exhibits to Defendants' Joint Statement of Undisputed Facts.  For reference, the cited exhibits in that Statement can be found in the Joint Appendix:  Ex. DD, '241 Patent (JA50-86); Ex. EE, '838 Patent (JA77-109); Ex. FF, '716 Patent (JA110-46); Ex. GG, '757 Patent (JA147-86); Ex. HH, '601 Patent (JA187-231); Ex. II, '741 Patent (JA232-63); Ex. JJ, '450 Patent (JA264-95).

device" and provides steps for receiving a message with a "message identifier" indicating that additional information is available; "receiving input" from the user of the handset; and then "transmitting" a request related to that content, such as requesting delivery of the additional information. *Id.* The Helferich patent portfolio includes a number of other patent claims describing the two-party communication invention from the perspective of the handset. HPL Br. 11-13.

Claim 9 of the '838 Patent is exemplary of how Helferich described the same basic two-party communication from the perspective of the "transmitting content" aspect of the communication. *See* '838 Patent, 21:27-49 (JA105). It recites stored content, the transmission of a "message" with an "information identifier" for locating the content "to the wireless communication device" (the handset); the "wireless communications device" sending, "as a reply to the" message-sender's "message," a "request message"; and the message-sender's receipt of that message. *Id.* It thus requires a handset. JA1032-48.

The language of every other transmitting content claim explicitly requires a handset. *Id.* Each asserted claim—which are all transmitting content claims— requires a handset to receive the message and, in response, send a request for the content. *Id.* That includes every transmitting content claim that HPL spotlights. HPL Br. 5-9, 27-28. Claim 1 of the '450 Patent—"[a] method of providing content to a cell phone"—requires that a message-sender "initiat[e] a page to a content

subscriber" (which is received by the content subscriber's handset), and that the handset "contact[]" the "system" to "trigger retrieval of the content." '450 Patent, 19:22-36 (JA294). In claim 1 of the '757 Patent, the cellular phone sends "a request message" that includes "a command from the cellular phone to receive to [sic] the content," after which content is "delivered to the wireless communication device via the mobile radiotelephone network." '757 Patent, 19:47-2:52 (JA176, 178-79). And claim 13 of the '741 Patent recites "a notification system" that sends a notification with "an information identifier" to a "cell phone," "a request" from "the cell phone," and the message-sender's "receipt" of that request. '741 Patent, 20:43-63 (JA262).

### B. HPL Licenses Every Manufacturer That Sells Handsets In The United States

Starting in 2008, HPL elected to license its entire patent portfolio to *every* manufacturer that sells handsets in the United States, in exchange for tens of millions of dollars in royalties. JA2004-05. The licensed manufacturers included Apple, Samsung, Research in Motion, LG Electronics, Nokia, Microsoft, Motorola, HTC, Amazon.com, Sony, Kyocera, Hewlett-Packard/Palm, Panasonic, Sanyo, Dell, Toshiba, Acer, Sharp, Casio, i-mate, Wistron, Psion, Asustek, Huawei Technologies, NEC, ZTE, Pantech, and UTStarcom. JA1031, JA1057-1948.

When the '241 Patent was challenged through *inter partes* reexamination, HPL relied heavily on the extent of its licensing to argue that the challenged patent

was commercially successful, in an attempt to show that it was nonobvious. JA1950, 1972-73, 2002-07. HPL swore to the PTO that "[i]n about four years, the *entire* cellular handset industry—28 of the world's most aggressive companies— acquired licenses under the Helferich portfolio." JA2004-05. Summarizing its supposed "commercial success and commercial acquiescence," HPL insisted that "[e]very major handset company in the world accepted a license under the Helferich Patents." JA2007.

Although HPL now contends that the '241 Patent is a transmission-only patent for which it granted no license to the cellular handset industry, JA2255; HPL Br. 10, 20, 23, 46-47, HPL told the PTO the exact opposite. It relied on these handset licenses that it issued to "the *entire* cellular handset industry" to show that "[i]t is highly unlikely that all of the major companies in the handset industry . . . would sign licenses" to the '241 Patent if they believed it "to be obvious." JA2004-05.

HPL's licenses contain language licensing its entire portfolio, for example defining "Licensed Patents and Applications" as "all the patents and applications owned or controlled by, or exclusively licensed to, HPL" and granting a license to make, use, and sell products under "any and all inventions claimed in the Licensed Patents and Applications." JA2816. Each license includes a release that "acquits and discharges" the licensee's respective "direct and indirect past, present and

future customers, retailers, wholesalers, distributors, dealers, resellers, users, OEMs, vendors and [] manufacturers from" "any and all infringement claims." JA1031, 2076.

Some licenses also contain provisions purporting to claw back certain vaguely defined "content claims." JA1049. The model license provisions that HPL provided to the district court state that their grants are "[s]ubject to the exceptions and limitations set forth in" a section that states that the license is limited to the "Licensed Fields," which is defined in still another section as "Mobile Wireless Communication Devices." JA2100-02. HPL's model license also states that there is no license on "Reserved Claims," which it says "are more than one thousand issued and pending claims . . . not Infringed by Licensee because they expressly recite material additional operations . . . and/or are not substantially embodied in the products, services or methods within the scope of the Licensed Fields." JA2102. A few licenses identify example "reserved" claims by number, but the ones that do so are inconsistent with each other. JA2817. No license lists an entire patent as carved out or otherwise has any indication that the license grant does not include all of HPL's patents. JA1049-50, 2104.

In addition to granting an express license, each agreement also independently grants a covenant not to sue, providing that HPL will not "bring

suit" against a "Third Party" or "a Consumer." JA1031. The licenses define a "Third Party" as "a person or entity that is not HPL or Licensee." *Id.*

### C. HPL Asserts Its Licensed Patents Against Appellees

After collecting fees from all the handset manufacturers, HPL sued companies that allegedly create messages sent to the licensed handsets. Its infringement allegations focus on efforts by companies who send SMS text messages to handsets that were already licensed to receive those messages and render links or who post content on Twitter or Facebook (social media sites that HPL contends send out SMS messages to those same handsets). HPL sent hundreds of threatening license demands to the companies on its target list. Many companies capitulated rather than bear the cost and burden of defending an infringement suit. JA2005-07.

Appellees refused to acquiesce. HPL brought infringement suits against them, starting with the New York Times Company in fall 2010, followed by the other Appellees in early 2011. HPL alleged Appellees infringed the transmitting content claims of the Helferich patents by sending text messages (or posting content onto social media subsequently delivered) to handsets. The handsets then render text in those messages into hyperlinks and, upon a click, transmit requests for content allegedly provided by Appellees. JA502-03, 528-32, 613-15, 696-700, 793-97, 1032-48, 2595-96, 2815.

11

Content is only delivered if the handset transmits a request for content in response to a click of a hyperlink. And an SMS message sent by Appellees does not and cannot contain a hyperlink or HTML or other code for creating a hyperlink, but only text characters. JA1037-40, 2626-27, 2697. Indeed, HPL's infringement theory requires the handset to create that link based on the content of the received text message. *Id.*

HPL's illustrations in its infringement contentions demonstrate that this handset functionality is the heart of its invention. In those contentions, HPL asserted that the below image showed a message that the New York Times posted to Twitter:



JA2627. The "http://nyti.ms/cVEwfW" is a string of plain text; it is not a clickable hyperlink. Once the handset receives the message, however, it converts the text string into a clickable link. HPL showed that in an image of a different SMS message received from the New York Times and displayed on a licensed handset:



JA1049 (citing JA2034). As HPL's contentions also show, *id.*; JA2626-27, the "http://bit.ly/b6nyFF" portion of the message is sent as a string of plain-text characters that a licensed handset recognizes as a URL and then transforms into a link that is clickable. In the example HPL included, the user's licensed mobile handset uses the characteristic blue color and underlining to indicate that it has rendered the text into a clickable link.

Converting the text into a clickable link is done by the licensed handset performing its licensed function. JA1037-40. If the mobile phone did not have functionality to recognize URLs and render them as links, the user could not select the link and would never receive any content associated with the URL. *Id.* HPL's infringement contentions rely on that handset functionality. They allege that the New York Times (and other Appellees) infringe if the user clicks the link because upon a click the licensed handset would send an HTTP request for the webpage at the clicked URL. JA2038-39.

**D.   The District Court Grants Summary Judgment Of Patent Exhaustion**

Appellees moved jointly for summary judgment based on patent exhaustion. HPL cross-moved for summary judgment on patent exhaustion.

The district court granted Appellees' motion and denied HPL's cross-motion. 965 F. Supp. 2d 971 (JA1-15). The district court explained that "[a]ll of the patents-at-issue require the use of a handset device" and "HPL licensed its

patents to every handset manufacturer." JA10. "Accordingly," the district court continued, "every handset device has been licensed to practice HPL's patents; ergo, no handset device can infringe HPL's patents." *Id.*

The district court also ruled that HPL's covenants not to sue independently exhausted the patents. Each license provided a covenant under which "HPL agreed not to sue the licensee and third parties, including content providers and consumers, for selling or using a device covered by the License Agreement." JA11-12. Even though these covenants purported "to create post-sale restrictions against third parties," the court held HPL's patent rights exhausted under this Court's decision in *TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009). JA12.

The district court acknowledged that "HPL sought to carefully construct some of its Licensing Agreements in such a way that it could recover multiple royalties on the same patents from a single sale or use," by purporting to "reserve" particular content-transmission claims. JA9, 12. While HPL's attempts were "inconsistent" across licenses, JA9 n.4, even the most forceful failed as a matter of law. "HPL cannot avoid patent exhaustion by attempting to shield some of the claims within the patents-in-suit" from exhaustion, the court explained, because "the sale of the product results in the exhaustion of the *patent* in its entirety, rather than the exhaustion of certain *claims*." JA8, 10.

The district court further concluded, contrary to HPL's contention, that "the handset devices sold sufficiently embody the patents-in-suit." JA10. The handsets "have the capability to receive content from content providers." *Id.* Finally, the court pointed out that exhaustion prevented HPL from recovering royalties from Appellees, not just those who purchased handsets: "Once the handset manufacturers sell the handsets which embody HPL's patents, HPL's patents are exhausted as to all third parties, including Defendants." JA11. The court reasoned that there "would be little value to the handset manufacturers (or their end users) to have purchased licenses to HPL's patents" if no one could "send a message to the licensed handset device without infringing the patents." *Id.* HPL's various efforts to obtain "multiple royalties for its previously licensed (and, therefore, exhausted) patent[s]" would produce "confusion" and "uncertainty," "vitiate the doctrine of patent exhaustion," and "potentially deter further innovation." JA13-14. The court accordingly granted Appellees' motion and, after conditionally dismissing Appellees' counterclaims alleging that the patents were invalid, entered final judgment.

HPL filed a motion to alter or amend the judgment. JA2871-80. HPL further asked the court to issue a speculative advisory opinion concerning the decision's impact on future unlicensed handset manufacturers. JA2880-81. The district court denied HPL's motion, explaining that it "considered and gave the

appropriate weight, if any, to everything properly before the Court in ruling on the motions for summary judgment," and that it does not have to decide issues beyond those "presented to it." JA31-33.

## SUMMARY OF ARGUMENT

Patent exhaustion bars HPL from extracting multiple rounds of royalties based upon the use of already-licensed handsets. The handsets at issue in this case were made and sold under HPL's licenses and covenants not to sue; HPL cannot bring an infringement suit that relies on use of those handsets. It is improper double-dipping for HPL now to seek royalties for alleged infringement based on the normal and contemplated use of those licensed handsets.

Exhaustion precludes an infringement theory on a licensed patent that is predicated on use of a licensed article—as over a century and a half of patent jurisprudence confirms. *E.g.*, *Motion Picture Patents*, 243 U.S. at 516 (The patented item is "carried outside the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put upon it."); *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 456 (1873).

Every handset in the United States is licensed under the patents-in-suit, according to HPL's own sworn statements to the PTO and the district court. JA1031, 2004-05, 2007. HPL's agreements, containing both a patent license and a covenant not to sue the manufacturers or third parties, triggered exhaustion upon

the first sale of those products.  *See Quanta*, 553 U.S. at 625; *TransCore*, 563 F.3d at 1274-77.

HPL's infringement theory against Appellees relies on use of those same licensed handsets; without those handsets, there is no infringement.  Every claim of every asserted HPL patent requires some use of a licensed handset: to receive a message or to initiate a request for content based on an identifier in the message. Exhaustion removes a licensed item from the patent monopoly, precluding a patentee's "infringement suit" relying on "use of the device," regardless of whom the patentee has elected to sue.  *LifeScan*, 734 F.3d at 1366; *see also Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 549 (1852).  HPL's infringement theory must therefore fail because HPL's patent rights over the handsets have been completely exhausted.

In an effort to make "an end-run around exhaustion," *Quanta*, 553 U.S. at 630, HPL raises three arguments on appeal.  *First*, HPL argues that exhaustion protects only purchasers.  But that is wrong as a matter of law because it confuses the trigger of exhaustion with its effect.  *Second*, HPL argues that it attempted to contract around exhaustion by carving out certain claims from its licenses—a practice prohibited by numerous decisions of this Court and the Supreme Court, including *Keurig*.  732 F.3d at 1374 (A patentee may not "reserve specific claims from exhaustion.").  In addition, HPL's *post-hoc* interpretation of its licenses as

omitting a handful of patents is contradicted by the language of the licenses themselves. *Third*, HPL's argument that exhaustion requires an article to embody all the patent's essential features and lack any reasonable and intended non-infringing uses fails because that test does not apply where the product is patented. *Id.* at 1373-74. Nonetheless, the handsets here would meet any such embodiment requirement.

Because HPL's patent rights have been completely exhausted, the judgment of the district court should be affirmed.

## ARGUMENT

## I. HPL EXHAUSTED ITS PATENT RIGHTS BY LICENSING ITS PATENT PORTFOLIO TO THE ENTIRE HANDSET INDUSTRY

### A. Exhaustion Prevents Attempts To Extract Multiple Royalties For Use Of An Already-Licensed Product

Patent exhaustion wipes out all of a patentee's rights with respect to an exhausted item. *Quanta*, 553 U.S. at 625. Any infringement theory that relies on the use of an exhausted item breaks the chain of infringement. If the theory relies on performance of a step by that item or a system involving that item, that theory cannot be the basis for liability for infringing that same patent. *See LifeScan*, 734 F.3d at 1366 ("[A]n infringement suit w[ill] not lie with respect to the subsequent sale or use of the device."). In other words, exhaustion "terminates all patent rights" to the exhausted item—including the right to sue for its use. *Quanta*, 553 U.S. at 625. By "providing an efficient means for ensuring the termination of the

patent right," exhaustion guards against a patentee's attempts to "recover multiple times on its patented" article. *Keurig*, 732 F.3d at 1375.

Exhaustion prevents such "a double recovery" by "prohibit[ing] postsale restrictions on the use of a patented article." *Tessera*, 646 F.3d at 1369-70. "The patentee having once received his royalty upon such device, he cannot treat the subsequent seller or user as an infringer." *Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.*, 152 U.S. 425, 432 (1894). Exhaustion thus serves to "prevent[] the patent holder from invoking patent law to control post-sale use of the article." *Quanta*, 553 U.S. at 638.

An authorized sale will trigger exhaustion and a sale is authorized when the manufacturer has done so under license. *Id.* at 636. Thus, "exhaustion turns only on [a manufacturer]'s own license to sell products practicing the" patents—not on any restrictions in the license agreement that disclaim rights to "third parties." *Id.* at 637. Therefore, "[t]he only issue relevant to patent exhaustion is whether [the manufacturer]'s sales were authorized." *TransCore*, 563 F.3d at 1277; *see also Quanta*, 553 U.S. at 637 ("Because Intel was authorized to sell its products to Quanta, the doctrine of patent exhaustion prevents LGE from further asserting its patent rights.").

The Supreme Court recently rejected an attempt at double recovery by a patentee in *Quanta*. The patentee had argued that, even though it already had

received a royalty on a licensed item, a defendant "could nonetheless be liable for patent infringement" because it performed patented methods or made patented systems requiring the use of that item. 553 U.S. at 630. The Court explained that "when a patented item is once lawfully made and sold, there is no restriction on its *use*" that the patentee can impose. *Id.* (punctuation omitted). When a patentee or his licensee sells a patented product that is used in the patent claims, "he receives the consideration for its use and he parts with the right to restrict that use." *Adams*, 84 U.S. at 456.

Use of a licensed article to practice the licensed patent cannot support a later claim for infringement of that patent. Rather, a manufacturer's "authorized sale" takes the sold "products outside the scope of the patent monopoly." *Quanta*, 553 U.S. at 638; *accord Motion Picture Patents*, 243 U.S. at 516 (Once a patented item has been "sold," it is "thereby carried outside the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put upon it."); *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445, 1455 (Fed. Cir. 1997) (An authorized sale eliminates "the right to enforce any patent that the parties might reasonably have contemplated would interfere with the use of the purchased device."). In other words, a licensed sale completely exhausts, without qualification or restriction, the patent rights in the licensed article.

## B. HPL Granted Every Handset Manufacturer Licenses And Covenants Not To Sue Covering Its Entire Portfolio

HPL has conceded on multiple occasions that it authorized the sale of every handset in the United States. *See* JA1031 (citing JA2005, among others), 2058 (HPL referring to "[t]he handsets" as "authorized items"). HPL boasted to the PTO when defending its patents during reexamination proceedings that it had licensed and collected fees from "the *entire* cellular handset industry." JA2004-05. HPL also admitted to the district court that it had licensed the whole industry (although HPL argued that it restricted those licenses by carving out claims through a complicated web of provisions discussed below). JA2076.

Each of HPL's handset licenses conveys rights to make, use, and sell products under all its patents and patent applications, including the patents-in-suit. JA1031, 2816 (citing JA1096, 1098). Specifically, the licenses state that "HPL hereby releases" the licensee's "direct and indirect past, present and future customers, retailers, wholesalers, distributors, dealers, resellers, users, OEMs, vendors" and "manufacturers from" "any and all infringement claims." JA1031. Each handset license also provides that HPL will not "bring suit" against the licensee, a "Third Party," or "a Consumer." *Id.*

All that is necessary for exhaustion to apply is for the sale to be "authorized" under these licenses. *See Quanta*, 553 U.S. at 637 ("The License Agreement authorized Intel to sell products that practiced the LGE Patents."). Because the

licenses gave the manufacturers the right "to make, use, or sell" the handsets, once the patented items were sold under license, all the patents' claims—including their method and system claims—were exhausted. *Id.* at 628-30, 636 (punctuation omitted).

HPL's covenant not to sue in these agreements independently exhausted its patent rights. *See TransCore*, 563 F.3d at 1274-77 (covenants not to sue exhaust patent rights). Like the covenant in *TransCore*, HPL's covenant "does not include a restriction on sales" (*id.* at 1276): The handset manufacturers are authorized to make and sell handsets, and they have been doing so without objection from HPL.

Having used its industry-wide licensing effort to try to rebut obviousness before the PTO, HPL now boldly contends that "not all handset manufacturers that have entered the market are licensed under the Helferich patents." HPL Br. 15 n.8. But HPL raised this argument for the first time in its reconsideration motion and later in its appeal brief only in a footnote. JA2880-81. These are improper ways to raise and preserve arguments for appeal. *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012) ("Arguments raised only in footnotes . . . are waived."); *Bloch v. Frischholz*, 587 F.3d 771, 784 n.9 (7th Cir. 2009) ("[D]eveloping an argument for the first time in a motion to reconsider is too late."); *Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*, 336 F.3d 1373, 1379 (Fed. Cir. 2003) (same). Regardless, HPL's assertion of the existence of some unlicensed

handsets is flatly contradicted by its prior statements to the PTO and in its summary judgment briefing. JA2881, 2890-92. The district court properly rejected HPL's request for an opinion on issues beyond those presented in summary judgment briefing. JA32-33.

### C. HPL Exhausted All The Asserted Patents As To The Licensed Two-Way Communication

Exhaustion is the necessary legal consequence of HPL's decision to license the use of all handsets. That is because the licensed handsets are at the center of the two-way communication system described by HPL's patents. Having obtained a royalty for the two-way communications involving those handsets, HPL cannot now obtain a second royalty for the same communications, involving the same handsets, practicing the same licensed patents.

#### 1. Exhaustion Covers All Claims To The Patented Communication System, No Matter How They Are Drafted

As HPL admits in its brief, the patents-in-suit are directed to a single "new communication system" based on the same specification. HPL Br. 4-5 ("Helferich incorporated the ideas for his new communication system in a patent specification that has resulted in numerous patents and claims . . ."); *see also id.* at 36 ("[A]ll of the patents are based on the same specification."). As explained in the Statement of the Case above, in that system, one party transmits a message that is received by a handset; the receiving party must then initiate a request to obtain more

23

information; and finally, the first party transmits the additional information to the handset. The handset is central to the entire two-party communication.

HPL's decision to license *all* handsets therefore exhausts its patents entirely. The sale or license of an article carries with it "the right to engage in that product's contemplated use." *LifeScan*, 734 F.3d at 1373. Allowing HPL to exclude content providers from those two-way communications after HPL already has received its royalty from the sale of handsets "would bar the use of the [handsets] for their contemplated function and extend the patent monopoly improperly." *Id.* Exhaustion forbids that result: A patentee may not "invoke[e] patent law to enforce restrictions on the post-sale use of its patented product." *Keurig*, 732 F.3d at 1374. This Court thus rejects "attempt[s] to shield the patented apparatus from exhaustion" via strategic drafting. *Id.*

Yet HPL's brief rests on the false premise that drafting claims from different perspectives defeats exhaustion. *See, e.g.*, HPL Br. 21. Some claims are written from the perspective of the handset user (in essence, "the handset sends a request to the content provider") and others from the perspective of the content provider (in essence, "the content provider receives a request from the handset"). In other words, HPL contends that it can recover twice simply by having one claim with the handset as the subject of the sentence and another with the handset as the object.

24

The Supreme Court repeatedly has rejected such formalistic distinctions as an impermissible "end-run around exhaustion." *Quanta*, 553 U.S. at 630. Exhaustion is not contingent on the drafter's art. If it were otherwise, "a patent drafter" could "shield practically any patented item from exhaustion." *Id.*; *see also id.* at 629 n.5. The correct test turns on the substance of what has been licensed: "whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article." *United States v. Masonite Corp.*, 316 U.S. 265, 278 (1942). HPL has received its reward for two-party communications using licensed handsets. That is true regardless of the fact that some claims may be "drafted from the point of view" of a different actor. HPL Br. 6 n.3.

The following example illustrates the principle: Patentee invents the answering machine and gets a patent on it. The patent has three claims: (1) a product claim to the answering machine; (2) a claim that reads "Leaving a message on the answering machine, said message including the caller's phone number"; and (3) a claim that reads "Receiving a message left on the answering machine." Patentee licenses his patent to a manufacturer, who makes an answering machine and sells it to Purchaser. Purchaser's friend, Caller, calls Purchaser and leaves a message with Caller's callback number on the licensed answering machine.

Even HPL must agree that Patentee has exhausted his patent with respect to Purchaser's use of the answering machine by receiving messages (including Caller's)—claim 3. Yet according to HPL, Patentee could still sue Caller for leaving that very same message simply because claim 2 is phrased in such a way as to make Caller the "direct infringe[r]." HPL Br. 23. That cannot be and is not the law. Caller is practicing the patent only by leaving the same message that Purchaser is licensed to receive on her licensed answering machine. If Purchaser could not receive messages, the answering machine would be effectively worthless. The initial authorized sale of the answering machine took it outside the scope of the patent grant, and Patentee already has obtained the only royalty due to him. No amount of clever draftsmanship—to describe the same acts from two different perspectives—could change that result.

HPL's own example illustrates the point equally well. HPL hypothesizes "a patented system to pump gasoline." HPL Br. 28. For the example to parallel this case, the patented system would more appropriately be "a patented system to pump gasoline into a car," covering both a system for receiving gasoline in the car and a system for transmitting gasoline to the car. Under HPL's theory, even if the patentee licensed the patented technology in every car sold in the United States, exhaustion would protect only the purchasers of those cars. No one else could own or operate a gas station for those licensed cars to use. And no one else could fill

the car's tank without infringing the patent—making the license effectively worthless in Oregon and New Jersey, where individuals cannot legally pump their own gas.

Similarly here, as the district court found, people who purchased handsets with a licensed feature enabling them to receive text messages and click on links to access content would find that feature to be virtually worthless if no one was able to actually provide that content. JA11. HPL admits as much, agreeing that handset owners may use those handsets to practice the "receiving content" claims. HPL Br. 31-32. But HPL's view of exhaustion would deprive them of the ability to do so. Such a result would violate the longstanding principle that, when a patented item is "once lawfully made and sold, there is no restriction on its *use* to be implied for the benefit of the patentee." *Quanta*, 553 U.S. at 630 (punctuation omitted).

HPL's suggestion that the only purpose of the exhaustion doctrine is to eliminate "restraints on alienation," HPL Br. 44-46, is thus incorrect. Exhaustion secures not only the right to alienate—*i.e.*, sell—a licensed item, but also "the right to engage in that product's contemplated use," one of the doctrine's core rationales. *LifeScan*, 734 F.3d at 1373. This Court recently explained that permitting a patentee to "control use" of patented items "after it sold them" would "be counter to the spirit of the doctrine of patent exhaustion." *Keurig*, 732 F.3d at 1374. Otherwise, a patentee could sue every time a licensed product is used—as

the Supreme Court has long forbidden.  *See, e.g.*, *Adams*, 84 U.S. at 455.  HPL's interpretation thus undermines exhaustion's main "purpose[]":  "to provide an efficient framework for determining when a patent right has been exhausted." *Keurig*, 732 F.3d at 1374.  If a patentee could continually sue over every use of an article, even if that article is licensed, any hope of a license providing security from patent liability is doomed.

That is precisely what HPL has attempted here.  HPL's artificial distinction between its transmitting claims and its receiving claims would result in a double recovery for the same acts while depriving handset owners of the ability to receive content except for what is permitted by HPL.  Exhaustion prevents both of these results.  Patentees may not recover more than one royalty.  *Keeler v. Standard Folding-Bed Co.*, 157 U.S. 659, 663 (1895).  Restrictions aimed at controlling the acts of subsequent users present a paradigmatic case for exhaustion.  *See Quanta*, 553 U.S. at 638 (exhaustion serves to "prevent[] the patent holder from invoking patent law to control post-sale use of the article").  Under HPL's view, however, any time a patent implicates a computer system with multiple categories of participants (*e.g.*, system administrators and end users), the patentee can proceed against each participant separately—for the exact same transactions on the exact same system.  That view is not correct.

## 2. Every Asserted Claim Requires Use Of A Handset

To the extent claim drafting is relevant to exhaustion, it supports the district court's judgment that the patents at issue require use of the handsets. JA10 (citing JA528). Every asserted patent claim requires a wireless handset that can render a hyperlink and send a content request—regardless of the claim's supposed point of view. JA1032-48. HPL's assertion that its patent claims do not require the use of a handset is false: The language of each claim requires a handset. *Id.* In other words, a handset is an element of each asserted claim. *Id.*

Each asserted claim requires a "request" or a "reply" to come from a licensed handset. JA1042-45. As explained in the Statement of the Case above, if the link generated by the wireless handset is never clicked or there is no handset to receive the text message, delivery of content cannot occur and, thus, all elements of the claimed method will never be performed or the system cannot function. As a result, without use of a licensed handset, there is no infringement:



Consistent with that understanding, HPL's infringement claims do not allege that Appellees push webpages to handsets independently. Instead, HPL contends, Appellees send messages with a string of plain-text characters without a link; the

handset, not Appellees, transforms that text into a link using the licensed technology. JA2626-27, 2697. If the link is clicked, that licensed handset sends a request for the website. JA2038. That is the claimed invention according to HPL. JA1982.

The method claims all require use of a handset. JA1032-48. For example, claim 9 of the '838 Patent exemplifies the method claims. *See* '838 Patent 21:27-49. It recites stored content, the transmission of a "message" with an "information identifier" for locating the content "to the wireless communication device," the "wireless communications device" sending, "as a reply to the" message-sender's "message," a "request message," and the message-sender's receipt of that message. *Id.* It thus requires a handset. JA1032-48.

Even claim 1 of the '450 Patent, on which HPL relies (HPL Br. 5-7), requires a licensed handset to receive a message and retrieve the content. It claims "[a] method of providing content to a cell phone" that requires a message-sender to "initiat[e] a page to a content subscriber." '450 Patent, 19:22-36 (JA294). In other words, a content subscriber's licensed handset must receive a page from the message-sender. The claim also requires "a system to be contacted to trigger retrieval of the content." *Id.* The handset thus must "contact[]" the "system" to "trigger retrieval of the content." *Id.*

HPL argues that method claim 1 of the '450 Patent somehow operates without a handset, but its own infringement contentions alleged that Appellees infringe that claim because a handset retrieves content. HPL stated that the domain names in Appellees' messages "are system addresses for the system that the mobile phone contacts to begin the process of retrieving the identified content." JA2595-96. Under HPL's own infringement theory, the "mobile phone" must "contact[]" the "system" in order to "begin the process of retrieving the identified content." *Id.*

Despite HPL's arguments otherwise, HPL Br. 26-27, claim 1 of the '757 Patent is no different, mentioning a cellular phone and wireless communication device no fewer than ten times, and including a similar "system identifier address" as claim 1 of the '450 Patent. JA176, 178-79. The '757 Patent requires a licensed handset to receive a message and retrieve the content: The content provider "receiv[es] a request message" from the cellular phone that includes "a command from the cellular phone to receive to [sic] the content." *Id.* Content is then "delivered to the wireless communication device via the mobile radiotelephone network." *Id.*

HPL's system claims are substantively the same, having just tacked on generic computer structures to the other method claims and then reciting similar elements that also require use of the handset. *Cf. Alice Corp. v. CLS Bank Int'l,*

573 U.S. --- (2014), slip op. at 16 (where "the system claims are no different from the method claims in substance," both will "fail for substantially the same reasons"). For example, claim 13 of the '741 Patent, which HPL argues lacks a handset, HPL Br. 28, recites "a notification system" that sends a notification with "an information identifier" to a "cell phone," "a request" from "the cell phone," and the message-sender's "receipt" of that request. *See* '741 Patent, 20:43-63 (JA262). Like every other asserted system claim, claim 13 requires a handset. JA1032-48.

Because every asserted claim requires a handset, without a handset there can be no infringement: A "patentee's rights extend only to the claimed combination of elements, and no further." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014). Taking an element outside the scope of the patent monopoly removes any possibility of infringement because "the patent is not infringed unless all the steps are carried out." *Id.* In *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336 (1961), for example, the patent covered a convertible car with a fabric roof. *Id.* at 337. The Court held that the right "to use a patented combination" came with the right to repair, including by placing a new roof on the convertible. *Id.* at 345. Because one element of the

multi-element claim—the new roof—was taken outside the patent's reach, the Court held, no infringement suit could lie.  *Id.* at 345-46.[3]

HPL cannot avoid exhaustion by creatively relabeling the handset as merely "part of the environment in which the invention is used."  HPL Br. 9.  The handset functionality involving links is HPL's invention.  JA1982, 2240-41, 2244-45, 2248, 2251.  In any event, HPL is apparently alluding to decisions of this Court holding that, for joint infringement purposes, preamble statements that describe the environment in which the claim operates may be limiting but nonetheless performed by a second actor.  *See Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1374-75 (Fed. Cir. 2011).  That holding is relevant only to *who* must perform a claim step or element, not *whether* it must be performed.  Because all elements are necessary for infringement, the label HPL assigns to the various elements does not matter.  Otherwise, a patentee could (through draftsmanship) sue or obtain royalties from every person who makes any use of a licensed product by crafting claims viewing that use from different perspectives.  "Such an outcome

---

[3] *Aro* provides yet another illustration of exhaustion's purpose in preventing suits based on use of a licensed article.  Under HPL's erroneous view of the law, the car owner in *Aro* could not hire a mechanic to repair the car because the mechanic is offering a separate service for which he would be held liable for infringement because he does not own the car.  The car owner would find the law to be of little comfort if it "protected" only her and not anyone else who might provide a service to the car.  The owner surely would find such a limitation "a[] restriction on how [he] use[s] [his] device[]."  HPL Br. 26.

would . . . be counter to the spirit of the doctrine of patent exhaustion because [HPL] could control use of the [handsets] after it sold them." *Keurig*, 732 F.3d at 1374. It is not the law.

HPL's own expert admitted that the asserted claims require the handset to perform some functions, though he argued these semantics and drew the handset in a separately colored box. JA2240-41, 2244-45, 2248, 2251. But he, just like HPL in its brief, did not explain what he means by "environment" or why that labeling would make a difference. *Id.* Moreover, HPL's expert declaration is not relevant here. Exhaustion can be decided as a question of law for which expert testimony is not necessary.[4] The point HPL's expert purports to dispute—that all claims require the use of a handset—is a question of the scope of what was exhausted, a question of law. Much like extrinsic evidence from experts during claim construction, expert testimony cannot preclude summary judgment of exhaustion here. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-89 (1996).

## II. HPL'S ARGUMENTS AGAINST EXHAUSTION FIND NO SUPPORT UNDER THE LAW

Elevating form over substance, HPL tries to circumvent a clear case of exhaustion through irrelevant technicalities and erroneous statements of law. But

[4] HPL incorrectly asserts that there is a factual dispute related to "use." Whether there is a use is the key question for exhaustion—one that can unquestionably be decided as a matter of law. *See, e.g.*, *LifeScan*, 734 F.3d at 1366 (holding that the alleged infringer "has established a patent exhaustion defense as a matter of law").

HPL cannot "shield" its "patented item[s] from exhaustion." *Quanta*, 553 U.S. at 630. The Supreme Court and this Court have repeatedly held that exhaustion prevents double recovery by focusing on substance, not form. *See, e.g.*, *id.* at 629-30; *Motion Picture Patents*, 243 U.S. at 516; *Adams*, 84 U.S. at 456; *LifeScan*, 734 F.3d at 1373; *Keurig*, 732 F.3d at 1375; *Tessera*, 646 F.3d at 1369; *TransCore*, 563 F.3d at 1275. And HPL's arguments are nothing if not formalistic.

### A. Exhaustion Protects More Than Purchasers

HPL first argues that exhaustion should not apply because its enforcement of the "content claims" does not restrict the purchasers of licensed handsets in their use of those handsets. This argument hangs on fundamentally wrong views of exhaustion: Exhaustion protects only purchasers, and the "use" of a patented product is limited to persons physically handling that product. HPL Br. 24-36, 45. Exhaustion is not so limited, and preventing content providers from sending links would clearly restrict licensed handset owners from receiving them.

As discussed above, "when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly." *Bloomer*, 55 U.S. at 549. The machine does not re-enter the limits of the patent monopoly merely because someone else uses it. *See Adams*, 84 U.S. at 455-56. Accordingly, when an infringement claim requires a licensed device, there cannot be infringement.

*See LifeScan*, 734 F.3d at 1366, 1374 ("[T]he patentee's transfer of the right to use the machines exhausted his rights as to those machines.") (punctuation omitted).

HPL contends that *Bowman v. Monsanto Co.*, 133 S. Ct. 1761 (2013), somehow changed the scope of exhaustion to protect only individuals who purchased a licensed item. But *Bowman* merely held that a purchaser of a patented product (self-replicating soybeans) cannot intentionally make new, infringing products. *Id.* at 1766-67. That is because exhaustion follows "the 'particular article' sold." *Id.* at 1766. The sale of one article does not exhaust patent rights over a different, new article. *Id.* at 1766-67. HPL does not argue that Appellees make new handsets, so *Bowman*'s narrow holding is inapplicable.

To be sure, in addressing whether the accused infringer—who had purchased the patented self-replicating commodity soybeans from a third-party seller—could be sued for making new products, the Court noted that "[u]nder the doctrine of patent exhaustion, the authorized sale of a patented article gives the purchaser, or any subsequent owner, a right to use or resell that article." *Bowman*, 133 S. Ct. at 1764; *see also id.* at 1766 ("[T]he sale confers on the purchaser, or any subsequent owner, the right to use or sell the thing as he sees fit.") (punctuation omitted). But the Court did not insert the word "only" before "the purchaser." The Court was not compiling a complete, exhaustive list of every person that a patentee could not

sue.  It was merely addressing the case at hand, which dealt with a purchaser of a self-replicating product.

Rather than constricting who can assert an exhaustion defense, *Bowman* reiterated that the "doctrine of patent exhaustion limits a patentee's right to control what others can do with an article embodying or containing an invention." *Bowman*, 133 S. Ct. at 1766.  Appellees are such "others," and HPL is attempting to "control" what they "can do with" licensed handsets.  *Bowman* confirmed that exhaustion follows the "particular article sold" (*id.*); it did not hold that a patentee may maintain lawsuits against everyone but purchasers.

Indeed, the *Bowman* Court reaffirmed that, when a particular article is sold, the sold item is forever freed of the patent:  "The purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward by the sale of the article; once that purpose is realized the patent law affords no basis for restraining the use and enjoyment of the thing sold."  *Id.* (citation omitted).  In other words, exhaustion "prevents a patentee from controlling the use of a patented product following an authorized sale."  *Id.* at 1768.

HPL also cites cases that it contends allow a patentee to sue for the use of articles so long as those articles might be "separately patentable" (even if not actually separately patented).  HPL Br. 29-31 (citing *Morgan Envelope* and *Aiken*

*v. Manchester Print Works*, 1 F. Cas. 245, 247 (C.C.D.N.H. 1865)). To the contrary, *Morgan Envelope* and the related cases invoked by HPL reiterate that exhaustion follows the particular article sold. 152 U.S. at 432. Under this principle, buying a patented combination does not give the purchaser the perpetual right to buy and use new, unlicensed component articles covered by a separate patent because that separate patent is not exhausted as to those new articles. *See id.* at 433-44 (discussing *Cotton-Tie Co. v. Simmons*, 106 U.S. 89 (1882)). Appellees, however, do not sell *any* components of a handset, much less ones covered by a separate HPL patent. Instead of replacing part of a licensed article, Appellees are accused of infringement based on actions that *use* that article— licensed handsets.

Nor does *ExcelStor Technology Inc. v. Pabst Licensing GMBH & Co. KG*, 541 F.3d 1373 (Fed. Cir. 2008), authorize the multiple recovery HPL seeks. *ExcelStor* was not an infringement suit, but rather a contract dispute in which a licensee sought to avoid paying royalties. *Id.* at 1375. The Federal Circuit explained that there is no federal "cause of action" for multiple recoveries on a patent: Exhaustion merely prohibits an infringement suit, so the licensee would have to turn to state court to resolve its contract dispute. *Id.* at 1376-77.

## B. Exhaustion Cannot Be Avoided By HPL's Purported Contract Limitations

HPL believes, incorrectly, that a patentee can evade the exhaustion doctrine by using continuation practice to secure numerous related claims in multiple patents, licensing its entire portfolio, and then purporting to claw back some of those claims from its licenses. HPL Br. 44-54. But a patentee cannot "reserve" any rights to seek additional royalties for the use of a licensed product, or even try to expressly state that a patent is not exhausted. *See Quanta*, 553 U.S. at 628-30 (A patentee cannot "shield" a "patented item from exhaustion" by refusing to transfer the right to perform "a method claim" in "an assignment contract."). Patent exhaustion jurisprudence is replete with patentees, like HPL, who attempted without success to extract multiple royalties from one product through clever draftsmanship. *See, e.g., id.* at 626 (noting the "frequency with which patent holders were using" cleverly drafted "licenses to limit the use of their products" even in the 1920s) (quotation marks omitted). A patentee cannot avoid exhaustion through artful drafting of restrictions and requirements. *Id.* at 628-30, 636; *cf. Alice*, slip op. at 14, 16-17. Exhaustion, in other words, is not coextensive with a licensing defense; it sweeps more broadly to prevent double recoveries.

### 1. Exhaustion Cannot Be Evaded By Contractual Restrictions On Use Of A Licensed Article

"There are strict limitations on the power of the patentee to attach conditions to the use of the patented article." *United States v. Masonite Corp.*, 316 U.S. 265,

39

277 (1942). Although it is permissible to license different manufacturers to make different sets of licensed goods by geography or type of purchaser (*see, e.g., Rubber Co. v. Goodyear*, 76 U.S. (9 Wall.) 788, 799-800 (1870)), once any particular item is sold under license, no further restrictions may be placed on the use of the licensed item itself.

The Supreme Court rejected such contractual restraints on exhaustion in *Quanta*. There, the Court specifically mentioned two ineffective limitations in the license agreement at issue: a mandate that the manufacturer notify customers that the patentee "had not licensed those customers to practice its patents," and language that "specifically disclaimed any license to third parties to practice the patents by combining licensed products with other components." 553 U.S. at 636-37. The Supreme Court held that neither of these restrictions avoided patent exhaustion. *Id.* Because the patentee had granted the manufacturer a license to sell the products, the patent was completely exhausted, irrespective of the contractual restrictions. *Id.* As the Court explained, these attempted limitations were "irrelevant" to the issue of exhaustion. *Id.* at 637 ("[E]xhaustion turns only on Intel's own license to sell products practicing the LGE Patents."). All other details of the license were a matter of contract between the parties to the license. *Id.* at 637 n.7 ("We note that the authorized nature of the sale to Quanta does not

necessarily limit LGE's other contract rights.").[5]  In other words, what matters for exhaustion is the licensed sale; everything else is, at most, a contractual dispute between HPL and its handset licensees.

Similarly, *Bowman* also found the limiting terms of a license irrelevant. Whether the farmer acquired the seeds with "a license from Monsanto to plant the seed and then harvest and market one crop of beans" or from an authorized sale without a license, including these particular terms did not matter.  133 S. Ct. at 1767 n.3.  Whether the license was explicit or implicit, or what its terms were, did not change the analysis:  So long as there was an authorized sale, the patentee could not restrict the use of the article except to prevent the making of a new article. *Id.*

HPL argues that its carve-out of particular claims (certain transmission claims) was a permissible "field of use" restriction.  HPL Br. 50-54.  But different claims that rely on the exact same use are not separate fields of use.

The cases cited by HPL deal with horizontal divisions of licenses between different manufacturers, largely based on geography.  These cases stand for the unremarkable proposition that a patentee can license one company to make its products in Massachusetts and another company to make its products in New York,

---

[5]  At any rate, here, as in *Quanta*, the patentee does not "contend[] that [the seller] breached the agreement."  553 U.S. at 636; JA2061 (HPL noting the lack of a contractual dispute between HPL and the handset manufacturers).

as discussed above. *See Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 456 (1940) (permitting manufacturing licenses "restricted in point of space or time"); *Rubber Co.*, 76 U.S. at 799-800 (upholding a license limited to manufacturing in a particular geographic area).

HPL's other authorities permit non-geographic ways to horizontally divide the manufacturers. For example, *General Talking Pictures Corp. v. Western Electric Co.* allowed a patentee to license one manufacturer to make and sell products to commercial theaters and another manufacturer to make and sell products to home users. 304 U.S. 175, 179 (1938). To the extent HPL contends that *General Talking Pictures* permitted any post-sale restrictions, it did not, and any such conclusion would be inconsistent with *Quanta*. *Quanta*, 553 U.S. at 636. *Princo* (a case about patent misuse, not exhaustion) did not even describe what "field of use limitations" it was referring to; its general remarks are explanatory *dicta*. *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc).

Independently, HPL's covenant not to sue exhausted its patent rights completely even if it intended to limit the rights of third parties, because such attempts are "of no moment in a patent exhaustion analysis." *TransCore*, 563 F.3d at 1275; *see also Quanta*, 553 U.S. at 637 ("[T]he question whether third parties received implied licenses is irrelevant because . . . exhaustion turns only on Intel's

own license to sell products practicing the LGE Patents."); *Bobel v. Maxlite, Inc.*, No. 12-C-5346, 2013 WL 142987, at *4 & n.3 (N.D. Ill. Jan. 11, 2013) (applying exhaustion even though the covenant purported to limit the rights of "third-party beneficiaries").

HPL also suggests that its contract restrictions should enable its lawsuits because those contracts recited that it received a "reduced" royalty. HPL Br. 51. Even assuming *arguendo* for summary judgment purposes that HPL's assertion is factually correct, it is legally irrelevant. *Tessera* specifically rejected the argument that a patent should not be held exhausted because "a finding of patent exhaustion here would deprive [the patentee] from receiving even a single recovery." 646 F.3d at 1369; *accord LifeScan*, 734 F.3d at 1375 (No case "suggest[s] that exhaustion could be avoided by showing the absence or inadequacy of the patentee's reward."). Here, HPL has received an abundant recovery, as explained above.

While HPL could have licensed different manufacturers to make different items, HPL could not—despite its attempts to do so—divide a single item into licensed and unlicensed uses under the same patents, especially considering that both sets of claims involve the same use of the same handsets; that is an ineffective post-sale restriction. *See Tessera*, 646 F.3d at 1370; *Quanta*, 553 U.S. at 636-37.

### 2.      Exhaustion Is Not Limited To Individual Claims

HPL argues that exhaustion should not apply here because it attempted to carve out certain claims in individual patents from its general license to its entire patent portfolio.   HPL Br. 50-54.   But exhaustion cannot be circumvented by carving up a patent claim-by-claim or spreading claims across multiple patents. "To permit a patentee to reserve specific claims from exhaustion would frustrate the purposes of the doctrine, one of which is to provide an efficient framework for determining when a patent right has been exhausted."   *Keurig*, 732 F.3d at 1374; *see also Quanta*, 553 U.S. at 629-30 (Exhaustion cannot be evaded by "draft[ing]" a patent as "including a method claim for the machine's patented method of performing its task.").   The law does not permit a patentee to "assert its claims" covering the use of licensed articles, if the articles themselves are covered by "the same patent."   *Keurig*, 732 F.3d at 1374.   In short, the doctrine is "patent exhaustion," *Quanta*, 553 U.S. at 625, not "claim exhaustion."

HPL attempts to limit this holding from *Keurig* to its specific "context." HPL Br. 49-50.   But *Keurig*'s reasoning and holding are not so limited.   The *Keurig* majority rejected a legal argument advanced by the patentee that would have forced a claim-by-claim analysis—the same argument advanced by HPL here. *Keurig*'s holding that exhaustion applied to entire patents was thus "necessary to the Court's analysis."   *DaimlerChrysler Corp. v. United States*, 361 F.3d 1378,

1385 (Fed. Cir. 2004).  Judge O'Malley's proffer of still a third analysis does not render the majority's holding *dictum*.  An "alternative ground," even when stated by the Court itself—much less when hypothesized by a concurring judge—cannot "relegate[]" a court's reasoning "to the category of *obiter dictum*."  *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537-38 (1949).

HPL's claim-by-claim rule would "vitiate the doctrine of patent exhaustion." *Keurig*, 732 F.3d at 1374.  Instead, the law is "straightforward" (*Tessera*, 646 F.3d at 1370):  The sale of a device "that partially practice[s] a patent" completely "exhaust[s] that patent."  *Quanta*, 553 U.S. at 635.  Even if transmitting content claims, along with receiving content claims, are "contained in each of the [Helferich] Patents," those patents are exhausted.  *Id.* at 628.

Carving up a patent by claim and purporting to license only certain claims but not others will not immunize the patent from exhaustion.  Were it otherwise, a patentee could draft a patent with both apparatus and method claims and license only the apparatus claims to try to defeat exhaustion—yet *Keurig* disallowed that very result.  732 F.3d at 1374.  In *Quanta* as well, "including a method claim" in

the patent did not immunize the patentee from exhaustion. *Quanta*, 553 U.S. at 629.[6]

HPL now contends that its vague definition of "content claims" would include all the claims of some of the patents-in-suit, and so it effectively granted no license to certain patents—even though its licenses expressly state that all of its patents are included. HPL Br. 46-50; JA2816 (citing JA1096, 1098). That argument is both waived and wrong.

During summary judgment briefing in the district court, HPL raised this issue only in a brief footnote. JA2059 n.3. "Arguments that are not fleshed out and are merely raised in footnotes are not preserved." *Stephanatos v. United States*, 306 F. App'x 560, 564 (Fed. Cir. 2009) (collecting cases); *see also Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250 n.2 (Fed. Cir. 2008) ("Judges are not like pigs, hunting for truffles buried in briefs." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

Even if HPL's argument had been preserved, that argument is not supported by the language of its license agreements or the law. The agreements grant licenses to HPL's entire portfolio. JA2816 (citing JA1096, 1098). Some of the agreements then purport to list certain claims that are carved out—but, by HPL's

---

[6] To the extent HPL contends that district court and regional circuit cases decided before the creation of this Court analyzed exhaustion claim-by-claim, HPL Br. 31 n.17, *Keurig* held otherwise and thus controls. 732 F.3d at 1374.

own admission, none of its licenses list all of the claims of any patent. JA2104.

Moreover, HPL's current assertion is inconsistent with its past representations to the PTO. HPL now contends that the '241 Patent is a transmission-only patent not covered by its manufacturing licenses, but HPL told the PTO the opposite. It relied on those very licenses to show that "[i]t is highly unlikely that all of the major companies in the handset industry . . . would sign licenses" to the '241 Patent if they believed it "to be obvious." JA2004-05. HPL does not explain how a license can show that a patent is nonobvious if the license does not cover that patent.

Yet HPL contends that in spite of the agreements' explicit inclusion of every patent in HPL's arsenal and refusal to explicitly carve out any entire patent, some whole patents are excluded because of the licenses' vague definition of "content claims" and HPL's expert's conclusory statement that many of the asserted claims fit that definition. HPL Br. 15-16.

HPL's own simplified model license agreement demonstrates how deliberately opaque its licenses are. HPL's model license states that its license grant is "[s]ubject to the exceptions and limitations set forth in" a section that states that the license is limited to the "Licensed Fields," which is defined in still another section as "Mobile Wireless Communication Devices." JA2100-02. HPL's model license also states that there is no license on "Reserved Claims,"

which it says "are more than one thousand issued and pending claims . . . not Infringed by Licensee because they expressly recite material additional operations . . . and/or are not substantially embodied in the products, services or methods within the scope of the Licensed Fields." JA2102. These vague reservations provide little clarity on what claims or patents were or were not purportedly reserved.

HPL's need to rely on *post-hoc* expert testimony to explain what these carve-outs mean illustrates the problem: obfuscation in the licenses themselves. Interpretation of a written license agreement is a legal question, properly within the province of the court; it cannot vary depending on what an expert later says. *See Markman*, 517 U.S. at 389. Even HPL's own expert did not list which claims its licenses purportedly withheld, stating only that "[t]here are several hundred 'content only claims' in these patents." JA2255. And HPL identifies different claims as reserved "content claims" in different licenses. JA2817.

Even if HPL's identifications of transmitting content claims in its licenses were not contradictory, its reliance on such vague definitions generates "uncertainty regarding the rights of both third parties and end users" of the licensed products, *Keurig*, 732 F.3d at 1375: neither can know which claims are supposedly covered and which are not. HPL's licenses are "elaborate to the extent of confusion," and "fail[] utterly to provide" notice to "users or licensees" that

certain patents are unlicensed. *Strauss v. Victor Talking Mach. Co.*, 243 U.S. 490, 498-99 (1917). That ambiguity affords the patent holder an improper ability to later define what is and is not licensed.

Even the ineffective provision in *Quanta* gave notice to third parties about what aspects of the patents they could not practice. 553 U.S. at 636. Here, by contrast, users of the licensed products cannot know which claims are reportedly covered because the licenses are not available to the public. Third parties thus have no notice whatsoever. Without the ability to provide the public with clear notice, exhaustion cannot fulfill its function of "secur[ing]" the "rights" to make use of the item "in the ordinary pursuits of life." *Id.* at 625 (citation omitted).

Fundamentally, one of "the purposes of the doctrine" of patent exhaustion "is to provide an efficient framework for determining when a patent right has been exhausted." *Keurig*, 732 F.3d at 1374. To permit a patentee's fuzzy clawback to defeat exhaustion long after the ink has dried on the license—based solely on its self-serving interpretation of that nebulous language—"would frustrate" this purpose. *Id.* HPL's licensing regime fosters uncertainty, fear of future lawsuits, and the chill of innovation that accompanies such uncertainty and fear. *See Markman*, 517 U.S. at 390. Exhaustion removes that "cloud of uncertainty" HPL has attempted to create. *Tessera*, 646 F.3d at 1370.

In any event, this is yet another respect in which a patentee cannot evade exhaustion through the drafter's art. HPL cannot evade exhaustion by carving out related patents any more than it can by carving out related claims. As discussed above, and conceded by HPL, all of the asserted patents are directed to a "communication system" that is disclosed in a single "patent specification that has resulted in numerous patents and claims" through continuation practice. HPL Br. 4-5. While licensing one patent does not necessarily exhaust a patentee's right to assert unrelated patents, *see, e.g.*, *Quanta*, 553 U.S. at 634; *Endo Pharmaceuticals Inc. v. Actavis, Inc.*, 746 F.3d 1371, 1377-79 (Fed. Cir. 2014), it exhausts the right to assert related patents, in the same family, against the licensed articles when those articles are used for the very purpose for which they were licensed. The Supreme Court has held as much on at least two occasions. *See Quanta*, 553 U.S. at 634-35 ("[E]xhaustion analysis is not altered by the fact that more than one patent is practiced by the same product."); *Ethyl Gasoline*, 309 U.S. at 446, 457 (finding exhaustion of three related patents concerning gasoline combined with fuel additive and method of using same). Otherwise, the license would be worth very little, and exhaustion would be easily evaded by filing continuation applications to proliferate the number of patents—precisely the kind of evasion the courts have long rejected.

Even if patent exhaustion did not apply patent-by-patent, HPL would still lose. The concurring opinion in *Keurig*—which HPL argues is the correct analysis, HPL Br. 50—reached this very conclusion. *See* 732 F.3d at 1375 (O'Malley, J., concurring). According to the concurrence, a court need not examine whether any particular patent has been licensed, because a patentee's "patent rights covering normal methods of using [licensed articles] would be exhausted by the sale of [those articles], regardless of which patent or patents contain the relevant apparatus and method claims." *Id.* In other words, sale of an invention exhausts all the patent rights pertaining to that invention—including all "apparatus and method claims." *Id.* Accordingly, exhaustion applies here under any of the *Keurig* judges' views.

HPL alleges that it initially attempted to combine multiple, patentably distinct inventions in one patent, but later (in response to restriction requirements) filed divisional applications and obtained separate patents. HPL Br. 13-14. But the PTO's restriction requirement is irrelevant under the *Keurig* majority's approach because HPL did not separately license its patents and irrelevant under the concurrence's approach because a patentee may not split up claims for the same invention. HPL's analysis could thus undermine the prohibition against double patenting. *Cf. In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985) (The rule against "double patenting" "precludes one person from obtaining more than one

51

valid patent for either (a) the 'same invention,' or (b) an 'obvious' modification of the same invention."). Moreover, some of the asserted patents indisputably include both transmitting and receiving claims, confirming that the two sets of claims are not distinct inventions.

### C. Substantial Embodiment Is Not A Requirement For Patented Products

HPL next contends that even though it collected tens of millions of dollars in royalties from licensing the manufacture of handsets, the handsets do not embody the asserted claims. HPL Br. 36-44. But HPL is wrong as a matter of law that the handsets need to pass an embodiment test, and HPL does not explain what the purpose of its licenses to the manufacturers was if not to authorize the sale and use of the handsets those manufacturers sell. Even so, the accused functionality would meet any such test, as the district court properly decided as a matter of law.

### 1. *Keurig* Rejected HPL's Argument That Exhaustion Requires A Substantial Embodiment Test

The exhaustion analysis is simple: If "the product sold . . . was patented," exhaustion applies; no further analysis is required. *Keurig*, 732 F.3d at 1373. Whether a product substantially embodies a patent is relevant only when the product is *not* patented, as *Keurig* also squarely held. Thus, contrary to HPL's position, an accused infringer need not show that the "item (1) has no reasonable

noninfringing use and (2) includes all inventive aspects of the claimed method." *Id.*[7]

The patentee in *Keurig*, like HPL here, argued that these findings were necessary in every exhaustion case, based on its overly broad reading of a statement in an earlier Supreme Court case that "the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold." *See United States v. Univis Lens Co.*, 316 U.S. 241, 249 (1942); *see also Quanta*, 553 U.S. at 631-34 (explaining that the facts in *Quanta* were similar to those in *Univis*). As this Court explained, however, *Univis* and *Quanta* dealt with the very different question of "whether the sale of an unpatented component (*e.g.*, lens blanks that are further ground and polished or microprocessors and chipsets that are further attached to memory and buses in a computer system), which by itself does not practice the patented method, is still sufficient for exhaustion." *Keurig*, 732 F.3d at 1373.

---

[7] HPL attempts to avoid *Keurig*'s holding that embodiment is not required for patented products by contending that the holding was unnecessary since the product in *Keurig* would have met an embodiment test. HPL Br. 38 n.23. But the lack of need for a patented product to satisfy an embodiment test was this Court's stated rationale, and HPL's effort to downplay this holding of *Keurig* fails for the same reason as its effort to wash away *Keurig*'s patent-by-patent holding. *See Keurig*, 732 F.3d at 1372 (rejecting Keurig's argument because "the product sold by Keurig was patented").

*Univis* and *Quanta* held that, in the unusual case involving the sale of an unpatented product, exhaustion applies if the product met a "substantial embodiment test." *Id.* ("Both of the *Univis* and *Quanta* opinions emphasized the unpatented nature of the products sold."). The Court did not impose any new "reasonable noninfringing use" or "all inventive aspects" requirement on exhaustion in the more typical scenario "in which the product sold by [a licensee] was patented." *Id.* "The Court's decision in *Quanta* did not alter" the "principle" that the sale of "a patented machine" secures "the right to the use of the machine so long as it is capable of use." *Id.* at 1374 (punctuation omitted). Indeed, *Quanta* described the sale of an unpatented product embodying "essential features" of a patent as merely one "example" of an event triggering exhaustion. 553 U.S. at 635.

Beyond *Univis* and *Quanta*, none of the Supreme Court's other exhaustion cases even mention an embodiment test. For example, contrary to HPL's assertion, HPL Br. 29-30, *Morgan Envelope*—which involved "a subsidiary element (toilet paper rolls) of a patented combination"—did not apply an embodiment test, but reiterated that, through "original sale by the patentee, the[ articles] passed out of the limits of the monopoly, and might be used or sold" without infringement liability. 152 U.S. at 432.

Here, there has been an authorized sale of patented articles. The handset manufacturers each took a license so they could manufacture and sell handsets. Such a license was necessary (at least under HPL's infringement theory) because the handsets practice the HPL patents—they have functionality to enable them to receive a message, present a portion of the message as a link and, upon user input, request content associated with the link.

HPL tries to downplay *Keurig*'s holding that patented products need not meet an embodiment test by contending that a subsequent case, *LifeScan*, evaluated whether a patented product embodied the patent. HPL Br. 37. HPL's attempt to write *Keurig* out of the Federal Reporter fails. *Keurig* is an earlier precedential panel decision and thus would control over *LifeScan* even if there were any conflict. *See Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991). And there is no conflict because *LifeScan* did not hold that the presence of a potential non-infringing use can defeat exhaustion. To the contrary, *LifeScan* "rejected the contention that a potential noninfringing use prevents exhaustion where the use in question is the very use contemplated by the patented invention itself." 734 F.3d at 1369 (citing *Keurig*, 732 F.3d at 1373). That is the case here, where HPL's infringement theory is that handsets are used in precisely the manner contemplated by the patents.

## 2. Even If A Substantial Embodiment Test Applied, The Handsets Embody The Patents

Even if HPL were correct that the patented handsets needed to meet an embodiment test, the handsets would satisfy any such standard. The relevant feature of the handsets does not have any reasonable and intended non-infringing use under HPL's broad infringement theory. *See Univis*, 316 U.S. at 249. As an initial matter, HPL has waived any contention that non-infringing uses exist by merely referencing an argument in the appendix—but failing to actually name or explain those uses. HPL Br. 43; *Graphic Controls Corp. v. Utah Med. Prods., Inc.*, 149 F.3d 1382, 1385 (Fed. Cir. 1998).

Moreover, as Appellees explained to the district court, JA1022-24, 2784-87, the action performed by the licensed handsets—recognizing URLs, enabling selection of links, and requesting content—has no non-infringing uses. *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1330 (Fed. Cir. 2010) ("[I]n determining whether there are substantial noninfringing uses, we must only consider the particular tool in question when that tool is a separate and distinct feature of a larger product.") (internal quotation marks omitted). The non-infringing alternatives HPL identified in the district court—where one server, person or entity stores the content while another sends the message containing the URL of the content, JA2253-55—would be infringing under HPL's infringement theory. JA1032-48, 2815-16, 2573-76, 2591-95. HPL's infringement contentions broadly

defined the claim terms "content provider" and "causing" to argue that Appellees would infringe even if they did not both store the message and send it, but rather caused some other entity or server to perform some steps of the claim. *Id.*

Furthermore, HPL's alternatives are for the handset owners, not for Appellees. As this Court has explained, "the question . . . is whether . . . the alleged direct infringers have a noninfringing use" for the feature, not whether any others could develop a non-infringing use. *LifeScan*, 734 F.3d at 1369 (punctuation omitted). Here, HPL has not established, and the record does not support, that the alleged direct infringers—Appellees—have any other use for handsets in other people's hands except to send content to them.

HPL argues that the handsets do not contain all of the inventive features of the asserted claims. HPL Br. 37-42. But exhaustion is not claim-specific; and, as in *Keurig*, the handsets indisputably embody HPL's patents. Thus HPL's argument that the handset functionality and content-provision are separately patentable is irrelevant. Indeed, *Quanta* rejected this very argument. 553 U.S. at 631 (rejecting LGE's argument that exhaustion did not apply because the licensed items were "'independent and distinct products' from the systems using the LGE Patents," with a "patentable distinction" between them). "The question here is not whether the" content-provision "would have been separately patentable." *LifeScan*, 734 F.3d at 1371.

Similarly, the exhaustion analysis is not altered by the fact that a patent requires multiple articles, such as both a handset and a server. *LifeScan* rejected the argument that exhaustion did not apply because the patent "requires both a meter and a test strip." *Id.* at 1365. The patent required a meter, and the meter embodied the patent; thus the meter's sale exhausted the patent. *Id.* at 1364, 1370.

Even if there were a "sufficient embodiment" test for every individual claim, each asserted claim requires the use of a handset, as the district court found. JA10. *Quanta* held that an item sufficiently embodies the patent when it "partially practice[s]" the patent—*i.e.*, it performs some of the functions claimed by the patent. 553 U.S. at 635. *Quanta* explained that "methods . . . may be 'embodied' in a product, the sale of which exhausts patent rights," *id.* at 628, when the products "embody only some of the 'patentably distinct elements and steps' involved in the" patents-in-suit. *Id.* at 634. Where an "essential feature[]" of an asserted patent is licensed—*i.e.*, a feature needed for infringement, a feature that "partially practice[s]" that patent—there can be no infringement from using that element. *Id.* at 635.

Here, the handsets are the central element of each claim—they perform critical steps in the method claims and critical operations in the system claims. The handsets embody the only purportedly inventive feature of the claims—the ability to render text URLs into links that, upon a click, automatically request

content.  *See* JA1982 (HPL explaining to the PTO that the prior-art "mechanism that Helferich intended to improve upon" required the user to "separately pull" desired content).  The patents' own specifications amply demonstrate this; they focus on the handset's capabilities.  JA2816-17.  That the claims also require the delivery of content—an element that is not "unique" or "central" to HPL's supposed invention but rather a "standard component[]"—is immaterial.  *Quanta*, 553 U.S. at 632-34.  Receiving requests for content and sending that content in response is not inventive; every publisher, newspaper, and catalog in history has performed those steps.  Here, sending content can hardly be "central," *id.* at 633; a provider sends content only at the end of the process, if and after: (1) a message containing a URL is sent, (2) the patented technology on the handset enables selection of the URL, (3) someone selects that link, and (4) the handset sends a request for the content.  JA1034-48.

> ### 3. Substantial Embodiment Is Appropriately Decided By The Court On Summary Judgment Where It Does Apply

HPL also argues that if there is a substantial embodiment test, it is a question of fact for the jury to decide or for which expert testimony is needed.  HPL Br. 34, 37-38.  Again, HPL is wrong.  The Court in *Quanta* provided its own legal analysis of sufficient embodiment, without so much as a reference to any factual findings.  *See Quanta*, 553 U.S. at 630-35.  Similarly, *Univis* concluded that the lens blanks sufficiently embodied the patents even though "[t]he record gives no account of the

prior art and does not provide us with other material to which, if available, resort might appropriately be had in determining the nature of the alleged invention and the validity and scope of the patent claims founded upon it." 316 U.S. at 248. The Court found it "unnecessary" to decide the scope of the claims to conclude that the lens blanks "embod[ied] the invention." *Id.* at 248-50. By contrast, HPL has not cited a single case where the Supreme Court or this Court has held that sufficient embodiment is a question of fact or that it needed to be submitted to a jury or that expert testimony was required.

As this Court held, "[p]atent exhaustion . . . may be properly decided by summary judgment." *Keurig*, 732 F.3d at 1373. That is certainly true here, where the patents and asserted claims all involve handsets—the very articles that have been licensed. Moreover, even if there were any material disputes, they would go only to the scope of the claims, which is "a question of law." *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1284 (Fed. Cir. 2014) (en banc).

Even if HPL were correct that the handsets here must meet some embodiment test, the handsets satisfy any interpretation of that test as a matter of law. Allowing HPL to control the use of the allegedly inventive link-rendering feature after it already has received its royalty from sale of handsets with that feature "would bar the use of the [handsets] for their contemplated function and

extend the patent monopoly improperly." *LifeScan*, 734 F.3d at 1373.  Exhaustion forbids that result.

## CONCLUSION

This Court should affirm the judgment of the district court.

Dated:  June 23, 2014

Respectfully submitted,

*/s/ Brian M. Buroker*

Brian M. Buroker*
   *Principal Attorney*

Alexander N. Harris
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8264

Blair A. Silver
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
T:  (202) 955-8500
F:  (202) 530-4200
bburoker@gibsondunn.com

*Counsel has consent of all Appellees
to file the foregoing document

*Counsel for Defendant-Appellee The New York Times Company*

Edward R. Reines
   *Principal Attorney*
Byron C. Beebe
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

*Counsel for Defendants-Appellees G4 Media, LLC, CBS Corporation,
and Bravo Media LLC*

Adam Conrad
KING & SPALDING LLP
100 N. Tryon Street
Charlotte, NC 28202
(704) 503-2600

Benjamin M. Stern
HOLLAND & KNIGHT, LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Daryl Joseffer
*Principal Attorney*
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 737-0500

R. David Donoghue
Anthony J. Fuga
HOLLAND & KNIGHT, LLP
131 South Dearborn Street
Chicago, IL 60603
(312) 263-3600

*Counsel for Defendant-Appellee J.C. Penney Corporation, Inc.*

# CERTIFICATE OF SERVICE

I, Brian M. Buroker, hereby certify that I caused the foregoing Brief for Defendants-Appellees to be filed via the Court's CM/ECF system and served on counsel of record who have registered for such service on June 23, 2014.


_____*/s/ Brian M. Buroker*_____
Brian M. Buroker

*Counsel for Defendant-Appellee*
*The New York Times Company*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
## AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,973 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:  June 23, 2014

_____*/s/ Brian M. Buroker*_____
Brian M. Buroker

*Counsel for Defendant-Appellee*
*The New York Times Company*