# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## 2014-1196, -1197, -1198, -1199, -1200

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY,

*Defendant-Appellee,*

and

J.C. PENNEY CORPORATION, INC.,

*Defendant,*

and

G4 MEDIA, LLC, THE BON-TON STORES, INC.,
BRAVO MEDIA LLC, and CBS CORPORATION,

*Third Party Defendants.*

———————————

2014-1196

———————————

Appeal from the United States District Court for the
Northern District of Illinois in No. 1:10-cv-04387, Judge John W. Darrah

(caption continued on next page)

## REPLY BRIEF FOR PLAINTIFF-APPELLANT
## HELFERICH PATENT LICENSING, LLC

Victoria Curtin
VICTORIA GRUVER CURTIN, P.L.C.
14555 N. Scottsdale Road, Suite 160
Scottsdale, Arizona 85254
(480) 998-3547


July 24, 2014

Aaron M. Panner
Brendan J. Crimmins
Michael E. Joffre
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Plaintiff-Appellant Helferich Patent Licensing, LLC*

(additional counsel listed on inside cover)

Steven G. Lisa
Jon E. Kappes
LAW OFFICES OF STEVEN G. LISA, LTD.
55 West Monroe Street, Suite 3210
Chicago, Illinois 60603
(312) 752-4357

Gerald D. Hosier
LAW OFFICES OF GERALD D. HOSIER,
    LTD.
PO Box 12354
Aspen, Colorado 81612
(970) 920-3475

*Counsel for Plaintiff-Appellant Helferich Patent Licensing, LLC*

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

G4 MEDIA, LLC,

*Defendant-Appellee*.

————————————

2014-1197

————————————

Appeal from the United States District Court for the
Northern District of Illinois in No. 1:11-cv-07395, Judge John W. Darrah

———————————————————————————————

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

CBS CORPORATION,

*Defendant-Appellee*.

————————————

2014-1198

————————————

Appeal from the United States District Court for the
Northern District of Illinois in No. 1:11-cv-07607, Judge John W. Darrah

———————————————————————————————

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

BRAVO MEDIA LLC,

*Defendant-Appellee*.

————————————

2014-1199

————————————

Appeal from the United States District Court for the
Northern District of Illinois in No. 1:11-cv-07647, Judge John W. Darrah

———————————————————————————————

(caption continued on next page)

HELFERICH PATENT LICENSING, LLC,

*Plaintiff-Appellant*,

v.

J.C. PENNEY CORPORATION, INC.,

*Defendant-Appellee*.

———————————

2014-1200

———————————

Appeal from the United States District Court for the
Northern District of Illinois in No. 1:11-cv-09143, Judge John W. Darrah

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................3

I.  EXHAUSTION DOES NOT APPLY BECAUSE DEFENDANTS'
    INFRINGEMENT DOES NOT INCLUDE THEIR USE OF
    HANDSETS ............................................................................................3

    A.  The Claim Language Forecloses the Argument That
        Infringement Requires Defendants To Use a Handset ..........................3

    B.  Exhaustion Does Not Excuse Direct Infringement That
        Enhances the Utility of a Purchased Article .........................................9

    C.  Expanding Exhaustion Would Not Serve Any Legitimate
        Policy and Would Create Damaging Uncertainty ...............................13

II. ALTERNATIVELY, EXHAUSTION DOES NOT APPLY
    BECAUSE HANDSETS DO NOT SUBSTANTIALLY
    EMBODY THE ASSERTED PATENT CLAIMS .......................................14

    A.  Exhaustion Requires Defendants To Show That Handsets
        Substantially Embody the Content Claims .........................................14

    B.  Handsets Do Not Substantially Embody HPL's Content
        Claims ..............................................................................................16

    C.  Although the Court Need Not Reach the Issue, Exhaustion
        Should Be Analyzed Claim-by-Claim in Appropriate Cases .............21

III. HPL'S LICENSES REINFORCE THE INAPPLICABILITY OF
     EXHAUSTION .......................................................................................22

CONCLUSION .................................................................................................28

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

Page

**CASES**

*Adams v. Burke*, 84 U.S. 453 (1873)...........................................................8

*Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368
    (Fed. Cir. 2011)...................................................................1, 2, 4, 5

*Aiken v. Manchester Print Works*, 1 F. Cas. 245 (Clifford, Circuit
    Justice, C.C.D.N.H. 1865) ............................................2, 11, 12, 13

*American Cotton-Tie Co. v. Simmons*, 106 U.S. 89 (1882).....................11

*Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336
    (1961)...................................................................................8

*Bloomer v. McQuewan*, 55 U.S. 539 (1852)..............................................8

*BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007).................. 1-2

*Bowman v. Monsanto Co.*, 133 S. Ct. 1761 (2013) ....................................9

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002) .................22

*Ethyl Gasoline Corp. v. United States*, 309 U.S. 436 (1940) .....................14, 24, 25

*General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124
    (1938).............................................................................23, 24

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
    123 F.3d 1445 (Fed. Cir. 1997) .....................................................8

*Jones v. Hardy*, 727 F.2d 1524 (Fed. Cir. 1984) .....................................21

*Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370
    (Fed. Cir. 2013)......................................... 7, 13, 15, 16, 17, 21, 24

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
    734 F.3d 1361 (Fed. Cir. 2013) ...........................2, 7, 10, 11, 15, 16

*Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111
(2014) ............................................................................4, 6, 7, 18

*Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.*,
152 U.S. 425 (1894).................................................................8, 11

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
243 U.S. 502 (1917).....................................................................8

*Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008) ...............6, 18

*Property & Cas. Ins. Ltd. v. Central Nat'l Ins. Co. of Omaha*,
936 F.2d 319 (7th Cir. 1991) .......................................................27

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
553 U.S. 617 (2008)..................................................... 3, 7, 11, 14, 15, 16, 18,
21, 23, 24, 25, 26

*Stukenborg v. United States*, 372 F.2d 498 (Ct. Cl. 1967) .....................................12

*Tessera, Inc. v. ITC*, 646 F.3d 1357 (Fed. Cir. 2011)................................................8

*TransCore, LP v. Electronic Transaction Consultants Corp.*,
563 F.3d 1271 (Fed. Cir. 2009) .......................................7, 8, 23, 24

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) .........1, 4, 5, 6

*United States v. Univis Lens Co.*, 316 U.S. 241 (1942)..............................11, 14, 16

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997).................15

## OTHER MATERIALS

Thomas G. Hungar, *Observations Regarding the Supreme Court's
Decision in* Quanta Computer, Inc. v. LG Electronics, Inc.,
49 IDEA 517 (2009) ......................................................................15

# INTRODUCTION

The authorized sale of handsets does not exhaust HPL's patent rights against the Defendant content providers because Defendants do not use handsets to perform any element of the asserted content claims, such as storing, identifying, managing, and notifying subscribers about Defendants' content. HPL never alleged that handset owners infringe (directly or indirectly) any content claim. Rather, the infringing conduct defined by HPL's content claims is performed entirely by Defendants, using their content systems, resulting in their direct infringement.

Indeed, Defendants do not argue that exhaustion applies because *they* use licensed handsets in their allegedly infringing activities. Instead, they argue that exhaustion applies because a handset "is used" by *others* in conjunction with Defendants' infringing activities. Defs.' Br. 1. But the language of HPL's patent claims makes clear that a handset is (at most) only part of the environment in which Defendants carry out their infringing conduct; the use of a handset is not an element of the asserted claims. *See Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1374 (Fed. Cir. 2011); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1308-09 (Fed. Cir. 2011). HPL structured its claims " 'to capture infringement by a single party,' by 'focus[ing] on one entity' " – here, the Defendant content providers. *Uniloc*, 632 F.3d at 1309 (quoting *BMC Res., Inc. v.*

*Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007)) (alteration in original); *see Advanced Software Design*, 641 F.3d at 1374. Defendants' infringing conduct does not require, as an element of the claim, their use of a handset.

Defendants also assert that HPL supposedly licensed, and receives royalties for, "two-way communications" that include their content subscribers' use of handsets. But HPL did not license "two-way communications." HPL licensed handset manufacturers – subject to specific limitations – to make, use, and sell *handsets*, and any exhaustion of its patent rights is only possible with respect to those handsets. Defendants nevertheless insist that HPL is barred from enforcing its content claims in a way that, they say, makes the handsets' licensed features "effectively worthless." The assertion, however, that the authorized sale of an article creates a license (implied or by exhaustion) to practice separately patented inventions that might increase the utility of the purchased article is foreclosed by *Aiken v. Manchester Print Works*, 1 F. Cas. 245 (Clifford, Circuit Justice, C.C.D.N.H. 1865), and its progeny, including this Court's recent statements in *LifeScan Scotland, Ltd. v. Shasta Technologies, LLC*, 734 F.3d 1361, 1368-69 (Fed. Cir. 2013).

Even if exhaustion could bar a suit against a direct infringer (here, the content providers) based on the assertion that an article is used by someone else (the content subscribers), the authorized sale of handsets could not excuse

Defendants' infringement of HPL's content claims.  Under *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), sale of an article cannot exhaust a patent right when the article does not substantially embody the claimed invention.  Here, the evidence establishes that a handset sold to a consumer does not embody even one element of the content claims, let alone substantially all of the inventions defined by the content claims.  And, in any event, the express terms of HPL's licenses to the handset manufacturers foreclose any argument that HPL licensed handsets under the content claims at issue.

## ARGUMENT

## I.   EXHAUSTION DOES NOT APPLY BECAUSE DEFENDANTS' INFRINGEMENT DOES NOT INCLUDE THEIR USE OF HANDSETS

Exhaustion potentially applies only when a patent holder asserts that a person's use or sale of an article acquired with the patentee's authorization constitutes direct infringement.  HPL Br. 24-26, 32-33.  Here, Defendants neither possess nor operate handsets when they infringe the content claims, and their subscribers who possess and operate handsets do not practice the content claims when they receive Defendants' content.  Exhaustion therefore does not apply.

### A.   The Claim Language Forecloses the Argument That Infringement Requires Defendants To Use a Handset

Defendants cannot rebut HPL's showing – supported by record evidence – that "Defendants do not use handsets when they infringe the content claims of the

patents-in-suit." HPL Br. 26. Citing several illustrative examples, HPL demonstrated that infringement of the asserted content claims does not require the accused infringer to possess or operate a handset. *Id.* at 26-29.

**1.** Defendants nevertheless assert (at 29) that, when a content provider infringes the asserted claims, someone else – one of their subscribers – performs some action using a handset and that, for this reason, "a handset is an element of each asserted claim." *See also* Defs.' Br. 29 (arguing that, "if the link generated by the wireless handset is never clicked or there is no handset to receive the text message, delivery of content cannot occur and, thus, all elements of the claimed method will never be performed or the system cannot function"). That argument, however, is foreclosed by this Court's reasoning in *Advanced Software Design* and *Uniloc*. Those cases establish that a defendant directly infringes – that is, practices *every element* of a patent claim, *see Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) – even if the defendant can practice the invention only in an environment that involves additional conduct by others.

In *Advanced Software Design*, the claims required that the alleged infringer employ a process involving a financial instrument "encrypted in combination with key information . . . printed on the financial instrument." 641 F.3d at 1373. The defendant argued that the preamble steps were part of the process; this Court disagreed, holding that the "asserted claims . . . recite a process or system for

validating checks, not for encrypting and printing them." *Id.* at 1375. In *Uniloc*, the defendant argued that it could not be liable for infringement because the allegedly infringing "remote registration station" was "part of a registration system" that included "local licensee unique ID generating means" – that is, an end-user's computer running necessary algorithms – and the defendant "did not supply or use the end-users' computers." 632 F.3d at 1297 (quoting claim language), 1308-09. The Court disagreed, noting that the claim language focused on the use of the "remote registration station" – which the defendant used – and that the "local licensee unique ID generating means" was part of "the environment in which that registration station must function." *Id.* at 1309. "That other parties are necessary to complete the environment in which the claimed element functions does not necessarily divide the infringement between the necessary parties." *Id.*

That analysis forecloses Defendants' argument that a handset is an element of any asserted claim, because each content claim "focuses exclusively on" the content providers' actions, which do not include use of a handset. *Id.* Defendants argue (at 33) that this Court's cases stand for the proposition that "statements that describe the environment in which the claim operates may be limiting but nonetheless performed by a second actor" and are "relevant only to *who* must

perform a claim step or element, not *whether* it must be performed."[1] But Defendants' argument cannot be squared with the principle – recently reaffirmed by the Supreme Court – that direct infringement requires the accused infringer to perform *all* elements of a claim. *See Limelight*, 134 S. Ct. at 2117; *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329-30 (Fed. Cir. 2008). HPL does not allege that the handset user is infringing HPL's content claims, and *Defendants'* direct infringement does *not* include *Defendants'* use of a handset. Rather, consistent with *Limelight* and *Muniauction*, Defendants are solely responsible for performing every element of the content claims, including those relating to the delivery of content to handsets. Handsets, owned and used *by others*, are at most part of the environment in which *Defendants* perform the claimed methods and implement the accused systems. HPL Br. 27-28.[2] That has never been sufficient to bring exhaustion doctrine into play.

---

[1] Defendants also suggest (at 33) that the cases involve only "preamble statements," but in *Uniloc* the "local licensee unique ID generating means" was part of the body of the asserted claim.

[2] Defendants' discussion of the claims confirms the point. They assert (at 30) that claim 9 of the '838 patent "recites . . . the 'wireless communications device' sending, 'as a reply to the' message-sender's 'message,' a 'request message.'" In fact, the claim teaches a method of communicating data from a content provider in which, among other elements, "the content provider receiv[es] a request message . . . from the wireless communication device." A105. That language does not entail content providers' use of the handset; it requires that the content provider *receive* a request message sent by the user of a wireless communication device. Similarly, the fact that the content provider's *receipt* of a

Rather, in every exhaustion case, the patentee's infringement allegations depended on proving that the possessor and user of the purchased article directly infringed the claim. In *Quanta*, LGE alleged that Quanta directly infringed when it used the licensed microprocessors and chipsets in manufacturing computers. *See* 553 U.S. at 624. In *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370 (Fed. Cir. 2013), Keurig alleged that purchasers of its brewers directly infringed when they used those brewers with Sturm's cartridges. *See id.* at 1372. In *LifeScan*, LifeScan alleged that owners of its blood-glucose meters directly infringed when they used those meters with Shasta's test strips. *See* 734 F.3d at 1365. In *TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009), the patentee alleged that defendant "agreed to set up and test toll-collection systems"

---

request for content is one element of claim 1 of the '757 patent does not make a handset an element of that claim.

Claim 13 of the '741 patent describes a system that is configured to cause content updates to be transmitted to a cell phone after receiving a request for content from the cell phone. A262. Performing the elements of that claim does not require the alleged infringer to possess or operate a handset; a handset is thus not an "element" of the claim. *See Limelight*, 134 S. Ct. at 2117.

Although Defendants say (at 30) that claim 1 of the '450 patent "requires a licensed handset to receive a message and retrieve the content," each step of that claim can in fact be performed even if no handset receives or responds to the content provider's notification, HPL Br. 5-7. Contrary to Defendants' argument (at 31), HPL's infringement contentions show only that the New York Times initiates content notifications that contain a system address for a mobile phone to contact to trigger retrieval of content; infringement can occur even if no handset contacts the system. A2595.

purchased from a licensee. *Id.* at 1273. In each case, the patentee sought to prove

that the authorized possessor of the article operated it in a manner that directly

infringed.[3] Because that is not the case here, exhaustion doctrine does not apply.

**2.** None of this means that exhaustion is "contingent on the drafter's art."

Defs.' Br. 25. HPL's handset and content claims do not recite the same invention

"from different perspectives." *Id.* at 24; *see id.* at 33-34. They claim distinct

inventions – different methods and systems – practiced by different actors. The

content claims define inventions enabling content providers to store, identify,

manage, and send notifications about their content, and to make that content

---

[3] *See also Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 507 (1917) (patent holder alleged that defendant directly infringed by using articles); *Adams v. Burke*, 84 U.S. 453, 456-57 (1873) (same); *Bloomer v. McQuewan*, 55 U.S. 539, 547-48 (1852) (same); *Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.*, 152 U.S. 425, 432-33 (1894) (patent holder alleged that purchasers directly infringed by using articles with unpatented components supplied by defendant); *Tessera, Inc. v. ITC*, 646 F.3d 1357, 1360, 1371 (Fed. Cir. 2011) (patent holder alleged that defendant directly infringed by importing articles); *cf. Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445, 1451, 1454 (Fed. Cir. 1997) (purchaser's use protected under doctrine of implied license).

In *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336 (1961), the Court held that replacement of an unpatented component (cloth) of a patented combination (a convertible top) was permissible repair and therefore not infringement. *See id.* at 345-46. Defendants assert (at 33 n.3) that, under HPL's view, the car owner could not have hired a mechanic to repair the roof, but that is not HPL's position. Lawful repair does not become unlawful reconstruction simply because it is carried out by a third party.

available for delivery to handsets. The handset claims, by contrast, teach improvements in technology for mobile devices. HPL Br. 5-13.

The PTO recognized that content claims and handset claims are independent and distinct inventions, issuing at least 17 restriction requirements, many of them addressing specifically differences between the content and handset claims. *Id.* at 14, 41. Similarly, in the reexaminations filed by Defendants against HPL's patents, the PTO again confirmed that the novelty in the inventions defined by content claims was grounded in the claimed operations of the content providers – not the handsets. *Id.* at 39-40.

Defendants nonetheless argue that the existence of separate patents is irrelevant because HPL supposedly granted handset manufacturers licenses to all its patents. Leaving aside the inaccuracy of that premise, *but see infra* Part III.B, it misses the point: exhaustion applies to "the thing," *Bowman v. Monsanto Co.*, 133 S. Ct. 1761, 1766 (2013); use of "the thing" (a handset) does not infringe the content claims. The scope of the license granted to handset manufacturers is irrelevant to that analysis.

## B. Exhaustion Does Not Excuse Direct Infringement That Enhances the Utility of a Purchased Article

Defendants argue (at 23) that "the licensed handsets are at the center of the two-way communication system." But Defendants mischaracterize the claims they

9

are accused of infringing.  Handsets are not an element of, let alone the "center of," HPL's content claims.  *See supra* pp. 4-6 & note 2.

Defendants also assert (at 23) that HPL, "[h]aving obtained a royalty for the two-way communications involving those handsets, . . . cannot now obtain a second royalty for the same communications."  But exhaustion doctrine does not prevent HPL from obtaining compensation from content providers that do not themselves purchase, possess, or use handsets in practicing the content claims, but that instead practice HPL's content claims using separate systems and methods.

Defendants maintain that enforcement of the content patents would have the effect of preventing " 'the use of the [handsets] for their contemplated function.' " Defs.' Br. 24 (quoting *Lifescan*, 734 F.3d at 1373) (alteration in Defs.' Br.).  HPL has not, however, exercised any right under the patent laws to exclude any handset owner from using a handset in any way she chooses.  Rather, HPL seeks to enforce its right to exclude content providers from using different systems and methods for managing their content that infringe HPL's distinct content claims.

Defendants suggest (at 27) that this will render licensed handsets less useful, because "no one" will be able to provide content to handset owners.[4]  But

_____

[4] Defendants' premise is faulty:  the handset licenses permit handset owners to practice HPL's distinct handset inventions (e.g., "airplane mode"); handset owners do not infringe HPL's content claims; and handset users can receive content either in ways that do not infringe HPL's content claims or from licensed content providers.  HPL Br. 10-13, 43.

exhaustion does not prevent patentees from enforcing separate patent rights, even if that may make a different purchased article less useful. In *Aiken*, the court rejected the defendant's argument that its purchase of a patented knitting machine entitled it to manufacture additional patented needles necessary to use the machine. *See* 1 F. Cas. at 246-47.[5] Even though the knitting machine was worthless without the needles, exhaustion did not foreclose enforcement of the needle patent by the seller of the knitting machine. *See id.*; *cf. American Cotton-Tie Co. v. Simmons*, 106 U.S. 89, 93-94 (1882) (purchase of patented buckle did not authorize remanufacture of patented combination cotton bale tie, although buckle was otherwise useless).[6] The case for exhaustion is even weaker here; Defendants neither own nor operate handsets, and exhaustion does not immunize their separate infringement of HPL's content claims, regardless of the effect on the amount of licensed content available to their subscribers' handsets.

---

[5] *Aiken* was discussed with approval by the full Supreme Court in *Morgan Envelope*, 152 U.S. at 435, and this Court relied on the relevant analysis in *LifeScan*, 734 F.3d at 1371-72.

[6] The Supreme Court's more recent exhaustion precedents similarly have recognized that the purchase of an article used in practicing one patent does not entitle even the purchaser to violate other patent rights. *See Quanta*, 553 U.S. at 634 ("The sale of a device that practices patent A does not, by virtue of practicing patent A, exhaust patent B."); *see also United States v. Univis Lens Co.*, 316 U.S. 241, 248 (1942) ("We therefore put to one side questions which might arise if the finisher of a particular lens blank utilized the invention of some patent other than the patent which was practiced in part by the manufacture of the blank.").

Defendants assert (at 38) that *Aiken* is irrelevant because they "do not sell *any* components of a handset, much less ones covered by a separate HPL patent," but that misses the point. The authorized sale of an article (knitting machines in *Aiken* and handsets here) does not prevent a patent holder from asserting rights in separate inventions (the needle patent in *Aiken* and the content claims here), even when doing so reduces the usefulness of the article sold. *Cf. Stukenborg v. United States*, 372 F.2d 498, 504 (Ct. Cl. 1967) (per curiam) ("The mere fact that a person has an implied license to use a device that is covered by one set of claims does not give the person an implied license to use the device in combination with other devices in which the combination is covered by another set of claims."). HPL does not seek "double recovery" (Defs.' Br. 19, 28, 35, 39); it seeks a single recovery for each of its separately patented inventions.[7]

---

[7] Defendants' answering-machine hypothetical (at 25-26) assumes that the only invention is in the machine and that there is nothing inventive in the operations of the caller apart from the functioning of the machine – unlike the content claims at issue here. By contrast, if the PTO determined that a method for *leaving* messages (e.g., one assisting hearing-impaired callers to detect the machine and leave a message) was distinct and separately patentable – because it involved performance of novel steps – the sale of an answering machine to another would not exhaust that separately claimed method.

Defendants' counter (at 26-27) to HPL's hypothetical gasoline pumping system is equally unavailing. First, it depends on Defendants' mischaracterization of HPL's inventions, which are not (as Defendants posit) two sides of the same coin. Moreover, if a patentee had claims solely on a gasoline pumping system, a license to the car manufacturer would not protect the driver using the infringing system. And if the patentee had patents both on systems for pumping gasoline and

### C. Expanding Exhaustion Would Not Serve Any Legitimate Policy and Would Create Damaging Uncertainty

No purpose of the exhaustion doctrine would be served by applying it here. Exhaustion protects the purchaser's right to use an article sold with the patent holder's authorization. HPL Br. 44-45. Here, the content providers do not purchase the handsets or use them in performing their directly infringing activities. *Id.* at 26-28. And the users of the articles are not alleged to infringe the content claims. Contrary to Defendants' assertion (at 24), HPL is not "invoking patent law" to impose any restriction on the use of licensed handsets. *Keurig*, 732 F.3d at 1374.

Furthermore, affirming the district court would radically expand exhaustion doctrine, creating damaging uncertainty. It is common for a single firm to own rights to many patents, covering a variety of inventions. It is also routine for an article to be part of the environment in which a distinct invention is practiced. HPL Br. 9 & n.4. If that were enough to support a potential exhaustion defense, a sale by the patentee or a licensee of one article would cast doubt on the enforceability of distinct patents. That is why patent exhaustion has always been limited to those patent rights that are exercised in the sale of the article in

---

on distinct systems within automobiles that would be beneficial only when receiving gasoline pumped by patented pumping systems, both the car manufacturer and the pumping system manufacturer would need licenses to avoid infringement. That is the lesson of *Aiken* and its progeny: separate patents on distinct inventions may be separately enforced, and that is the situation here.

question.[8]  When, as in this case, the article is not used to practice the patents-in-

suit, exhaustion is categorically inapplicable.

## II.  ALTERNATIVELY, EXHAUSTION DOES NOT APPLY BECAUSE HANDSETS DO NOT SUBSTANTIALLY EMBODY THE ASSERTED PATENT CLAIMS

Even if exhaustion were potentially applicable, the defense would fail

because Defendants cannot show that the handset substantially embodies the

distinct content claims.  HPL Br. 36-44.

### A.    Exhaustion Requires Defendants To Show That Handsets Substantially Embody the Content Claims

Contrary to Defendants' argument (at 52-55), *if* exhaustion were potentially

applicable here, *Quanta*'s substantial-embodiment analysis would apply.  That

analysis addresses cases involving the sale of articles that, although not containing

all the elements of a patent claim, are used in practicing the invention defined by

that claim.  *See Quanta*, 553 U.S. at 628; *Univis*, 316 U.S. at 249.  Any contention

that subscribers' handsets fully embody the asserted content claims would be

contrary to the evidence:  Defendants' infringing conduct involves the use of

distinct content-management systems and methods – the very activities on which

the PTO relied in finding the content claims novel.  HPL Br. 39-40.

---

[8] *See Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 457 (1940) (by selling patented product, patentee "relinquishes its exclusive right to use" that product).

Defendants assert (at 52-55) that exhaustion can apply here regardless of whether handsets substantially embody the asserted patent claims because handsets are "patented."  But an article is "patented" – making the substantial-embodiment analysis unnecessary – only when the article meets each element of the asserted patent claim.[9]  Although handsets may be "patented" in that sense with respect to some of HPL's *handset* claims, they are *not* patented under any of the *content* claims because their use does not infringe those claims.  HPL Br. 5-10, 26-28.

Handsets thus are not "patented" in the sense that the coffee brewers in *Keurig* were patented; the brewers "completely practiced the claimed invention." 732 F.3d at 1372; *see id.* at 1374 (referring to the brewers as "the apparatus that practices" Keurig's "claim[ed] methods").  There accordingly was no need to consider the substantial-embodiment test, which, as framed by the Supreme Court in *Quanta*, applies when the item at issue "does not completely practice the patent."  553 U.S. at 628.  This Court confirmed in *LifeScan* that, where "additional steps [are] needed to complete the invention from the product," *Quanta* supplies "the applicable test."  734 F.3d at 1367-68.

---

[9] *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); Thomas G. Hungar, *Observations Regarding the Supreme Court's Decision in* Quanta Computer, Inc. v. LG Electronics, Inc., 49 IDEA 517, 542 (2009) (equating "patented" in the exhaustion context with "meet[ing] all of the limitations of the patent claim at issue").

## B. Handsets Do Not Substantially Embody HPL's Content Claims

Defendants' alternative contention (at 56-61) that handsets substantially embody HPL's content inventions is contrary to the language of the asserted claims and the record evidence. HPL Br. 36-42.

1. Defendants have not established that the "only reasonable and intended use" of a handset is to practice each of the content claims. *Quanta*, 553 U.S. at 631. Wireless handsets, of course, have a multitude of uses that bear no relation to HPL's content inventions (even accepting for the sake of argument Defendants' mischaracterizations of those inventions as involving some "use" of handsets).[10] Handsets are nothing like the articles at issue in prior substantial-embodiment cases. The blood-glucose meters in *LifeScan*, the coffee brewers in *Keurig*, the computer chips in *Quanta*, and the lens blanks in *Univis* all were specifically intended *only* for use in practicing the patent claims asserted in those cases. *See Quanta*, 553 U.S. at 632 ("LGE has suggested no reasonable use for the Intel Products other than incorporating them into computer systems that practice the LGE Patents."); *Univis*, 316 U.S. at 249 (the lens blanks were "capable of use only in practicing the patent"); *LifeScan*, 734 F.3d at 1369 ("[T]here is no

---

[10] Defendants' assertion (at 56) that HPL "waived" this argument by "failing to actually name [and] explain" the non-infringing uses of handsets is incorrect. HPL explained that, far from being the "only" reasonable and intended use of handsets, practicing HPL's content claims is not an intended use of handsets at all. HPL Br. 37 & n.21.

suggestion that the users can put LifeScan's meters to noninfringing uses.");

*Keurig*, 732 F.3d at 1372 (the brewers "completely practice[ ]" the claimed

invention).

Defendants argue (at 56) that "[t]he relevant feature" of the handsets lacks

any reasonable and intended use other than to practice the content claims. But

there is *no* feature of handsets that is intended for use in practicing the content

claims – that is, in storing, identifying, managing, and notifying subscribers about

Defendants' content.[11]

Defendants seek to confuse the issue by asserting (at 56-57) that "[t]he non-

infringing alternatives HPL identified . . . would be infringing under HPL's

infringement theory" because Defendants "would infringe even if they did not both

store the message and send it, but rather caused some other entity or server to

perform some steps of the claim." What HPL in fact argued is that there are ways

in which content can be transmitted to and viewed on a handset without the content

provider infringing HPL's content claims. A2253-55; HPL Br. 43; *see supra*

note 4.[12] Even if every receipt of content by a handset user required a content

---

[11] HPL Br. 5-10, 26-28; *supra* note 2; A2238 (¶ 18(c)), A2240-41 (¶ 19(b),
(d)), A2244-45 (¶ 20(b), (d)), A2248-49 (¶ 21(b), (d)), A2251-52 (¶ 22(b), (d)),
A2253 (¶ 23), A2259-60 (¶ 34).

[12] Defendants are correct (at 57) that they are liable for infringement even
when they direct or employ others to perform some of the steps of HPL's content
claims. But, in HPL's examples of non-infringing alternatives, multiple

provider to infringe the content claims, however, exhaustion still would not apply because Defendants have not shown that handsets are used to infringe the content claims. HPL Br. 26-28.

Defendants assert (at 57) that "HPL's alternatives are for the handset owners, not for [Defendants]," but the fact that Defendants do not use handsets to infringe the content claims is one of the reasons why their exhaustion defense fails. It is not a reason to expand that defense to immunize Defendants – which neither own nor use handsets to practice the patented inventions – from liability for directly infringing HPL's content claims.[13]

**2.** Defendants also have not demonstrated that handsets embody "[t]he essential, or inventive, feature[s]" of HPL's content inventions. *Quanta*, 553 U.S. at 632. Defendants repeatedly argue that the "key" to all of HPL's inventions "is the handset and its ability to receive the message and enable a request for the additional information." Defs.' Br. 4; *see id.* at 33 ("The handset functionality involving links is HPL's invention."), 58 ("the handsets are the central element of

---

independent actors perform different steps of the methods. A2253-55; *see Limelight*, 134 S. Ct. at 2117; *Muniauction*, 532 F.3d at 1329-30.

[13] Defendants assert (at 57) that they have no "use for handsets in other people's hands except to send content to them." But Defendants do not "use . . . handsets in other people's hands" when they "send content to" those handsets anymore than NBC "uses" a viewer's television set when it broadcasts the nightly news. Moreover, HPL identified non-infringing ways for content providers to provide content.

each claim"). But that assertion mischaracterizes both the inventions at issue and the operation of the handsets. HPL's content claims define methods and systems for managing content – activities that not only are different from those that handset users perform to request and receive content on their devices but also were found by the PTO to be the basis for patentability of the content claims. HPL Br. 5-10, 26-28. For example, one of HPL's content claims defines a patented method involving storing content, notifying subscribers of the content without transmitting the content itself, and limiting the time that the content is available. A294-95 ('450 patent, claim 1); HPL Br. 5-7. Another claim teaches content providers to notify users of the availability of content (for example, a weather forecast) and then to update that content (a new forecast) without sending new notifications to the user. A176, A178-79 ('757 patent, claim 1); HPL Br. 7-9. Neither of those claimed inventions (or any of HPL's other claimed content inventions) involves the functionalities of handsets. HPL Br. 39-40 (citing PTO statements confirming this point).

None of the sources on which Defendants rely supports their claim that any functionality of handsets constitutes any part of, let alone the "key" to, HPL's claimed content inventions. In the PTO filing that Defendants cite (at 5, 30, 33, 59), HPL explained that the claims in the '241 patent were not obvious in light of a particular prior-art reference because that reference did "not teach or suggest a

selective call signal that includes an information identifier and an acknowledgment request." A1982. An "information identifier" and "acknowledgment request" are two aspects of the "selective call signal" transmitted by the content provider's system, not the handset. *See* A74-76 ('241 patent, claims 1, 41, 71). Thus, HPL's content inventions improved the services furnished by content providers, not the features of handsets.

Defendants' reliance on HPL's infringement contentions is equally unfounded. *See* Defs.' Br. 12-13, 29-30 (citing A2626-27; A2697; A2038). Those contentions show that Defendants infringe certain elements of the asserted claims because: they create or cause the creation of content notifications for transmission to cellular phones, A2625-27; they operate notification systems configured to send content notifications to cellular phones, A2697; and they receive request messages transmitted from wireless communications devices, A2038. None of those infringement contentions suggests that any handset functionality is a part of the claimed content inventions, as HPL's unrebutted expert testimony confirmed (A2239, A2243, A2246, A2250, A2252-53).

The most Defendants could accurately say is that, for a content provider to complete performance of most (but not all) of the content claims, the content provider must receive a request for the content. But the content provider receiving a request does not make the handset an element of the claims, *supra* Part I.A.1, let

alone "[t]he essential, or inventive, feature" of the claims. *Quanta*, 553 U.S. at

632.

**C.    Although the Court Need Not Reach the Issue, Exhaustion Should Be Analyzed Claim-by-Claim in Appropriate Cases**

For the reasons explained in Part I, exhaustion is categorically inapplicable

here; therefore, to decide this appeal, the Court need not resolve whether the

substantial-embodiment analysis should be conducted claim-by-claim.  HPL Br.

46-47.

Even so, Defendants make no effort to reconcile their contention that

"exhaustion is not claim-specific," Defs.' Br. 57, with the principle that "each

claim [in a patent] must be considered as defining a separate invention," *Jones v.

Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984); *see* HPL Br. 48.  They seek support

from *Keurig* and *Quanta*, Defs.' Br. 44-45, 57, but neither of those cases involved

a purchased article that substantially embodied some but not all asserted claims in

a single patent.  When this Court confronts that issue, it should hold that

substantial embodiment must be analyzed on a claim-by-claim basis "the same way

[this Court] conduct[s] almost every analysis related to patent law." *Keurig*, 732

F.3d at 1375 (O'Malley, J., concurring in the result); *see* HPL Br. 47-50.

In addition, this issue is beside the point as to five of the seven patents-in-suit, because they contain only content claims.  HPL Br. 10, 46 (citing expert evidence).[14]

## III.  HPL'S LICENSES REINFORCE THE INAPPLICABILITY OF EXHAUSTION

**A.**      HPL's handset licenses are relevant because they contain provisions reflecting the recognition of both sophisticated parties to the licensing transaction that handsets do not embody, and handset users do not infringe, HPL's content claims.  HPL Br. 54.

Defendants' lengthy discussion (at 8-11, 21-23, 39-52) of the handset licenses provides no support for their exhaustion defense because a sale authorized by the patent holder is only one requirement for exhaustion.  Even when there has been an authorized sale of an article, exhaustion does not apply unless the patent

---

[14] Defendants suggest (at 9, 47) that HPL told the PTO that the '241 patent was a handset patent, rather than a content patent.  In fact, HPL relied on its commercially successful licensing program in both the handset and the content fields as evidence of the non-obviousness of its patent portfolio, and it stated that "the '241 patent has been a material part of Helferich's content licensing program." A2005.

Nor did HPL waive the point that five of the patents-in-suit are content-only. Defs.' Br. 46.  HPL argued that point below in its opposition brief, A2059 n.3, and in its statement of facts, A2090 (¶ 46), and it provided supporting evidence, A2255 (¶ 25).  Defendants responded to the point.  A2795.  Moreover, the point is not a "new issue" raised initially on appeal; rather, it is an "additional argument[ ]" supporting HPL's position that exhaustion does not apply.  *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1370-71 (Fed. Cir. 2002) (no waiver in such circumstances).

holder's claim rests on the direct infringer's own use of that article and (when that prerequisite is satisfied, which it is not here) that the article substantially embodies the relevant invention.  That is why, in *Quanta*, the Supreme Court separately addressed substantial embodiment (in Part III.B of the Court's opinion) and the existence of an authorized sale (in Part III.C).  *See* 553 U.S. at 630-37.  Because the prerequisites for exhaustion are not present here, *see supra* Parts I and II, the doctrine does not apply, regardless of what the handset licenses say.

**B.**     Moreover, Defendants' discussion of HPL's handset licenses is legally and factually inaccurate.

**1.**     HPL does not argue that "contractual restrictions on *use* of a licensed article" defeat exhaustion.  Defs.' Br. 39 (emphasis added; capitalization and boldface omitted).  Restrictions on a licensee's authority to *manufacture and sell* a particular product do, however, prevent exhaustion.  *See Quanta*, 553 U.S. at 636; *General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 127 (1938); *see also* Defs.' Br. 41 ("what matters for exhaustion is the licensed sale").[15]

---

[15] HPL's license restrictions do not "attempt[] to . . . divide a single item" – that is, a handset – "into licensed and unlicensed uses."  Defs.' Br. 43; *see also id.* at 41 ("[D]ifferent claims that rely on the exact same use are not separate fields of use.").  Handsets are not an element of the content claims.

In addition, contrary to Defendants' suggestion (at 42), although "an *unconditional* covenant not to sue" is equivalent to an unconditional license for exhaustion purposes, *TransCore*, 563 F.3d at 1274 (emphasis added), restrictions on a covenant not to sue (as in HPL's handset agreements) are no less enforceable

Defendants argue (at 44-50) that, for exhaustion purposes, licensing one claim in a patent is the same as licensing the entire patent, but neither *General Talking Pictures* nor *Quanta* recognizes any such limitation on the validity of field-of-use restrictions. *Quanta*'s explanation why exhaustion applies to method claims does not support Defendants because the Court premised that discussion on the understanding that Intel was "authorized to sell a completed computer system that practices the LGE Patents." 553 U.S. at 630. The Supreme Court did not address a case in which the patentee denied the licensed manufacturer authority to practice certain patent claims. And no license restriction was considered in *Keurig*, because the products in question were manufactured and sold by the patent holder, not a licensee. *See* 732 F.3d at 1371.

Apart from their erroneous reliance on precedent, Defendants offer no reason why patent holders cannot impose field-of-use restrictions on a claim-by-claim basis. Prohibiting such license restrictions would be particularly anomalous in light of the rule (which Defendants do not dispute) that each patent claim defines a separate invention. *See supra* p. 21.

Nor did the Supreme Court "h[o]ld" in *Quanta* or *Ethyl Gasoline* that license restrictions cannot apply to "related patents." Defs.' Br. 50. In *Quanta*, LGE had

---

than restrictions on a license, *see id.* at 1276-77 (explaining that the "settlement agreement does not include a restriction on sales" and that, "[a]s a result," the sales were authorized and exhaustion applied).

imposed no restrictions on Intel's authority to make or sell products embodying any of its patents. *See* 553 U.S. at 637. In *Ethyl Gasoline*, the Court recognized the right of patent holders to impose license restrictions, but held that no such restrictions had been imposed.[16]

2. As a factual matter, HPL did not, as Defendants suggest, grant handset manufacturers unconditional licenses to its entire patent portfolio. Defendants rely on the definition of the term "Licensed Patents and Applications." *See* Defs.' Br. 9, 21, 46. But every operative grant provision of the handset licenses – the license grant, the release, and the covenant not to sue – is expressly limited to the "Licensed Field[ ]" of "Mobile Wireless Communication Devices," A2123, A2124-25 (¶¶ 2(a), 3(a), 3(b)(1)), and subject to other restrictions discussed in HPL's opening brief (at 15-16, 50-51). Although Defendants acknowledge those restrictions, Defs.' Br. 10, 47, they fail to reconcile them with their position that the handset licenses are unconditional.[17]

---

[16] *See Ethyl Gasoline*, 309 U.S. at 456 (a patent holder generally "may grant licenses to make, use or vend, restricted in point of space or time, or with any other restriction upon the exercise of the granted privilege"); *id.* at 457 ("The picture here revealed is not that of a patentee exercising its right to refuse to sell or to permit his licensee to sell the patented products . . . .").

[17] A few handset companies that both manufacture wireless devices and provide content to those devices bargained for licenses authorizing them both to make handsets embodying HPL's handset claims and to practice HPL's content claims. HPL Br. 15 n.8, 43 n.26. In those dual-field licenses, there are two licensed fields – mobile wireless devices and "Mobile Wireless Content and

Defendants also ignore the express language confirming that the handset licensees are not authorized to practice claims that "expressly recite material additional operations that are carried out (or material additional structure that is added) by Third Parties, including . . . Content Provider[s] . . . and/or are not substantially embodied in the products, services or methods within the scope of the Licensed Fields." A2102 (¶ 5) (emphasis omitted). That language is not "opaque," as Defendants contend. It clearly expresses the agreement of both sophisticated parties to the licensing transaction that the manufacturer has "no license" as to claims that "'are not substantially embodied in the products, services or methods within the scope of the Licensed Fields.'" Defs.' Br. 47-48 (quoting A2102).[18] Because handsets do not substantially embody HPL's content claims, the handset licenses grant no license, covenant, or release under the content claims.

**C.** In any event, Defendants have not and cannot claim that exhaustion applies as to handsets sold with no license from HPL. HPL Br. 15 n.8, 55; *see Quanta*, 553 U.S. at 636 ("Exhaustion is triggered only by a sale authorized by the

---

Message Provision carried out by or for Licensee" – and corresponding grant restrictions. A2106 (¶ 10). Defendants' citations to those dual-field licenses, *see* Defs.' Br. 9, 21, 46 (citing A2816, which in turn cites a dual-field license at A1096, A1098), provide no support for their arguments about the scope of HPL's handset licenses.

[18] The handset licenses also reaffirm that handset owners may use their devices to practice the handset inventions without fear of liability for infringing HPL's handset claims. A2100-01 (§§ 2.b, 3.b(iii)).

patent holder."). Defendants repeatedly assert that HPL "conceded" in a submission to the PTO that it "authorized the sale of every handset in the United States." Defs.' Br. 21; *see id.* at 1, 3-4, 8-9, 21-23 (citing A1031; A2004-05). But what HPL in fact told the PTO was that, between 2007 and 2011, every then-existing manufacturer of cellular handsets acquired a license from HPL. A2004-05; *see also* NYT Dkt. No. 164-3, at 3 ("*nearly* the entire handset industry") (emphasis added), *cited in* A1031; NYT Dkt. No. 179, at 5 ("every *major* manufacturer of handsets") (emphasis added), *cited in* A1031. That says nothing about the unlicensed manufacturers that have entered the handset market since 2011 or that will enter that market before the last of the patents-in-suit expires (in 2021).

HPL did not waive this argument. Defs.' Br. 22. HPL expressly "[d]enied" Defendants' factual assertion that it had licensed every patent-in-suit to the entire handset industry, A2075-76, and it sought clarification in response to the district court's unexpected statement in its summary judgment order that "HPL's patents are exhausted," A14; *see Property & Cas. Ins. Ltd. v. Central Nat'l Ins. Co. of Omaha*, 936 F.2d 319, 323 n.7 (7th Cir. 1991) (no waiver where district court raised issue *sua sponte*). HPL also presented the argument in the text of its opening appellate brief (at 55), not "only in a footnote," as Defendants assert.

# CONCLUSION

The district court's judgments should be reversed.

Respectfully submitted,

/s/ *Aaron M. Panner*

| | |
|---|---|
| Victoria Curtin | Aaron M. Panner |
| VICTORIA GRUVER CURTIN, P.L.C. | Brendan J. Crimmins |
| 14555 N. Scottsdale Road, Suite 160 | Michael E. Joffre |
| Scottsdale, Arizona 85254 | KELLOGG, HUBER, HANSEN, TODD, |
| (480) 998-3547 | EVANS & FIGEL, P.L.L.C. |
| | 1615 M Street, N.W., Suite 400 |
| Steven G. Lisa | Washington, D.C. 20036 |
| Jon E. Kappes | (202) 326-7900 |
| LAW OFFICES OF STEVEN G. LISA, LTD. | |
| 55 West Monroe Street, Suite 3210 | Gerald D. Hosier |
| Chicago, Illinois 60603 | LAW OFFICES OF GERALD D. HOSIER, |
| (312) 752-4357 | LTD. |
| | PO Box 12354 |
| | Aspen, Colorado 81612 |
| | (970) 920-3475 |

*Counsel for Plaintiff-Appellant Helferich Patent Licensing, LLC*

July 24, 2014

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

Jul 24, 2014

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| | |
|---|---|
| Aaron M. Panner | /s/ Aaron M. Panner |
| Name of Counsel | Signature of Counsel |

Law Firm   Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.

Address   1615 M Street, N.W., Suite 400

City, State, ZIP   Washington, D.C.

Telephone Number   (202) 326-7900

FAX Number   (202) 326-7999

E-mail Address   apanner@khhte.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

## CERIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this brief contains 6,884 words. This certificate was prepared in reliance on the word count of the word-processing system (Word 2007) used to prepare this brief.

The undersigned further certifies that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Word 2007 in 14-point Times New Roman font.

July 24, 2014

/s/ *Aaron M. Panner*

Aaron M. Panner
*Counsel for Plaintiff-Appellant*
*Helferich Patent Licensing, LLC*